**BURSOR & FISHER, P.A.**
L. Timothy Fisher (SBN 191626)
Yeremey O. Krivoshey (SBN 295032)
Blair E. Reed (SBN 316791)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail:  ltfisher@bursor.com
          breed@bursor.com
          ykrivoshey@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (SBN 276006)
2665 S. Bayshore Dr., Suite 220
Miami, FL 33133
Telephone: (305) 330-5512
Facsimile:  (305) 676-9006
E-Mail:  scott@bursor.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IGNACIO PEREZ, | Case No.  4:19-cv-07288-YGR |
| Plaintiff, | |
| v. | **AMENDED COMPLAINT** |
| INDIAN HARBOR INSURANCE COMPANY, and DOES 1 through 50, inclusive, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## NATURE OF THE ACTION

1.     This is a breach of contract case against an insurance company for bad faith failure to settle a class action lawsuit within policy limits and refusal to negotiate settlement, which led to a class action judgment being entered against the insured.  The insurance company rejected multiple settlement offers ranging from $60,000 to $825,000, walked out of a mediation without making a settlement offer, and refused to negotiate for more than two years.  Thereafter the Plaintiff prevailed at trial, winning a $267 million class action judgment against the insured, KBR, Inc. d/b/a Rash Curtis & Associates (hereafter, "Rash Curtis" or "RCA"), a small family business.  After judgment was entered, and on the eve of its anticipated bankruptcy filing, Rash Curtis executed an Assignment Of Cause Of Action In Exchange For Covenant Not To Execute (hereafter, the "Assignment").

2.     A true and correct copy of the Assignment is attached hereto as Exhibit 1, which includes Exhibits A through O attached to the original Assignment.  The facts recited in the Assignment, and all statements in the Assignment, including the Exhibits thereto, are incorporated herein by reference as though fully set forth herein.

3.     The underlying lawsuit is *Perez, et al. v. Rash Curtis & Associates*, United States District Court, Northern District of California, Case No. 4:16-cv-03396-YGR (hereafter, the "Underlying Lawsuit").  The court in the Underlying Lawsuit approved the Assignment pursuant to Fed. R. Civ. P. 23(d)(1)(C), subject to two conditions:

    (1)    Plaintiff, through Class Counsel, shall promptly notify the Court of the recovery, if any, obtained on behalf of Class Members as a result of the Assignment; and

    (2)    Any recovery obtained as a result of the Assignment shall be held in trust until this Court approves a fair, reasonable and adequate method for distributing the proceeds of the recovery to Class Members.

A true and correct copy of the court's order approving the Assignment is attached hereto as Exhibit 2.

4.      At the time of the incidents which were the subject of the Underlying Lawsuit, Rash Curtis was insured under an errors and omissions liability insurance policy No. MPP9032852 (hereafter, the "Insurance Policy") issued by Indian Harbor Insurance Company, with coverage limited to $3,000,000, with a purported $1,000,000 "sub-limit" for claims arising out of alleged violation of the TCPA.  *See* Assignment ¶ 3 and Exh. C.

**PARTIES**

5.      Plaintiff Ignacio Perez is, and at all times mentioned herein was, a resident of Sacramento, California and a citizen of the State of California.  Plaintiff is the Court-appointed class representative of the certified classes in the Underlying Lawsuit.  *See* Assignment ¶ 19 and Exh. L.  Plaintiff is also the Assignee of Rash Curtis's rights under the Insurance Policy.  *See* Assignment ¶ 40.

6.      Defendant Indian Harbor Insurance Company ("Indian Harbor") is a Delaware corporation, headquartered in Stamford, Connecticut.  At all relevant times, Indian Harbor was engaged in the business of offering insurance nationwide (including in California and this District) and was part of a group of companies owned and overseen by XL Group Ltd.

7.      Plaintiff is unaware of the true names and capacities, whether corporate, associate, or otherwise, of the Defendants sued herein as DOES 1 to 50, inclusive, and therefore sues said defendants by such fictitious names.  Plaintiff will seek leave to amend this complaint to allege their true names and capacities when the same have been fully and finally ascertained.  Plaintiff is informed and believes and thereon alleges that each of the defendants designated as a Doe, by reason of their standing and relationship to the remaining defendants, possesses an interest in the subject matter insurance contract, and by reason of their conduct, aided, assisted, and conspired to prevent the payment of insurance benefits and thereby caused the injuries and damages complained of.

8.      Plaintiff is informed and believes and thereon alleges that Defendants, and each of them, are or were the agents, servants and employees of each of their co-defendants, and at all

times herein mentioned, were acting in the course and scope of said agency and employment, with the full knowledge, consent, permission and ratification of each of their co-defendants.

## JURISDICTION AND VENUE

9.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because Plaintiff and Defendants are citizens of different States, and the amount in controversy exceeds $75,000.

10.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendants transact significant business within this District and a substantial part of the events giving rise to Plaintiff's claims took place within this District.

## COUNT 1
## Breach Of Contract

11.     Plaintiff incorporates by reference the foregoing paragraphs of this Complaint and of the Assignment as if fully stated herein.

12.     Implied within the Insurance Policy was a provision of good faith and fair dealing, which required that neither party do anything that would injure the rights of any other party to receive the benefits for which the Insurance Policy was contracted.

13.     By virtue of Defendants' conduct as alleged herein, Defendants breached provisions of the Insurance Policy, including but not limited to the implied covenant of good faith and fair dealing.  Defendants breached by rejecting at least four offers to settle the Underlying Lawsuit for amounts ranging from $60,000 to $825,000, *see* Assignment ¶¶ 7-18, by walking out of a mediation without making a settlement offer, *see* Assignment ¶¶ 14-18, and by refusing to negotiate from January 31, 2017 through May 13, 2019, when the jury's verdict was entered in the Underlying Lawsuit, *see* Assignment ¶ 30.

14.     By rejecting these settlement offers and refusing to negotiate, Defendants failed to take into account and give at least as much consideration to the interest of Rash Curtis, the insured, as they gave to their own interests.  During all of the relevant times herein, there was a great risk of recovery beyond the policy limits and the reasonable manner of disposing of the Lawsuit was to

accept each of Plaintiffs' settlement offers when they were made, and/or to participate in settlement negotiations in good faith rather than refusing to negotiate.

15.     Plaintiff is informed, believes and thereon alleges that the insured, Rash Curtis, had performed all the terms and conditions of the policy to be performed.

16.     As a proximate result of the aforementioned unreasonable and bad faith conduct of Defendants, Rash Curtis was entitled to bring an action for breach of contract for its own benefit, to recover the entire amount of the judgment assessed against Rash Curtis of $267,349,000, plus post-judgment interest at a rate of 2.36% per annum, plus attorney's fees.  Plaintiff sues in Rash Curtis's stead as its assignee, seeking those contractual damages from Defendants' unreasonable and bad faith refusal to negotiate settlement.

## PRAYER FOR RELIEF

17.     WHEREFORE, Plaintiff prays for judgment against Defendants:

a.   For compensatory damages in an amount according to proof at trial, in an amount not less than $267,349,000 plus interest at a rate of 2.36% per annum from September 9, 2019 through the date of payment;

b.   For attorney's fees and expenses;

c.   For costs of suit incurred; and

d.   For such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

18.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated:  May 18, 2020                       Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:   */s/ Scott A. Bursor*
            Scott A. Bursor

Scott A. Bursor (SBN 276006)
2665 S. Bayshore Dr., Suite 220
Miami, FL 33133
Telephone: (305) 330-5512

Facsimile:  (305) 676-9006
E-Mail:  scott@bursor.com

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (SBN 191626)
Yeremey O. Krivoshey (SBN 295032)
Blair E. Reed (SBN 316791)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail:  ltfisher@bursor.com
           ykrivoshey@bursor.com
           breed@bursor.com

*Attorneys for Plaintiff*

**EXHIBIT 1**

## ASSIGNMENT OF CAUSE OF ACTION IN EXCHANGE FOR
## <u>COVENANT NOT TO EXECUTE</u>

This is an agreement between:

> IGNATIO PEREZ (hereafter, "Perez"), on behalf of himself and the certified classes as defined in the Final Judgment entered in *Perez, et al. v. Rash Curtis & Associates*, United States District Court, Northern District of California, Case No. 4:16-cv-03396-YGR (hereafter, the "Lawsuit"), and

> KBR, Inc., d/b/a RASH CURTIS & ASSOCIATES (hereafter, "Rash Curtis")

### <u>Recitals</u>

1.      On May 13, 2019, the jury in the Lawsuit returned a verdict finding that Rash Curtis had made 534,698 phone calls to Class members in violation of the Telephone Consumer Protection Act ("TCPA").  The TCPA provides for minimum statutory damages of $500 per violation.  A true and correct copy of the verdict form is attached hereto as **Exhibit A**.

2.      On September 9, 2019, the court entered Final Judgment in the Lawsuit against Rash Curtis awarding Perez and Class members $267,349,000, the minimum statutory damages award on the jury's verdict.  A true and correct copy of the Final Judgment is attached hereto as **Exhibit B**.

3.      At the time of the incidents which are the subject of the Lawsuit, Rash Curtis was insured under an errors and omissions liability insurance policy No. MPP9032852 (hereafter, the "Insurance Policy") issued by XL America, Inc., aka XL Catlin Inc., aka Indian Harbor Insurance Company, with coverage limited to $3,000,000, with a purported $1,000,000 "sub-limit" for claims arising out of alleged violation of the TCPA.  A true and correct copy of the Insurance Policy is attached hereto as **Exhibit C**.

4.      The Insurance Policy gave the insurer, XL America, Inc., aka XL Catlin Inc., aka Indian Harbor Insurance Company (hereafter, "XL") the right and duty to defend all covered claims brought in the United States, and the right to select defense counsel.  However, Rash Curtis had been utilizing the legal services of attorney Mark Ellis of the Ellis Law Group ("ELG"), and inquired by and through their insurance broker whether Mr. Ellis and ELG could remain their counsel. Pursuant to the request, XL provided an endorsement (Endorsement #008, Part D) to the Insurance Policy which permitted Rash Curtis to retain Mark Ellis and ELG as defense counsel "subject to compliance by the Insured and the Insured's selected defense counsel with the Company's [XL's] reasonable guidelines." A true and correct copy of Endorsement #008 is attached hereto as **Exhibit D**.

5.      XL required defense counsel to comply with XL Catlin's "Insurance Claims Litigation Management: Guidelines for Defense Counsel" (hereafter, the "XL Guidelines").  The XL Guidelines required that XL retain full control of any settlement negotiations.  In a section titled "Settlement & Resolution," the XL Guidelines state:

1

Settlement authority can only come from XL Catlin and settlement negotiations should always be directed by the XL Catlin claim professional.  Accordingly, it is mandatory that XL Catlin is kept fully apprised of all negotiations or opportunities to engage in resolution activities.

XL Catlin should be informed immediately in writing of any settlement offer or overtures regardless of whether settlement authority is requested.  Likewise, any settlements involving other parties (e.g. co-defendants) should be immediately reported to the claim professional.

A true and correct copy of the XL Guidelines is attached hereto as **Exhibit E**.

6.      Endorsement #008 to the Insurance Policy also includes what is commonly referred to as a "hammer clause" by which XL could pressure Rash Curtis to consent to a settlement by limiting the amount of proceeds paid by XL toward settlement or defense costs if Rash Curtis refused to accept a reasonable settlement offer.  The language in Section D provides:

The Company will not settle any claim without the Insured's consent.  If, however, the Insured refuses to consent to any settlement recommended by the Company and acceptable to the claiming party, and the opportunity to effectuate that settlement is lost, then the Company's liability for that claim will not exceed the lesser of the lost settlement amount plus fifty percent (50%) of damages and defense expenses incurred by the Insured in excess of the lost settlement amount, or the remaining Limits of Liability.

7.      On December 13, 2016, Perez's counsel made an offer in writing to settle the Lawsuit for $85,000.  The parties hereto believe this offer was fair and reasonable.  The offer was far below the Insurance Policy limits.  Indeed, it was less than 3% of the $3 million policy limit and only 8.5% of the $1 million purported TCPA sub-limit.  Pursuant to the XL Guidelines, which gave XL full control of settlement negotiations, XL, by and through ELG, rejected this offer.  A true and correct copy of this offer and rejection is attached as **Exhibit F**, at 2 ($85,000 offer rejected with $37,500 counteroffer on December 14, 2016).

8.      On December 19, 2016, Perez's counsel made an offer in writing to settle the Lawsuit for $60,000.  The parties hereto believe this offer was fair and reasonable.  The offer was far below the Insurance Policy limits.  Indeed, it was only 2% of the $3 million policy limit and only 6% of the $1 million purported TCPA sub-limit.  Pursuant to the XL Guidelines, which gave XL full control of settlement negotiations, XL, by and through ELG, rejected this offer.  A true and correct copy of this offer and rejection is attached as **Exhibit F**, at 4 ($60,000 offer) and *id.* at 5 (rejected on January 3, 2017 with $55,000 counteroffer).

9.      On January 31, 2017, Perez's counsel made an offer in writing to settle the Lawsuit for $375,000.  The parties hereto believe this offer was fair and reasonable.  The offer was below the Insurance Policy limits.  Indeed, it was only 12.5% of the $3 million policy limit and only 37.5% of the $1 million purported TCPA sub-limit.  Pursuant to the XL Guidelines, which gave XL full control of settlement negotiations, XL, by and through ELG, rejected this offer.  A true and correct copy of this offer and rejection is attached as **Exhibit F**, at 7 (offer), and **Exhibit G**, at 1 (stating the offer is "outrageous and is hereby rejected").

10.     On January 31, 2017, Perez's counsel urged XL to make a counteroffer, stating in writing that the $375,000 figure was "[n]ot meant to be a final offer.  We're happy to consider a counter once you've had a chance to discuss with your client."  *See* Exhibit G, at 2.

11.     On January 31, 2017, ELG acknowledged in writing that Rash Curtis's potential liability could "bankrupt the company."  But XL still refused to make a counteroffer or even to negotiate toward a settlement.  *See* Exhibit G, at 2.

12.     On May 1, 2017, ELG received a transcript of the deposition of Steven Kizer, Rash Curtis's former Director of Compliance, who testified that Rash Curtis used autodialers to call skip-traced phone numbers stored in phone fields 5 through 10.  A true and correct copy of the email transmitting this transcript to ELG is attached as **Exhibit H**.

13.     On May 30, 2017, Perez's counsel filed a motion to certify Skip-Trace Class 1, Skip-Trace Class 2, Non-Debtor Class 1, and Non-Debtor Class 2.  *See* ECF No. 47

14.     On June 21, 2017, the parties agreed to participate in a full day mediation.  ELG had proposed Doug deVries as mediator, and Perez's counsel agreed.  The mediation was scheduled for August 16, 2017.

15.     On July 15, 2017, after the mediation had been scheduled and the date confirmed, ELG wrote an email to Perez's counsel: "the prior settlement of $60,000 which you claimed was not a settlement will never be re-offered." A true and correct copy of this email from Mr. Ellis is attached hereto as **Exhibit I**.  ELG did not provide Rash Curtis with a copy of this email.  Rash Curtis was unaware of this communication and did not authorize it.

16.     On August 14, 2017, the parties exchanged mediation briefs. ████████

17.     On August 16, 2017, the parties attended a mediation with Mr. deVries.  Adam Williams attended the mediation as a representative of XL.  During the mediation, XL made no offer to settle the case. ████████

██████████████████████ Nevertheless, XL rejected this offer and walked out of the mediation without making a counter offer, or any offer to settle the case on any terms.

18.     On August 31, 2017, ████████

████████ XL still did not make a counteroffer or express any interest in settlement.

19.     On September 6, 2017, the Court granted Perez's motion to certify Skip-Trace Class 1, Skip-Trace Class 2, Non-Debtor Class 1, and Non-Debtor Class 2, defined as follows:

> **Skip-Trace Class 1:** All persons who received a call on their cellular telephones within four years of the filing of the complaint until the date that class

notice is disseminated from Rash Curtis' DAKCS VIC dialer and/or Global
Connect dialer whose cellular telephone was obtained by Rash Curtis through
skip tracing.

**Skip-Trace Class 2:** All persons who received a prerecorded message or
robocall on their cellular telephones [or] landline phones within four years of the
filing of the complaint until the date that class notice is disseminated from Rash
Curtis whose telephone number was obtained by Rash Curtis through skip tracing.

**Non-Debtor Class 1:** All persons who received a call on their cellular
telephones within four years of the filing of the complaint until the date that class
notice is disseminated from Rash Curtis' DAKCS VIC dialer and/or Global
Connect dialer whose telephone number was obtained by Rash Curtis through
skip tracing and for whom Rash Curtis never had a debt-collection account in
their name.

**Non-Debtor Class 2:** All persons who received a prerecorded message or
robocall on their cellular telephones [or] landline phones within four years of the
filing of the complaint until the date that class notice is disseminated from Rash
Curtis whose telephone number was obtained by Rash Curtis through skip tracing
and for whom Rash Curtis has never had a debt-collection account in their name.

A true and correct copy of the Court's order granting class certification is attached hereto as
**Exhibit L**.

20.     On September 6, 2017, Perez's counsel sent a copy of the class certification order
to the mediator, Mr. deVries, to encourage further settlement negotiations.  A true and correct
copy of that email is attached hereto as **Exhibit M**.

21.     On September 15, 2017, Mr. deVries wrote to Perez's counsel:  "I reviewed the
orders, have spoken with Mark Ellis and followed up with an email to him to see whether or not
there is any interest on their part in re-engaging in settlement discussion at this time.  I will
advise you as soon as I have a response."  A true and correct copy of that email is attached hereto
as **Exhibit N**, at 3.

22.     At this point, on September 15, 2017, Perez had prevailed on his motion for class
certification and was in possession of strong evidence of TCPA liability that would bankrupt
Rash Curtis.

23.     On September 18, 2017, Mr. deVries wrote to Perez's counsel:  "[h]aving
consulted with Mark Ellis, I am advised that while options may remain open in future no further
settlement negotiations will occur at this time."  A true and correct copy of that email is attached
hereto as **Exhibit N**, at 1-2.

24.     On December 11, 2017, Perez moved for summary judgment on two key issues:
whether Rash Curtis's dialers were "Automatic Telephone Dialing Systems" (ATDSs), and
whether Rash Curtis had consent to call Perez.  That same day ELG filed cross-summary

judgment motions on all claims partially based on the affirmative defense that Perez had given prior express consent.

25.     On February 2, 2018, the Court granted Perez's motion for summary judgment, finding that Rash Curtis's dialers were ATDSs, and that Rash Curtis did not have consent to call Perez.  Further, the Court denied Rash Curtis's motion for summary judgment on the defense of prior express consent as to Perez, and further granted a request by Perez for Rule 37 evidentiary sanctions that excluded purported evidence of Perez's consent from all future hearings and from trial.  A true and correct copy of the Court's summary judgment order is attached hereto as **Exhibit O**.

26.     On February 5, 2018, Perez's counsel sent a copy of the summary judgment order to the mediator, Mr. deVries:  "I wanted to follow up with you about the Rash Curtis class action that we mediated with you last year.  We received Judge Gonzalez Rogers' order on the parties' motions for summary judgment on Friday.  Once again, it was a resounding victory for the plaintiffs.  A copy of the order is attached.  Can you follow up with defendant's counsel Mark Ellis and see if he has any interest in mediating?"  A true and correct copy of that email is attached hereto as **Exhibit N**, at 1.

27.     At this point, on February 5, 2018, Perez had already won class certification and had prevailed on his individual claim that Rash Curtis had called him in violation of the TCPA.  The only issue left to be tried was the number of violations.  Any reasonable person would have understood, at this point, that Rash Curtis faced a potential liability of hundreds of millions of dollars.  Still, XL refused to make any settlement offer, and persisted in refusing to participate in any further negotiation or mediation.

28.     On May 6, 2019, trial commenced.

29.     On May 13, 2019, the jury returned a special verdict finding that Rash Curtis had made 534,698 phone calls to Class members in violation of the TCPA.  Upon receiving the verdict on May 13, 2019, the Court observed that judgment on the verdict would "exceed $250 million."  5/13/19 Trial Transcript at 804, lines 4-5.  The minimum statutory damage award of $500 per violation under the TCPA amounted to $267,349,000.

30.     From January 31, 2017, when XL rejected Perez's offer to settle the Lawsuit for $375,000 (*see* Exhibit G), through May 13, 2019, when the jury returned its verdict (*see* Exhibit A), XL never made any settlement offer nor did it invoke it's "hammer clause" to encourage Rash Curtis to settle.  Indeed, during this time XL participated in a full day mediation, but still never made any settlement offer.

31.     From January 31, 2017, when XL rejected Perez's offer to settle the Lawsuit for $375,000 (*see* Exhibit G), through May 13, 2019, when the jury returned its verdict, neither XL nor ELG recommended or advised Rash Curtis to pursue settlement negotiations with Perez.  There are no writings evidencing that XL or ELG did so.  Moreover, XL never demanded that Rash Curtis settle the matter for any amount of money, nor did XL invoke the "hammer clause."

32.     XL rejected at least four written offers to settle the Lawsuit within the policy limits, including (1) Perez's December 13, 2016 offer to settle for $85,000 which was rejected on

December 14, 2016 when XL made a counteroffer of $37,500 (*see* Exhibit F, at 2); (2) Perez's December 19, 2016 offer to settle for $60,000, which was rejected on January 3, 2017 when XL made a counteroffer of $55,000 (*see* Exhibit F, at 4-5); (3) Perez's January 31, 2017 offer to settle for $375,000, which was rejected that same day by email from Mark Ellis stating the offer "is outrageous and is hereby rejected" (*see* Exhibit G); ████████████████████████████
████████████████████. In each of these four instances, Perez offered to settle for less than 1% of the amount of the judgment that was ultimately awarded, and XL refused.

33.    From the time of obtaining prior written consent from XL for ELG to represent Rash Curtis as its defense counsel through the Verdict being issued by the jury after trial, Rash Curtis did not instruct ELG or XL to refuse any of Perez's settlement offers nor was Rash Curtis advised to demand that XL settle the claim for an amount within the $3,000,000 policy limit. There are no writings evidencing that Rash Curtis did so.

34.    The parties hereto believe XL's rejections of settlement offers within the policy limits and refusal to settle with Perez was unreasonable in light of the facts stated above, and that such refusals breached XL's obligations to Rash Curtis under the Insurance Policy, including without limitation its implied covenant of good faith and fair dealing in respect to settlement of claims against Rash Curtis within the available policy limits so as to avoid the risk of excess liability.

35.    To facilitate the purposes of this Agreement, Rash Curtis agrees (a) to provide Perez's counsel with copies of all documents and correspondence between Rash Curtis and XL relating to the claim involved in the above-described litigation, except communications that solely concern post-trial motions or the appeal from judgment; (b) to waive the attorney-client privilege with respect to all communications between Rash Curtis and attorney Mark Ellis and the Ellis Law Group LLP, the attorneys and law firm approved by XL to defend Rash Curtis in said litigation, and to provide copies of all correspondence to and from said attorneys in relation to said attorneys' and law firm's work defending Rash Curtis in the Lawsuit, except communications that solely concern post-trial motions or the appeal from judgment; and (c) to provide Perez's counsel, upon request, with all documents and information relevant to prosecution of the claims described herein.

36.    It is in the mutual interests of the parties hereto to transfer their rights and to assume obligations to each other as hereinafter provided.

NOW, THEREFORE, THE PARTIES AGREE AS FOLLOWS:

37.    In consideration of the undertakings by Rash Curtis in this Agreement, PEREZ HEREBY COVENANTS AND AGREES NOT TO CAUSE LEVY OF WRIT OF EXECUTION upon such judgment against any asset or property of Rash Curtis, or its directors, officers, shareholders, managers, supervisors, their successors in interest or affiliated business entities or companies.

38.    Perez further agrees not to file such judgment for recordation in any recorder's office or in the office of the Secretary of State, so that it shall not appear as a lien of record

against any real or personal property interest of Rash Curtis, or its directors, officers, shareholders, managers, supervisors, their successors in interest or affiliated business entities or companies.

39.     Perez further agrees to execute any additional documents reasonably required by Rash Curtis from time to time hereafter to reflect the fact that any such judgment obtained by Perez shall not be enforceable against the assets or properties of Rash Curtis, or its directors, officers, shareholders, managers, supervisors, their successors in interest or affiliated business entities or companies.

40.     In consideration of Perez's covenants and undertakings hereunder, RASH CURTIS HEREBY ASSIGNS AND TRANSFERS TO PEREZ all claims and causes of action Rash Curtis may have or hereafter acquire against XL based on XL's failure and refusal to settle with Perez as hereinabove recited, except any claim for emotional distress or punitive damages against XL based on said acts.

41.     Any lawsuit or proceeding to enforce the rights assigned to Perez shall be instituted and maintained by Perez in his own name and at his own expense.  Rash Curtis agrees to testify in said action to the facts recited above, and further agrees to execute any additional documentation reasonably required by Perez to evidence, establish or enforce the rights assigned hereby.

42.     Perez accepts the aforesaid assignment with the understanding that Rash Curtis makes no warranty or representation as to the validity of the claims or causes of action against XL; and with the further understanding that the invalidity of such claims or causes of action shall not affect Perez's covenants and obligations under this agreement.

43.     The parties are not aware of any authorities describing procedures for seeking court approval for an assignment of cause of action in exchange for a covenant not to execute on a class action judgment.  It is the parties' understanding that Fed. R. Civ. P. 23(e) does not apply, and neither notice to the class nor court approval is required, since this agreement does not settle, voluntarily dismiss, or compromise Class members' claims, and does not bind absent Class members.  It is also the parties understanding that this agreement will be effective upon execution.  Nevertheless, the parties have agreed, in an abundance of caution, to present this agreement to the Court for approval, or in the alternative for a ruling that court approval is not required.  Should the Court disapprove of the instant agreement or should the agreement be deemed ineffective for any reason, then this entire agreement will be void and the parties will return to their status quo prior to executing this agreement.

44.     The foregoing document shall not be inadmissible in a court of law, or otherwise protected from disclosure, pursuant to the provisions of § 1119(b) of the California Evidence Code. This document shall expressly be deemed admissible in a court of law and otherwise subject to disclosure pursuant to the provisions of § 1123 of the California Evidence Code.

Dated: October 11, 2019

IGNACIO PEREZ

By: _____

Ignacio Perez,
Class Representative


Dated: October 11, 2019

BURSOR & FISHER, P.A.

By: _____

Scott A. Bursor
Class Counsel


Dated: October 11, 2019

KBR, Inc., d/b/a RASH CURTIS &
ASSOCIATES

By: _____

Terrence Paff
President, CEO and Owner


Dated: October 11, 2019

KBR, Inc., d/b/a RASH CURTIS &
ASSOCIATES

By: _____

Natasha Paff
Chief Operations Officer

8

Dated: October 11, 2019                    KBR, Inc., d/b/a RASH CURTIS &
                                           ASSOCIATES


                                           By
                                           Bob Keith
                                           Vice President of Operations

9

**EXHIBIT A**

**FILED**

MAY 13 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IGNACIO PEREZ, ET AL.,** | CASE NO. 16-cv-03396-YGR |
| Plaintiffs, | **CLASS ACTION** |
| vs. | **VERDICT FORM** |
| **RASH CURTIS & ASSOCIATES,** | |
| Defendant. | |

**WE, THE JURY IN THE ABOVE-ENTITLED CASE,** unanimously render the following verdicts in accordance with the instructions provided by the Court:

**A. On Plaintiff Perez's individual claims under the <u>Telephone Consumer Protection Act</u>:**

1. Did Rash Curtis call Plaintiff Ignacio Perez on his cellular telephone during the class period with the Global Connect dialer?

        $\times$             _____

        Yes              No

    **If you answered "no" to Question No. 1, skip Question Nos. 2 and 3 and proceed to Question No. 4. If you answered "yes" to Question No. 1, answer Question Nos. 2 and 3.**

2. How many times did Rash Curtis call Plaintiff Ignacio Perez on his cellular telephone during the class period with the Global Connect dialer?

        *14*

3. How many of the calls in your answer to Question No. 2 were made using an artificial or prerecorded voice?

        *14*

**B. On Class Members' claims under the <u>Telephone Consumer Protection Act</u>, with respect to defendant's use of the Global Connect Dialer:**

4. Did Rash Curtis make calls with its Global Connect dialer to Class Members' cellular telephone numbers obtained through skip-tracing during the class period without their prior express consent?



        Yes              No

---

VERDICT FORM                                       NO. 4:16-CV-03396-YGR

United States District Court
Northern District of California

**If you answered "no" to Question No. 4, skip Question Nos. 5 and 6 and proceed to Question No. 7.  If you answered "yes" to Question No. 4, answer Question Nos. 5 and 6.**

5. State the number of calls Rash Curtis made with its Global Connect dialer to Class Members' cellular telephone numbers during the class period without their prior express consent:

    501,043

6. How many of the calls in your answer to Question No. 5 were made using an artificial or prerecorded voice?

    501,043

**C. On Class Members' claims under the <u>Telephone Consumer Protection Act</u>, with respect to defendant's use of the VIC Dialer:**

7. Did Rash Curtis make calls with its VIC dialer to Class Members' cellular telephone numbers obtained through skip-tracing during the class period without their prior express consent?

    ____X____          _____
     Yes                    No

**If you answered "no" to Question No. 7, skip Question Nos. 8 and 9 and proceed to Question No. 10.  If you answered "yes" to Question No. 4, answer Question Nos. 8 and 9.**

8. State the number of calls Rash Curtis made with its VIC dialer to Class Members' cellular telephone numbers during the class period without their prior express consent:

    2,591

United States District Court
Northern District of California

9. How many of the calls in your answer to Question No. 8 were made using an artificial or prerecorded voice?

_____2,591_____

**D. On Class Members' claims under the <u>Telephone Consumer Protection Act</u>, with respect to defendant's use of the TCN Dialer:**

10. Did Rash Curtis make calls with its TCN dialer to Class Members' cellular telephone numbers obtained through skip-tracing during the class period without their prior express consent?

_____ X _____          _____

      Yes                          No

**If you answered "no" to Question No. 10, you are finished.  If you answered "yes" to Question No. 10, answer Question No. 11.**

11. State the number of calls Rash Curtis made with its TCN dialer to Class Members' cellular telephone numbers during the class period without their prior express consent:

_____31,064_____

**Please sign and date this verdict form, then return to the Court.**

Dated: _____5/13/19_____

                          3
                      _____
                      FOREPERSON NUMBER

                      _____
                      FOREPERSON SIGNATURE

United States District Court
Northern District of California

VERDICT FORM

NO. 4:16-CV-03396-YGR

**EXHIBIT B**

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (SBN 191626)
Yeremey O. Krivoshey (SBN 295032)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail:  ltfisher@bursor.com
        ykrivoshey@bursor.com

**BURSOR & FISHER, P.A.**
Scott A. Bursor (State Bar No. 276006)
2665 S. Bayshore Dr., Suite 220
Miami, FL 33133-5402
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: scott@bursor.com

*Attorneys for Plaintiff and the Classes*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDRA MCMILLION, JESSICA ADEKOYA, and IGNACIO PEREZ, on Behalf of Themselves and all Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>RASH CURTIS & ASSOCIATES,<br><br>Defendant. | Case No. 4:16-cv-03396-YGR<br><br>~~[PROPOSED]~~ FINAL JUDGMENT<br><br>Judge:  Yvonne Gonzalez Rogers |

**FINAL JUDGMENT**

Pursuant to Federal Rules of Civil Procedure 23, 54, and 58, the Court now enters Final

Judgment on behalf of the certified Classes, defined as follows:

**(a) Skip-Trace Class 1:** All persons who received a call on their cellular telephones from June 17, 2012 through April 2, 2019 from Rash Curtis' DAKCS VIC dialer and/or Global Connect dialer whose cellular telephone was obtained by Rash Curtis through skip tracing.

**(b) Skip-Trace Class 2:** All persons who received a prerecorded message or robocall on their cellular telephones [or] landline phones from June 17, 2012 through April 2, 2019 from Rash Curtis whose telephone number was obtained by Rash Curtis through skip tracing.

**(c) Non-Debtor Class 1:** All persons who received a call on their cellular telephones from June 17, 2012 through April 2, 2019 from Rash Curtis' DAKCS VIC dialer and/or Global Connect dialer whose telephone number was obtained by Rash Curtis through skip tracing and for whom Rash Curtis never had a debt-collection account in their name.

**(d) Non-Debtor Class 2:** All persons who received a prerecorded message or robocall on their cellular telephones [or] landline phones from June 17, 2012 through April 2, 2019 from Rash Curtis whose telephone number was obtained by Rash Curtis through skip tracing and for whom Rash Curtis has never had a debt-collection account in their name.

Excluded from the Classes are persons who provided their cellular telephone in an application for credit to a creditor that has opened an account with Rash Curtis in such debtor's name prior to Rash Curtis first placing a call using an automatic telephone dialing system and/or prerecorded voice.

The dissemination of the Class Notice, ECF Nos. 249, 293: (a) constituted the best

practicable notice to Class Members under the circumstances, (b) constituted notice that was

reasonably calculated, under the circumstances, to apprise Class Members of the pendency of the

Action, their right to exclude themselves, and the binding effect of the Final Judgment, (c) and met

all applicable requirements of law, including, but not limited to, the Federal Rules of Civil

Procedure, the United States Constitution (including the Due Process Clause), and the Rules of this

Court, as well as complied with the Federal Judicial Center's illustrative class action notices.  No

Class Members requested exclusion.

Consistent with the jury's verdict on May 13, 2019, ECF No. 347, each member of the

Classes shall recover from the Defendant, Rash Curtis & Associates, the amount of $500 per call

made in violation of the Telephone Consumer Protection Act, for an aggregate award in favor of the Classes of $267,349,000.

With regard to Plaintiff Ignacio Perez's individual claim under the Telephone Consumer Protection Act, Plaintiff Perez shall recover from Defendant, Rash Curtis & Associates, the amount of $500 per call made in violation of the Telephone Consumer Protection Act, for an aggregate award in favor of Plaintiff Perez of $7,000.

The Classes and Plaintiff Perez are entitled to post-judgment interest on the jury's award at a rate of 2.36% per annum.

Pursuant to Federal Rules of Civil Procedure 23(h)(1) and 54(d), and Local Rule 54, any motion for attorneys' fees, expenses, costs, and incentive awards shall be filed no later than 14 days after entry of this Judgment.  Notice of the motion shall be directed to Class Members pursuant to Fed. R. Civ. P. 23(h)(1).  Class Members may object to the motion pursuant to Fed. R. Civ. P. 23(h)(2).  Plaintiff shall file a motion for a proposed notice plan in accordance with Fed. R. Civ. P. 23(h)(2) within 28 days of the entry of Final Judgment.

**IT IS SO ORDERED.**

Dated:   September 9, 2019

YVONNE GONZALEZ ROGERS
United States District Judge

**EXHIBIT C**







## XL SELECT PROFESSIONAL

Please be advised that the following replaces the claims reporting address in the CONDITIONS section, part A. Reporting of Claims and Potential Claims of this Policy:

<u>via email:</u>

proclaimnewnotices@xlgroup.com

**OR**

<u>via regular mail:</u>

XL Insurance
PO Box 614002
Orlando, FL 32861-4002

© 2011 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

# NOTICE TO POLICYHOLDERS

## PRIVACY POLICY

The XL America, Inc. insurance group (the "Companies"), believes personal information that we collect about our customers, potential customers, and proposed insureds (referred to collectively in this Privacy Policy as "customers") must be treated with the highest degree of confidentiality. For this reason and in compliance with the Title V of the Gramm-Leach-Bliley Act ("GLBA"), we have developed a Privacy Policy that applies to all of our companies. For purposes of our Privacy Policy, the term "personal information" includes all information we obtain about a customer and maintain in a personally identifiable way. In order to assure the confidentiality of the personal information we collect and in order to comply with applicable laws, all individuals with access to personal information about our customers are required to follow this policy.

## Our Privacy Promise

Your privacy and the confidentiality of your business records are important to us. Information and the analysis of information is essential to the business of insurance and critical to our ability to provide to you excellent, cost-effective service and products. We understand that gaining and keeping your trust depends upon the security and integrity of our records concerning you. Accordingly, we promise that:

1. We will follow strict standards of security and confidentiality to protect any information you share with us or information that we receive about you;
2. We will verify and exchange information regarding your credit and financial status only for the purposes of underwriting, policy administration, or risk management and only with reputable references and clearinghouse services;
3. We will not collect and use information about you and your business other than the minimum amount of information necessary to advise you about and deliver to you excellent service and products and to administer our business;
4. We will train our employees to handle information about you or your business in a secure and confidential manner and only permit employees authorized to use such information to have access to such information;
5. We will not disclose information about you or your business to any organization outside the XL insurance group of Companies or to third party service providers unless we disclose to you our intent to do so or we are required to do so by law;
6. We will not disclose medical information about you, your employees, or any claimants under any policy of insurance, unless you provide us with written authorization to do so, or unless the disclosure is for any specific business exception provided in the law;
7. We will attempt, with your help, to keep our records regarding you and your business complete and accurate, and will advise you how and where to access your account information (unless prohibited by law), and will advise you how to correct errors or make changes to that information; and
8. We will audit and assess our operations, personnel and third party service providers to assure that your privacy is respected.

## Collection and Sources of Information

We collect from a customer or potential customer only the personal information that is necessary for (a) determining eligibility for the product or service sought by the customer, (b) administering the product or service obtained, and (c) advising the customer about our products and services. The information we collect generally comes from the following sources:

- Submission – During the submission process, you provide us with information about you and your business, such as your name, address, phone number, e-mail address, and other types of personal identification information;
- Quotes – We collect information to enable us to determine your eligibility for the particular insurance product and to determine the cost of such insurance to you. The information we collect will vary with the type of insurance you seek;

- Transactions – We will maintain records of all transactions with us, our affiliates, and our third party service providers, including your insurance coverage selections, premiums, billing and payment information, claims history, and other information related to your account;
- Claims – If you obtain insurance from us, we will maintain records related to any claims that may be made under your policies.  The investigation of a claim necessarily involves collection of a broad range of information about many issues, some of which does not directly involve you.  We will share with you any facts that we collect about your claim unless we are prohibited by law from doing so.  The process of claim investigation, evaluation, and settlement also involves, however, the collection of advice, opinions, and comments from many people, including attorneys and experts, to aid the claim specialist in determining how best to handle your claim.  In order to protect the legal and transactional confidentiality and privileges associated with such opinions, comments and advice, we will not disclose this information to you; and
- Credit and Financial Reports – We may receive information about you and your business regarding your credit.  We use this information to verify information you provide during the submission and quote processes and to help underwrite and provide to you the most accurate and cost-effective insurance quote we can provide.

Retention and Correction of Personal Information

We retain personal information only as long as required by our business practices and applicable law.  If we become aware that an item of personal information may be materially inaccurate, we will make reasonable effort to re-verify its accuracy and correct any error as appropriate.

Storage of Personal Information

We have in place safeguards to protect data and paper files containing personal information.

Sharing/Disclosing of Personal Information

We maintain procedures to assure that we do not share personal information with an unaffiliated third party for marketing purposes unless such sharing is permitted by law.  Personal information may be disclosed to an unaffiliated third party for necessary servicing of the product or service or for other normal business transactions as permitted by law.

We do not disclose personal information to an unaffiliated third party for servicing purposes or joint marketing purposes unless a contract containing a confidentiality/non-disclosure provision has been signed by us and the third party.  Unless a consumer consents, we do not disclose "consumer credit report" type information obtained from an application or a credit report regarding a customer who applies for a financial product to any unaffiliated third party for the purpose of serving as a factor in establishing a consumer's eligibility for credit, insurance or employment.  "Consumer credit report type information" means such things as net worth, credit worthiness, lifestyle information (piloting, skydiving, etc.) solvency, etc.  We also do not disclose to any unaffiliated third party a policy or account number for use in marketing.  We may share with our affiliated companies information that relates to our experience and transactions with the customer.

Policy for Personal Information Relating to Nonpublic Personal Health Information

We do not disclose nonpublic personal health information about a customer unless an authorization is obtained from the customer whose nonpublic personal information is sought to be disclosed.  However, an authorization shall not be prohibited, restricted or required for the disclosure of certain insurance functions, including, but not limited to, claims administration, claims adjustment and management, detection, investigation or reporting of actual or potential fraud, misrepresentation or criminal activity, underwriting, policy placement or issuance, loss control and/or auditing.

Access to Your Information

Our employees, employees of our affiliated companies, and third party service providers will have access to information we collect about you and your business as is necessary to effect transactions with you.  We may also disclose information about you to the following categories of person or entities:

- Your independent insurance agent or broker;
- An independent claim adjuster or investigator, or an attorney or expert involved in the claim;
- Persons or organizations that conduct scientific studies, including actuaries and accountants;
- An insurance support organization;
- Another insurer if to prevent fraud or to properly underwrite a risk;
- A state insurance department or other governmental agency, if required by federal, state or local laws; or
- Any persons entitled to receive information as ordered by a summons, court order, search warrant, or subpoena.

Violation of the Privacy Policy

Any person violating the Privacy Policy will be subject to discipline, up to and including termination.

For more information or to address questions regarding this privacy statement, please contact your broker.

# NOTICE TO POLICYHOLDERS

Dear Policyholder:

On the declaration page of your insurance policy you will find important information about your insurance coverage, including the policy premium.  XL believes that it is important for policyholders to know that the insurance premium you pay for this policy includes not only the cost for the insurance provided by XL but it may also include the compensation we may pay  to the insurance producer who has arranged for the placement of your insurance with XL.

We at XL are committed to full transparency concerning the amount of premium allocated to insurance producer compensation.  In the event that you have a question about the amount of compensation paid to the insurance producer for your insurance policy, we encourage you to contact your insurance producer.

Thank you for insuring with XL.

**NOTICE TO POLICYHOLDERS**

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy.  You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Policyholder Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC and possibly the U.S. Department of State.  **Please read this Policyholder Notice carefully.**

OFAC administers and enforces sanctions policy based on Presidential declarations of "national emergency".  OFAC has identified and listed numerous

- Foreign agents
- Front organizations
- Terrorists
- Terrorist organizations
- Narcotics traffickers

as *Specially Designated Nationals and Blocked Persons*.   This list can be found on the U.S. Department of the Treasury's web site - http//www.treas.gov/ofac.

The Secretary of the Treasury also has identified a number of entities in the insurance, petroleum, and petrochemicals industries determined to be owned or controlled by the Iranian government.  Business transactions with any of these entities are expressly prohibited.  These entities have been added to OFAC's list of *Financial Institutions Determined To Be Owned or Controlled by the Government of Iran.* This list can be found on the U.S. Department of the Treasury's web site - http://www.treasury.gov/resource-center/sanctions/Programs/Pages/iran.aspx, see List of CISADA and NDAA Prohibitions or Conditions

In accordance with OFAC regulations, or any applicable regulation promulgated by the U.S. Department of State, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance will be immediately subject to OFAC.  When an insurance policy is considered to be such a blocked or frozen contract, neither payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

PN CW 05 0914
©2014 X.L. America, Inc.  All rights reserved.  May not be copied without permission.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.
LOUR  12/29/2015

# NOTICE TO POLICYHOLDERS

**FRAUD NOTICE**

| | |
|---|---|
| **Arkansas** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Colorado** | **It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.** |
| **District of Columbia** | **WARNING:** It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits if false information materially related to a claim was provided by the applicant. |
| **Florida** | Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree. |
| **Kansas** | A "fraudulent insurance act" means an act committed by any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto; or conceals, for the purpose of misleading, information concerning any fact material thereto. |
| **Kentucky** | Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any materially false information or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime. |
| **Louisiana** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Maine** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties may include imprisonment, fines, or denial of insurance benefits. |
| **Maryland** | Any person who knowingly and willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **New Jersey** | Any person who includes any false or misleading information on an application for an insurance policy is subject to criminal and civil penalties. |
| **New Mexico** | ANY PERSON WHO KNOWINGLY PRESENTS A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OF A LOSS OR BENEFIT OR KNOWINGLY PRESENTS FALSE INFORMATION IN AN APPLICATION FOR INSURANCE IS GUILTY OF A CRIME AND MAY BE SUBJECT TO CIVIL FINES AND CRIMINAL PENALTIES. |

© 2013 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

| New York | **General: All applications for commercial insurance, other than automobile insurance:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.<br><br>**All applications for automobile insurance and all claim forms:** Any person who knowingly makes or knowingly assists, abets, solicits or conspires with another to make a false report of the theft, destruction, damage or conversion of any motor vehicle to a law enforcement agency, the department of motor vehicles or an insurance company, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the value of the subject motor vehicle or stated claim for each violation.<br><br>**Fire:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance containing any false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.<br><br>The proposed insured affirms that the foregoing information is true and agrees that these applications shall constitute a part of any policy issued whether attached or not and that any willful concealment or misrepresentation of a material fact or circumstances shall be grounds to rescind the insurance policy. |
|---|---|
| Ohio | Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud. |
| Oklahoma | **WARNING:** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony. |
| Pennsylvania | **All Commercial Insurance, Except As Provided for Automobile Insurance:** Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.<br><br>**Automobile Insurance:** Any person who knowingly and with intent to injure or defraud any insurer files an application or claim containing any false, incomplete or misleading information shall, upon conviction, be subject to imprisonment for up to seven years and the payment of a fine of up to $15,000. |
| Puerto Rico | **Any person who knowingly and with the intention of defrauding presents false information in an insurance application, or presents, helps, or causes the presentation of a fraudulent claim for the payment of a loss or any other benefit, or presents more than one claim for the same damage or loss, shall incur a felony and, upon conviction, shall be sanctioned for each violation by a fine of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000), or a fixed term of imprisonment for three (3) years, or both penalties. Should aggravating circumstances [be] present, the penalty thus established may be increased to a maximum of five (5) years, if extenuating circumstances are present, it may be reduced to a minimum of two (2) years.** |

© 2013 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

## NOTICE TO POLICYHOLDERS

| | |
|---|---|
| **Rhode Island** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **Tennessee** | **All Commercial Insurance, Except As Provided for Workers' Compensation** It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits.<br><br>**Workers' Compensation:**  It is a crime to knowingly provide false, incomplete or misleading information to any party to a workers' compensation transaction for the purpose of committing fraud. Penalties include imprisonment, fines and denial of insurance benefits. |
| **Utah** | **Workers' Compensation:**  Any person who knowingly presents false or fraudulent underwriting information, files or causes to be filed a false or fraudulent claim for disability compensation or medical benefits, or submits a false or fraudulent report or billing for health care fees or other professional services is guilty of a crime and may be subject to fines and confinement in state prison. |
| **Virginia** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| **Washington** | It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines and denial of insurance benefits. |
| **West Virginia** | Any person who knowingly presents a false or fraudulent claim for payment of a loss or benefit or knowingly presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison. |
| **All Other States** | Any person who knowingly and willfully presents false information in an application for insurance may be guilty of insurance fraud and subject to fines and confinement in prison.  (In Oregon, the aforementioned actions may constitute a fraudulent insurance act which may be a crime and may subject the person to penalties). |

LOUR  12/29/2015          © 2013 X.L. America, Inc.  All Rights Reserved.
                              May not be copied without permission.



**Regulatory Office**
Indian Harbor Insurance Company
505 Eagleview Blvd. Suite 100
Dept: Regulatory
Exton, PA 19341-0636
Telephone: 800-688-1840

# ERRORS AND OMISSIONS POLICY DECLARATIONS

**PRODUCER:**  Capitol Special Risks, Inc.      **PRODUCER NO.:**  11031
           1000 Parkwood Circle Suite 925
           Atlanta, GA 30339

**POLICY NO.:**  MPP9032852      **RENEWAL OF:**  New Policy

**THIS IS A CLAIMS MADE AND REPORTED POLICY. DEFENSE EXPENSES ARE WITHIN AND REDUCE THE LIMIT OF LIABILITY. PLEASE REVIEW THIS POLICY CAREFULLY.**

**Item 1.**  **NAMED INSURED:**  KBR, INC. DBA RASH CURTIS & ASSOCIATES

**Item 2.**  **ADDRESS:**  190 S ORCHARD AVE.
                    SUITE A-200
      City/State/Zip Code:  VACAVILLE, CA 95688

**Item 3.**  **POLICY PERIOD:**

      FROM:  November 1, 2015      TO:  November 1, 2016
           12:01 A.M. Standard Time at the address of the **Named Insured** as stated herein.

**Item 4.**  **Limits of Liability (Inclusive of Claim Expenses):**
      $  3,000,000      Each Claim
      $  3,000,000      In the Aggregate

**Item 5.**  **DEDUCTIBLE (Inclusive of Claim Expenses):**
      $  50,000      Each Claim
      $  N/A      Policy Aggregate, if applicable

**Item 6.**  **PREMIUM:**  $  90,000      CA Surplus Lines Tax: $2,700.00 CA Stamping Fee: $180.00 See attached D-2

© 2014 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

**Item 7.   PROFESSIONAL SERVICES:**

Solely in the performance of: Services as a collection agent

**Item 8.   RETROACTIVE DATE (if applicable):**   09/20/2001

**Item 9.   ENDORSEMENTS ATTACHED AT POLICY EFFECTIVE DATE:**

| Endorsement Number | Endorsement Form Number | Endorsement Title |
|---|---|---|
| | XLSP-MPL-PF | Errors And Omissions Insurance |
| | PN CW 02 05 05 | Notice To Policyholders - Privacy Policy |
| | PN CW 03 05 05 | Notice To Policyholders - Producer Compensation Notice |
| | PN CW 05 0914 | Notice To Policyholders - U.S. Treasury DepartmentÙs Office of Foreign Assets Control ("OFAC") |
| | PN CW 01 0613 | Notice To Policyholders - Fraud Notice |
| | IL MP 9104 0314 IHIC | In Witness - Indian Harbor Insurance Company |
| Endorsement No. 001 | XLSPMPL105 0312 | Amendatory Endorsement |
| Endorsement No. 002 | XLSPMPL105 0312 | Amendatory Endorsement |
| Endorsement No. 003 | XLSPMPL105 0312 | Amendatory Endorsement |
| Endorsement No. 004 | XLSPMPL105 0312 | Amendatory Endorsement |
| Endorsement No. 005 | XLSPMPL105 0312 | Amendatory Endorsement |
| Endorsement No. 006 | XLSPMPL111 0312 | Contingent Bodily Injury/Property Damage Coverage Endorsement |
| Endorsement No. 007 | XL-CASOP 11 10 | Service of Process |

© 2014 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

## NOTICE:

1. THE INSURANCE POLICY THAT YOU [HAVE PURCHASED] [ARE APPLYING TO PURCHASE] IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA. THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.

2. THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT THAT APPLY TO CALIFORNIA LICENSED INSURERS.

3. THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW. THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.

4. THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN) INSURER. YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER: 1-800-927-4357. ASK WHETHER OR NOT  THE INSURER IS LICENSED AS A FOREIGN OR NON-UNITED STATES (ALIEN) INSURER AND FOR ADDITIONAL INFORMATION ABOUT THE INSURER. YOU MAY ALSO CONTACT THE NAIC'S INTERNET WEB SITE AT WWW.NAIC.ORG.

5. FOREIGN INSURERS SHOULD BE LICENSED BY A STATE IN THE UNITED STATES AND YOU MAY CONTACT THAT STATE'S DEPARTMENT OF INSURANCE TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

6. FOR NON-UNITED STATES (ALIEN) INSURERS, THE INSURER SHOULD BE LICENSED BY A COUNTRY OUTSIDE OF THE UNITED STATES AND SHOULD BE ON THE NAIC'S INTERNATIONAL

INSURERS DEPARTMENT (IID) LISTING OF APPROVED NONADMITTED NON-UNITED STATES INSURERS. ASK YOUR AGENT, BROKER, OR "SURPLUS LINE" BROKER TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

7.      CALIFORNIA MAINTAINS A LIST OF APPROVED SURPLUS LINE INSURERS. ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE INTERNET WEB SITE OF THE CALIFORNIA D E PARTMENT OF INSURANCE: WWW.INSURANCE.CA.GOV.

8.      IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE. IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER'S FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.

D-2 (Effective July 21, 2011)

**SELECT PROFESSIONAL**

**ERRORS AND OMISSIONS INSURANCE**

> **THIS IS A CLAIMS MADE AND REPORTED POLICY. DEFENSE EXPENSES ARE WITHIN AND REDUCE THE LIMIT OF LIABILITY. PLEASE REVIEW THIS POLICY CAREFULLY.**

### A.  DEFINITIONS

Whenever used in this policy, the term:

1. **Claim** means a written demand received by the **Insured** for money, services, equitable relief or a request to toll or waive any applicable statute of limitations; provided, however, **claim** does not include any investigation, proceeding or prosecution initiated by any governmental, administrative, regulatory or prosecutorial authority.

2. **Company** means the insurance company named in the Declarations.

3. **Damages** means a monetary judgment or monetary award which the **Insured** is legally obligated to pay, including: statutory damages; punitive, multiplied or exemplary damages, where insurable by law; or pre-judgment and post-judgment interest.  **Damages** also means a monetary settlement to which the **Company** agrees on an **Insured's** behalf. However, **damages** does not include:

   a.  taxes, fines, penalties, forfeitures or court-imposed monetary sanctions;
   b.  the return, restitution, reduction, compromise or refund of commissions, fees, premiums, charges, gratuities or other compensation paid to an **Insured**;
   c.  the cost to correct, complete or re-perform any **professional services**;
   d.  the cost of compliance with any order for, grant of or agreement to provide non-monetary relief, including services or injunctive relief; or
   e.  any amounts uninsurable as a matter of law or public policy.

4. **Defense expenses** means:

   a.  reasonable and necessary fees charged and expenses incurred by attorneys designated by the **Company** to represent the **Insured**;

   b.  all other reasonable and necessary fees, costs and expenses incurred at the **Company's** request;

   c.  premiums on appeal bonds, attachment bonds or similar bonds however, the **Company** is not obligated to apply for or furnish such bonds.

   **Defense expenses** do not include salaries, compensation or overhead paid or incurred by the **Company** or by the **Insured**.

5. **Disciplinary action** means an action brought against the **Insured** by any regulatory agency, disciplinary board, peer review committee or similar entity alleging misconduct in providing **professional services. Disciplinary action** does not include criminal investigations or charges.

6. **Insured** means:

   a.  the **Named Insured**;

XLSP-MPL-PF 0312                                                                                    Page 1 of 8

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

LOUR  12/29/2015

    **b.** any **subsidiary**;

    **c.** any past or present partner, principal, shareholder, officer, director, member, employee or independent contractor, leased employee of the **Named Insured** or a **subsidiary**, but only for **claims** arising from **professional services** rendered in the course and scope of their duties on behalf of the **Named Insured;**

    **d.** the representatives of the estate of a deceased **Insured** but only for **claims** arising from **professional services** rendered in the course and scope of their duties on behalf of the **Named Insured** or a **subsidiary**;

    **e.** the guardian, trustee or other fiduciary of a bankrupt **Insured** or an **Insured** who has been judicially declared incompetent, but only for **claims** arising from **professional services** rendered in the course and scope of their duties on behalf of the **Named Insured** or a **subsidiary; and**

    **f.** the lawful spouse of an **Insured** solely by reason of (a) such spousal status, domestic partner status or (b) such spouse's or domestic partner's ownership interest in property or assets that are sought as recovery for such **claim**. Any sums for which such spouse or domestic partner becomes legally obligated to pay on account of such **claim** shall be deemed **damages**.

**7.** **Named Insured** means the person or entity designated in the Declarations as **Named Insured**.

**8.** **Personal injury** means malicious prosecution, abuse of process, defamation, false imprisonment, wrongful eviction, libel, slander or violation of a person's right of privacy.

**9.** **Policy period** means the period from the effective date and time of this policy to the policy expiration date and time as set forth in the Declarations, unless the policy is terminated earlier, in which event the **policy period** shall end on the date, and time, of such earlier termination.

**10.** **Professional Services** means those services specified in Item 7. in the Declarations performed by an **Insured** for others for a fee or other remuneration inuring to the benefit of the **Named Insured**.

**11.** **Retroactive Date** shown in the Declarations is the first date which will be considered for coverage under this policy for any act or omission in the performance of **professional services**.

**12.** **Subsidiary** means any entity which the **Named Insured** maintains a majority interest. Any entity that becomes a **subsidiary** during the **policy period** and whose annual gross revenue exceeds 15% of the **Named Insured's** gross revenue listed in the application for this policy will be considered an **Insured** only after notice to the **Company** within sixty (60) days of such transaction and any adjustment to the premium or terms and conditions have been agreed by the **Named Insured** and endorsed by the **Company**.

## B. WHAT IS COVERED

Subject to all terms and conditions of this policy, the **Company** will pay on the **Insured's** behalf **damages** and **defense expenses** arising out of a **claim** first made against the **Insured** during the **policy period,** and reported to the **Company** in writing during the **policy period,** by reason of an actual or alleged act or omission including **personal injury**, in the performance of **professional services**.

## C. SUPPLEMENTARY PAYMENTS

© 2012 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

LOUR  12/29/2015

1. **Defense of Disciplinary Actions**

   The **Company** will pay up to $25,000 per **policy period** for the defense of **disciplinary actions** brought against the **Insured** and reported to the **Company** during the **policy period**. The Deductible is not applicable and payments will not reduce the Limits of Liability.

2. **Subpoena Expenses**

   The **Company** will pay up to $7,500 per **policy period** for expenses incurred in assisting the **Insured** in responding to a subpoena which is received and reported in writing to the **Company** during the **policy period** and relates to **professional services.** The Deductible is not applicable and payments will not reduce the Limits of Liability.

3. **Other Payments**

   The **Company** will reimburse the **Insured** for actual loss of earnings and reasonable expenses incurred for attendance at trial, court-ordered hearings, depositions, arbitration or mediation at the **Company's** request. The **Company** will pay actual expenses incurred but limited to $500 per day, $7,500 per **claim** and $25,000 per **policy period**. The Deductible is not applicable and payments will not reduce the Limits of Liability.

## D.  DEFENSE AND SETTLEMENT

The **Company** will have the right and duty to defend all covered **claims** brought in the United States, its territories and possessions**.** While the **Company** may seek the **Insured's** input in selecting defense counsel, the **Company** retains the right to make that selection.

Subject to the **Company's** guidelines, the **Insured** and not the **Company** will have the duty to investigate and defend all **claims** brought outside of the United States of America, its territories and possessions. Payment by the **Company** of covered **defense expenses** with respect to any such **claims** shall be subject to compliance by the **Insured** and the **Insured's** selected defense counsel with the **Company's** reasonable guidelines.

The **Company's** obligation to defend and/or pay any **damages** or **defense expenses** will cease when the Limit of Liability has been exhausted.

The **Company** will not settle any **claim** without the **Insured's** consent.  If, however, the **Insured** refuses to consent to any settlement recommended by the **Company** and acceptable to the claiming party, and the opportunity to effectuate that settlement is lost, then the **Company's** liability for that **claim** will not exceed the lesser of the lost settlement amount plus fifty percent (50%) of **damages** and **defense expenses** incurred by the **Insured** in excess of the lost settlement amount, or the remaining Limits of Liability.

## E.  LIMITS OF LIABILITY

1. For each **claim**, the limit shown in the Declarations as per **claim** is the maximum amount the **Company** is obligated to pay for the combined total of all covered **damages** and **defense expenses** arising out of each **claim** first made during the **policy period.**

2. Subject to the per **claim** limitation above, the limit shown in the Declarations as Aggregate is the maximum amount the **Company** is obligated to pay for the combined total of all **damages** and **defense expenses** arising out of any and all **claims** first made during the **policy period**.

3. Payment of **defense expenses** as well as **damages** reduce and may exhaust the Limits of Liability.

## F.  DEDUCTIBLE

XLSP-MPL-PF 0312

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

LOUR  12/29/2015

The **Company's** obligation to pay **defense expenses** and **damages** for each **claim** is triggered when the **Insured** has paid **defense expenses** and/or **damages** in an amount equal to the Deductible shown in the Declarations.

If the **Insured** purchases an Aggregate Deductible option, the **Company's** obligation to pay **defense expenses** and **damages** is triggered when the **Insured** has paid the amount designated in the Declarations as Aggregate Deductible regardless of the number of **claims** made and covered by this policy.

## G.  EARLY CLAIM RESOLUTION INCENTIVE

If the **Company** resolves a **claim** as reflected in a settlement agreement, order, dismissal  or judgment, within one (1) year following the date that the **claim** is reported in writing to the **Company**, the **Named Insured** will be reimbursed or credited up to 50% of the Deductible they have paid for that **claim**. The maximum reimbursement or credit is $25,000 per **policy period**.

## H.  EXCLUSIONS

This insurance does not apply to any **claim**:

1.  based on or arising out of acts or omissions that occurred or are alleged to have occurred prior to the effective date of this policy if, on or prior to such date, any **Insured** knew or had a reasonable basis to believe either that a professional duty had been breached or that a **claim** might be made;

2.  based on or arising out of acts or omissions which occurred or are alleged to have occurred prior to the **retroactive date** of this policy;

3.  based on or arising out of actual or alleged violation of:

    a.  the Employee Retirement Income Security Act of 1974;
    b.  the Securities Act of 1933;
    c.  the Securities Exchange Act of 1934;
    d.  any state Blue Sky or securities law;
    e.  the Crime Control Act of 1970 (also known as the Racketeer Influenced and Corrupt Practices Act or RICO);

    or any rules, regulations or amendments in relation to such acts, or any similar state, federal or foreign statutes or regulations, including any **claim** based upon common law principles of liability pertaining to the same subject matter as the above-mentioned acts, laws or regulations;

4.  for actual or alleged bodily injury, physical harm, sickness or death of any person;

5.  for the actual or alleged destruction, diminution in value or loss of use of tangible property;

6.  based on or arising out of, or made by or against any business enterprise not named in the Declarations:

    a.  which any **Insured** controlled or in which any **Insured** maintained a pecuniary interest at the time of the act, or omission giving rise to the **claim**; or

    b.  which arises out of any **Insured's** acts or omissions in an **Insured's** capacity as an officer, director, partner or employee of such enterprise;

XLSP-MPL-PF 0312

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

LOUR  12/29/2015

For the purposes of this Exclusion, a pecuniary interest will be deemed to exist in any enterprise in which the **Insureds**, individually or collectively, maintain fifteen percent (15%) or more of the equity, debt or other instruments of ownership or control in such enterprise.

7.  by or on behalf of an **Insured** against another **Insured**;

8.  based on or arising out of the actual or alleged gaining of any profit or advantage to which the **Insured** is not legally entitled;

9.  based on or arising out of alleged criminal, intentionally wrongful, fraudulent or malicious acts or omissions. The **Company** will provide a defense for such **claims** through judgment or final adjudication.

10. based on or arising out of any discrimination, humiliation, harassment, or misconduct including but not limited to **claims** based on an individual's race, creed, color, age, gender, national origin, religion, disability, marital status or sexual preference. The **Company** will provide a defense of such **claims** through judgment or final adjudication.

    Exclusions 9. and 10 will not apply to any **Insured** who: (a) did not participate or acquiesce in such act or omission; (b) had no knowledge of or reason to suspect such act or omission; and (c) immediately notified the **Company** in writing after obtaining knowledge of such act or omission.

11. based on or arising out of any actual or alleged anti-trust law violation or any agreement or conspiracy to restrain trade;

12. based on or arising out of or related to any actual or alleged misappropriation of trade secret or infringement of patent, copyright, trademark, trade dress or any other intellectual property right;

13. for the liability which the **Insured** assumed under any contract, agreement, promise, guarantee or warranty, whether written or oral, and whether express or implied, unless the **Insured** would have been legally liable in the absence of such contract, agreement, promise, guarantee or warranty;

14. based on or arising out of actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time. This includes any loss, cost or expense arising out of any requested, demanded, ordered or voluntary, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing or in any way responding to or assessing the effects of a pollutant. Pollutant means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

## I.  ADDITIONAL TERMS AND CONDITIONS

### 1.  Reporting Requirements and Cooperation

**a.** If the **Insured** becomes aware of a **claim,** the **Insured** must:

**(1)** advise the **Company** immediately in writing, giving the **Company** all details including the specific act or omission; the injury or damage which has or may result from such act or omission; the circumstances by which the **Insured** first became aware of the act or omission; and, the names, addresses and telephone numbers of all persons who may have knowledge or relevant information;

**(2)** preserve all documents and other evidence relating to the **claim**;

**(3)** send the **Company** documents relating to the **claim** when requested;

---

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

LOUR  12/29/2015

**(4)** cooperate with the **Company** and defense counsel in the investigation, defense and settlement of a **claim** and enforcement of contribution or indemnification actions against others;

**(5)** attend hearings, depositions, and trials if requested; and

**(6)** not admit liability, make any offer of settlement or payments, incur any expense; or assume any obligation arising out of or in any way connected with a **claim** without the **Company's** prior written consent.

**b.** If, during the **policy period**, the **Insured** becomes aware of an act or omission in the performance of **professional services** that reasonably may be expected to give rise to a **claim**, and if, during the **policy period**, the **Insured** reports to the **Company** in writing: (1) such specific act or omission and the identity of each person and entity responsible for such act or omission; (2) the date on which such act or omission took place; (3) the injury which has or may result from such act or omission and the identity of each person and entity subject to such injury; and (4) the circumstances by which the **Insured** first became aware of such act or omission; then, any **claim** subsequently made arising out of such specific act or omission shall be deemed to be a **claim** made during the **policy period**.

**2. Claim Reporting Grace Period**

If a **claim** is first made against any **Insured** during the **policy period,** the **Insured** may report it to the **Company** in writing up to and including sixty (60) days following the cancellation, non-renewal or natural expiration of this policy and the **Company** will consider it for coverage as if the **Insured** had reported it in writing to the **Company** within the **policy period**, provided the **Insured** is in compliance with all the terms and conditions of this policy, including payment of all premiums and Deductibles.

**3. Multiple Claims**

Two or more **claims** arising out of the same or related facts, circumstances, situations, transactions or events, or arising out of the same or related acts or omissions, will be considered a single **claim** first made on the earliest of the date that:

**a.** the first such **claim** was made , regardless of whether such date is before or during the **policy period;** or

**b.** any of the acts or omissions alleged in such **claim(s)** was first reported under this or any prior policy of insurance, regardless of whether such policy was issued by the **Company**.

**4. Other Insurance**

Such insurance as is provided by this policy shall be excess of any other valid and collectible insurance, whether such insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written specifically as excess and so evidenced by reference to this policy number.

**5. Representations**

The **Insured** understands and acknowledges that the decision to issue this policy was based upon the information provided in the application, including any supplements, attachments and replies to underwriter's inquiries. The **Insured** represents and warrants that all such information is true, accurate and complete.

**6. Extended Claim Reporting Option**

If the **Insured** or the **Company** cancels or does not renew this policy, the **Named Insured** shall have the option to purchase an Extended Claim Reporting Endorsement (ERP), extending the period of time during

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

which **claims** may be reported but only with respect to **claims** arising out of **professional services** rendered prior to the end of the **policy period** and otherwise covered by this policy.

The **Named Insured** may purchase such ERP only if:

**a.** prior to the end of the **policy period**, the **Named Insured** was in compliance with all the terms and conditions of this policy, including payment of all premiums and deductibles when due;

**b.** the **Named Insured** agrees that the additional premium paid for the ERP is non-refundable;

**c.** the **Named Insured** made no material misrepresentation in the application, any supplements, attachments or replies to underwriter's inquiries; and

**d.** the **Named Insured** exercises this option and pays the additional premium within sixty (60) days following the end of the **policy period**.

The additional premium for an ERP shall be: (a) seventy-five percent (75%) of the annual premium for a one-year ERP; or (b) one hundred (100%) of the annual premium for a two-year ERP; or one hundred and fifty (150%) of the annual premium for a three-year ERP.

**7. Cancellation/Nonrenewal**

The **Named Insured** or the **Company** can cancel this policy by notifying the other in writing.

If the **Company** cancels or non-renews this policy, a written notice of cancellation or non-renewal will be sent to the **Named Insured** at the address shown in the Declarations. The notice will state the date on which the cancellation or non-renewal will become effective. The effective date of cancellation or non-renewal will be not less than sixty (60) days after notice is mailed to the **Named Insured** unless cancellation is for non-payment of premium in which case the effective date of cancellation will be not be less than ten (10) days after notice is mailed. The effective date of cancellation or non-renewal as stated therein will become the end of the **policy period** and return premium will be calculated on a pro rata basis.

If the **Named Insured** cancels, the return premium will be calculated at the industry standard short rate.

**8. Non-Waiver**

The **Company's** failure to enforce any terms, provisions or conditions, or the **Company's** failure to exercise any right or privilege, shall not operate or be construed as a waiver of any other terms, provisions, conditions, rights or privileges.

**9. Named Insured as Sole Agent**

The first **Named Insured** in Item 1. in the Declarations is the sole agent and will act on behalf of all of **Insureds.**

**10. Changes in Control**

If, during the **policy period,** any of the following events occur:

**a.** the acquisition of any **Named Insured**, or all or substantially all of its assets, by another entity or the merger or consolidation of any **Named Insured** into or with another entity such that the **Named Insured** is not the surviving entity; or

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

LOUR  12/29/2015

**b.**   the appointment of a receiver, conservator, trustee, liquidator or rehabilitator, or any similar official, for or with respect to any **Named Insured**;

this policy will continue in full force and effect with respect to **Claims** arising out of **professional services** rendered before such event. **Claims** arising out of **professional services** rendered after such event will not be considered for coverage.

After either such event, this policy may not be canceled and the entire premium will be deemed fully earned.

**11.  Assignment**

The **Insured's** interests under this policy may not be assigned without the **Company's** written consent.

**12.  Territory**

This policy applies to **claims** arising from **professional services** rendered worldwide.

This policy shall not apply to any **claim** arising from **professional services** which are in violation of the laws of the United States, including, but not limited to, U.S. economic or trade sanctions or export control laws administered by the U. S. Treasury, State Department or Commerce Department

© 2012 X.L. America, Inc.  All Rights Reserved.
May not be copied without permission.

LOUR  12/29/2015

# IN WITNESS

## INDIAN HARBOR INSURANCE COMPANY

REGULATORY OFFICE
505 EAGLEVIEW BOULEVARD, SUITE 100
DEPARTMENT:  REGULATORY
EXTON, PA  19341-1120
PHONE:  800-688-1840

It is hereby agreed and understood that the following In Witness Clause supercedes any and all other In Witness clauses in this policy.

All other provisions remain unchanged.

IN WITNESS WHEREOF, the Company has caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by a duly authorized representative of the Company.

| | |
|---|---|
| Joseph Tocco | Toni Ann Perkins |
| President | Secretary |

IL MP 9104 0314 IHIC
©2014 X.L. America, Inc.  All rights reserved.  May not be copied without permission.
LOUR  12/29/2015

**ENDORSEMENT #001**

This endorsement, effective 12:01 a.m., November 1, 2015 forms a part of Policy No. MPP9032852 issued to KBR, INC. DBA RASH CURTIS & AS SOCIATES by Indian Harbor Insurance Company.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**AMENDATORY ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**ERRORS AND OMISSIONS POLICY**

**COLLECTION AGENTS – WITH SUB-LIMIT FOR FDCPA, FCRA AND TCPA AND BORDEREAU**

This endorsement modifies insurance provided under the following:

**ERRORS AND OMISSIONS POLICY**

In consideration of the premium charged, it understood and agreed that **Section A. DEFINITIONS**, Item **1. Claim** and Item **3. Damages**, paragraph **a.** are deleted in their entirety and replaced as follows:

**1.   Claim** means a written demand received by the **Insured** for money, services, equitable relief or a request to toll or waive any applicable statute of limitations; provided, however, **claim** does not include any investigation, proceeding or prosecution initiated by any governmental, administrative, regulatory or prosecutorial authority.  However, this exclusion shall not apply to **claims** arising out of violations of the U.S. Federal Fair Debt Collection Practices Act (FDCPA), the Fair Credit Reporting Act (FCRA) and/or Telephone Consumer Protection Act of 1991 (TCPA).

**3.   Damages**:

**a.**   taxes, fines, penalties, forfeitures, or court-imposed monetary sanctions, except fines and statutory damages assessed specifically for alleged violations by the **Insured** of the U.S. Federal Fair Debt Collection Practices Act (FDCPA), the Fair Credit Reporting Act (FCRA) and/or Telephone Consumer Protection Act of 1991 (TCPA).

It is also understood and agreed that **Section E. LIMITS OF LIABILITY**, is deleted in its entirety and replaced with the following:

**E.   LIMITS OF LIABILITY**

**1.**   For each **claim**, the limit shown in the Declarations as per **claim** is the maximum amount the **Company** is obligated to pay for the combined total of all covered **damages** and **defense expenses** arising out of each **claim** first made during the **policy period.**  However, the total Limit of Liability of the **Company** for all **Defense Expenses** for all **claims** or demands for **damages**, **defense expenses**, or any other fines, fees or penalties arising out of alleged violation by the **Insured** of the U.S. Federal Telephone Consumer Protection Act of 1991 (TCPA) are subject to a sub-limit of $1,000,000.  This sub-limit is part of, and not in addition to, the Aggregate Limit of Liability as specified in Item 4. of the Declarations of the policy.

**2.**   Subject to the per **claim** limitation above, the limit shown in the Declarations as Aggregate is the maximum amount the **Company** is obligated to pay for the combined total of all **damages** and **defense expenses** arising out of any and all **claims** first made during the **policy period**.

**3.**   Payment of **defense expenses** as well as **damages** reduces and may exhaust the Limits of Liability.

XLSPMPL105 0312                    © 2012 X.L. America, Inc.  All Rights Reserved.                    Page 1 of 1
LOUR  12/29/2015                        May not be copied without permission.

It is also understood and agreed that **Section G. EARLY CLAIM RESOLUTION INCENTIVE** is deleted in its entirety.

Further, it is also understood and agreed that **Section H. EXCLUSIONS** is amended to include the following exclusions:

> based on or arising out of deceptive trade practices, dilution and civil actions for consumer fraud.  However, this exclusion shall not apply to **claims** arising out of violations of the U.S. Federal Fair Debt Collection Practices Act (FDCPA), the Fair Credit Reporting Act (FCRA) and/or Telephone Consumer Protection Act of 1991 (TCPA);

> based on or arising out of any failure of the **Insured** to pay or safeguard funds;

> based on or arising out of the sale or unauthorized use of confidential or proprietary information;

> based on or arising out of any investment advice, or the selection of any investment manager or investment advisory/custodial firm;

> based on or arising out of the rendering or failure to render a financial opinion regarding any entity or person.

Finally, is also understood and agreed that **Section I. ADDITIONAL TERMS AND CONDITIONS** is deleted in its entirety and replaced with the following:

**I.   ADDITIONAL TERMS AND CONDITIONS**

    **1.   Reporting Requirements and Cooperation**

        **a.**  If the **Insured** becomes aware of a **claim,** the **Insured** must:

            **(1)**  advise the **Company** as soon as practicable in writing, giving the **Company** all details including the specific act or omission; the injury or damage which has or may result from such act or omission; the circumstances by which the **Insured** first became aware of the act or omission; and, the names, addresses and telephone numbers of all persons who may have knowledge or relevant information;

            **(2)**  preserve all documents and other evidence relating to the **claim**;

            **(3)**  send the **Company** documents relating to the **claim** when requested;

            **(4)**  cooperate with the **Company** and defense counsel in the investigation, defense and settlement of a **claim** and enforcement of contribution or indemnification actions against others;

            **(5)**  attend hearings, depositions, and trials if requested; and

            **(6)**  not admit liability, make any offer of settlement or payments, incur any expense; or assume any obligation arising out of or in any way connected with a **claim** without the **Company's** prior written consent.

        **b.**  If, during the **policy period**, the **Insured** becomes aware of an act or omission in the performance of **professional services** that reasonably may be expected to give rise to a **claim**, and which may reasonably be expected to be resolved for less than the deductible, then in lieu of individual written notice of each **claim**, the **Insured** shall provide the **Company** with status reports on all **claims** reported to the **Company** via a **claim** bordereau on a quarterly basis, and reported, in no event, later than sixty (60) days after: (i) the end of the **policy period**, (ii) with respect to **claims** first made during the **claim** reporting grace period or any optional Extended Reporting Period, the end of the **claim** reporting grace period or Optional Extended Reporting Period.

If, during the **policy period**, the **Insured** reports to the **Company** in writing: (1) such specific act or omission and the identity of each person and entity responsible for such act or omission; (2) the date on which such act or omission took place; (3) the injury which has or may result from such act or omission and the identity of each person and entity subject to such injury; and (4) and the circumstances by which the **Insured** first became aware of such act or omission; then, any **claim** subsequently made arising out of such specific act or omission shall be deemed to be a **claim** made during the **policy period**.

All other provisions of this policy remain unchanged.

**ENDORSEMENT #002**

This endorsement, effective 12:01 a.m., November 1, 2015 forms a part of Policy No. MPP9032852 issued to KBR, INC. DBA RASH CURTIS & AS SOCIATES by Indian Harbor Insurance Company.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**AMENDATORY ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**ERRORS AND OMISSIONS POLICY**

In consideration of the premium charged, it is hereby understood and agreed that for any and all class action law suits, **Item 5. Deductible** of the policy declarations page is amended as follows:

| | | | |
|---|---|---|---|
| **Item 5.** | **RETENTION** (Inclusive of **claim expenses**): | $100,000 | Each **Claim** |
| | | $ N/A | Policy Aggregate-applicable |
| | | | **Claim Expenses** |

All other provisions of this policy remain unchanged.

**ENDORSEMENT #003**

This endorsement, effective 12:01 a.m., November 1, 2015 forms a part of Policy No. MPP9032852 issued to KBR, INC. DBA RASH CURTIS & AS SOCIATES by Indian Harbor Insurance Company.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**AMENDATORY ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**ERRORS AND OMISSIONS POLICY**

In consideration of the premium charged, It is understood and agreed that **Section D. DEFENSE AND SETTLEMENT** is deleted and replaced as follows:

**D.  DEFENSE AND SETTLEMENT**

The **Company** will have the right and duty to defend all covered **claims** brought in the United States, its territories and possessions**.** While the **Company** may seek the **Insured's** input in selecting defense counsel, the **Company** retains the right to make that selection.

Subject to the **Company's** guidelines, the **Insured** and not the **Company** will have the duty to investigate and defend all **claims** brought outside of the United States of America, its territories and possessions. Payment by the **Company** of covered **defense expenses** with respect to any such **claims** shall be subject to compliance by the **Insured** and the **Insured's** selected defense counsel with the **Company's** reasonable guidelines.

The **Company's** obligation to defend and/or pay any **damages** or **defense expenses** will cease when the Limit of Liability has been exhausted.

The **Company** will not settle any **claim** without the **Insured's** consent.  If, however, the **Insured** refuses to consent to any settlement recommended by the **Company** and acceptable to the claiming party, and the opportunity to effectuate that settlement is lost, then the **Company's** liability for that **claim** will not exceed the lesser of the lost settlement amount plus seventy percent (70%) of **damages** and **defense expenses** incurred by the **Insured** in excess of the lost settlement amount, or the remaining Limits of Liability.

All other provisions of this policy remain unchanged.

**ENDORSEMENT #004**

This endorsement, effective 12:01 a.m., November 1, 2015 forms a part of Policy No. MPP9032852 issued to KBR, INC. DBA RASH CURTIS & AS SOCIATES by Indian Harbor Insurance Company.


**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**AMENDATORY ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**ERRORS AND OMISSIONS POLICY**

**XL MPL + Endorsement**

In consideration of the premium charged, it is understood and agreed that **Section A. DEFINTIONS, damages, personal injury and subsidiary** are deleted in its entirety and replaced as follows:


   3.  **Damages** means a monetary judgment or monetary award which the **Insured** is legally obligated to pay, including: statutory damages; punitive, multiplied or exemplary damages, where it is deemed permitted under the laws and public policy of the applicable jurisdiction by law; or pre-judgment and post-judgment interest.  **Damages** also means a monetary settlement to which the **Company** agrees on an **Insured's** behalf. However, **damages** does not include:

   a.  taxes, fines, penalties, forfeitures or court-imposed monetary sanctions;
   b.  the return, restitution, reduction, compromise or refund of commissions, fees, premiums, charges, gratuities or other compensation paid to an **Insured**;
   c.  the cost to correct, complete or re-perform any **professional services**;
   d.  the cost of compliance with any order for, grant of or agreement to provide non-monetary relief, including services or injunctive relief; or
   e.  any amounts uninsurable as a matter of law or public policy.

The terms "applicable jurisdiction" shall mean for the purposes of this endorsement that jurisdiction most favorable to the insurability of punitive or exemplary damages provided that the jurisdiction must be:

   a.  where the punitive or exemplary damages were awarded or imposed; or

   b.  where any act which forms the basis of the **Claim** took place; or
   c.  where any "**Insured**" is incorporated, resides, or has its principal place of business


   8.  **Personal injury** means:

   a.  Malicious prosecution, abuse of process, defamation, false imprisonment, wrongful eviction, libel, slander or violation of a person's right of privacy.

   b.  Plagiarism, piracy or misappropriation of ideas or style of doing business;

   c.  Infringement or misappropriation of copyright, title, slogan, trademark, trade name, trade dress, logo, service mark or service name.

Provided, however, that **Personal injury** shall not include any of the foregoing offenses which arise out of, in the course of, result from or relate to advertising, broadcasting or telecasting activities conducted by or on behalf of any **Insured**.

**12.** **Subsidiary** means any entity which the **Named Insured** maintains a majority interest.  Any entity that becomes a **subsidiary** during the **policy period** and whose annual gross revenue exceeds 25% of the **Named Insured's** gross revenue listed in the application for this policy will be considered an **Insured** only after notice to the **Company** within sixty (60) days of such transaction and any adjustment to the premium or terms and conditions have been agreed by the **Named Insured** and endorsed by the **Company**.

It is further understood that **Section H. EXCLUSIONS** Items **6., 8.** and **12.** are deleted in its entirety and replaced as follows:

**6.** based on or arising out of, or made by or against any business enterprise not named in the Declarations:

**a.** which any **Insured** controlled or in which any **Insured** maintained a pecuniary interest at the time of the act, or omission giving rise to the **claim**; or

**b.** which arises out of any **Insured's** acts or omissions in an **Insured's** capacity as an officer, director, partner or employee of such enterprise;

For the purposes of this Exclusion, a pecuniary interest will be deemed to exist in any enterprise in which the **Insureds**, individually or collectively, maintain twenty five percent (25%) or more of the equity, debt or other instruments of ownership or control in such enterprise.

**8.** based on or arising out of the actual or alleged gaining of any profit or advantage to which the **Insured** is not legally entitled. The **Company** will provide a defense for such **claims** through judgment or final adjudication.

**12.** based on or arising out of or related to actual or alleged improper gaining or misuse of materials or trade secrets or infringement of patent.

All other provisions of this policy remain unchanged.

**ENDORSEMENT #005**

This endorsement, effective 12:01 a.m., November 1, 2015 forms a part of Policy No. MPP9032852 issued to KBR, INC. DBA RASH CURTIS & AS SOCIATES by Indian Harbor Insurance Company.


**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**AMENDATORY ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**ERRORS AND OMISSIONS POLICY**

In consideration of the premium charged, it is understood and agreed that Section A Definitions **Insured** is amended as follows:


**Insured** also means any client or customer of the **Named Insured**, but only if a written contract entered into by the **Named Insured** specifically requires that such client or customer be added as an additional **Insured** for professional liability or errors and omissions insurance, and only for **claims** (i) first made on or after the effective date of this endorsement and (ii) for vicarious or imputed liability of such client or customer which results from errors or omissions committed solely by the **Named Insured**.

The policy will not provide coverage for any error or omission committed by such client or customer referenced above which is added to this policy as an additional **insured**.

Section H Exclusions is amended by deleting exclusion 7 but solely with respect to **claims** asserted by such client or customer referenced above for errors or omissions actually or allegedly committed by an **insured** in the performance of or failure to perform **professional services**.


All other provisions of this policy remain unchanged.

ENDORSEMENT #006

This endorsement, effective 12:01 a.m., November 1, 2015 forms a part of Policy No. MPP9032852 issued to KBR, INC. DBA RASH CURTIS & AS SOCIATES by Indian Harbor Insurance Company.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**CONTINGENT BODILY INJURY/PROPERTY DAMAGE COVERAGE ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**ERRORS AND OMISSIONS POLICY**

In consideration of the premium charged, it is agreed that **Section H. EXCLUSIONS, 4.** and **5.** of this policy are deleted in their entirety and replaced with the following:

for actual or alleged bodily injury, physical harm, sickness or death of any person; destruction, diminution in value or loss of use of tangible property unless the **claim** results solely from an act or omission committed by the **insured** in the performance of professional services provided that:

**a.** such act or omission was a proximate cause of the foregoing; and
**b.** there is no other policy that is applicable to such **claim.**

It is further agreed that **Section H. EXCLUSIONS** is amended to include the following new exclusions:

based on or arising out of the ownership, maintenance, operation, use, entrustment to others, loading, or unloading of any motor vehicle, aircraft or watercraft, operated by, rented or loaned to any **Insured**;

based on or arising out of any act or omission for which any **Insured** could be held liable under any workers compensation, unemployment compensation or disability benefits law or under any similar law;

based on or arising out of bodily injury to any employee of the **Insured** arising out of his or her employment by the **Insured** or to any obligation of the **Insured** to indemnify or contribute with another employer because of damages arising out of such injury.

The **Named Insured** as a condition precedent to the obligations of the **Company** agrees and warrants that comprehensive general liability insurance, including products/completed operations coverage and premises/operations liability coverage, covering bodily injury or property damage in the same amount as stated in Item 4. in the Declarations of this policy applying to the **Named Insured's** operations will be kept in force during this **policy period**.

All other provisions of this policy remain unchanged.

**ENDORSEMENT #007**

This endorsement, effective 12:01 a.m., November 1, 2015 forms a part of Policy No. MPP9032852 issued to KBR, INC. DBA RASH CURTIS & AS SOCIATES by Indian Harbor Insurance Company

**SERVICE OF PROCESS**

The Commissioner of Insurance of the State of California is hereby designated the true and lawful attorney of the Company upon whom may be served all lawful process in any action, suit or proceeding arising out of this policy. The Company further designates:

John Oster
1990 North California Boulevard
Suite 740
Walnut Creek, CA  94596

as its agent in California to whom such process shall be forwarded by the Commissioner of Insurance.

For Illinois exposures, the Insurer further designates the Director of the Illinois Division of Insurance and his successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the insured or any beneficiary hereunder arising out of an Illinois exposure and this contract of insurance.

All other terms and conditions of this policy remain unchanged.

_____
(Authorized Representative)

© 2010 X.L. America, Inc. All Rights Reserved.
May not be copied without permission.

**EXHIBIT D**



## ENDORSEMENT #008

This endorsement, effective 12:01 a.m., November 1, 2015 forms a part of Policy No. MPP9032852 issued to KBR, INC. DBA RASH CURTIS & AS SOCIATES by Indian Harbor Insurance Company.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

### AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following:

**ERRORS AND OMISSIONS POLICY**

In consideration of the premium charged, it is understood and agreed that section D. Defense and Settlement is deleted in its entirety and replaced with the following:

### D.   DEFENSE AND SETTLEMENT

It will be the duty of the **Insured** and not the **Company** to defend any **claim**. The **Insured** may designate managing defense counsel as Mark Ellis, Ellis Law Group, subject to the **Company's** written consent (such consent not to be unreasonably withheld) and subject to the **Company's** guidelines. Alternatively, the **Insured** may elect to have the **Company** designate defense counsel.

Subject to the **Company's** guidelines, the **Insured** and not the **Company** will have the duty to investigate and defend all **claims** brought outside of the United States of America, its territories and possessions. Payment by the **Company** of covered **defense expenses** with respect to any such **claims** shall be subject to compliance by the **Insured** and the **Insured's** selected defense counsel with the **Company's** reasonable guidelines.

The **Company's** obligation to defend and/or pay any **damages** or **defense expenses** will cease when the Limit of Liability has been exhausted.

The **Company** will not settle any **claim** without the **Insured's** consent.  If, however, the **Insured** refuses to consent to any settlement recommended by the **Company** and acceptable to the claiming party, and the opportunity to effectuate that settlement is lost, then the **Company's** liability for that **claim** will not exceed the lesser of the lost settlement amount plus fifty percent (50%) of **damages** and **defense expenses** incurred by the **Insured** in excess of the lost settlement amount, or the remaining Limits of Liability.

Further, it is understood and agreed that the defintion of Defense expenses is deleted in its entirety and replaced with the following:

**Defense expenses** means:

1. Fees charged by defense counsel designated by the **Insured** with the **Company's** prior written consent but not to exceed hourly rates of $225 per partner and $210 per associate or in the alternative, fees charged by defense counsel designated by the **Company** where the **Insured** has elected to have the **Company** designate such counsel; and,

2. All other reasonable and necessary fees, costs and expenses resulting from the investigation, adjustment, negotiation, arbitration, mediation, defense or appeal of a **claim**, if incurred by the **Company** or by the **Insured** with the **Company's** prior written consent; and,

3.  Premiums on appeal bonds, attachment bonds or similar bonds however, the **Company** is not obligated to apply for or furnish any such bond.

4.  The **Named Insured** and defense counsel also understand, agree and acknowledge, that for any services rendered by and expenses through defense counsel to constitute **claims expenses**, defense counsel must comply with all other applicable provisions of the Company's current **guidelines**. The responsibility for ensuring that the **Company's** guidelines are adhered to rests with **the Named Insured.**

**Claim expenses** will be paid first and will reduce the limit of liability available to pay **damages**. **Claim expenses** do not include fees, costs or expenses of employees or officers of the **Company**, or salaries, loss of earnings or other remuneration by or to any **Insured**.

Further, it is understood and agreed that **I. Additional Terms &   Conditions**    is amended by the additon of the following:

## I.   ADDITIONAL TERMS AND CONDITIONS

### Compliance with Defense Guidelines

The **Insured will** bear responsibility for defense counsel to timely comply with all **Company** guidelines. The **Named Insured** acknowledges and agrees that timely compliance by defense counsel with such defense guidelines as the **Company** may reasonably require, including timely completion of a litigation plan and litigation budget, is material to the **Company's** obligations under the policy including the obligation to pay **claim expenses** and **damages**. Non-compliance by defense counsel with the **Company's** guidelines with respect to any **claim** will relieve the **Company** of any obligation to pay **claim expenses** or **damages** in such **claim**.  However, the **Company** will not be relieved of its obligations under the policy in the event of non-compliance with its guidelines by defense counsel designated by the **Company** where the **Insured** has elected to have the **Company** designate such counsel, conditioned upon the **Insured's** exercise of reasonable efforts and/or cooperation with those of the **Company** to secure defense counsel's compliance.

All other provisions of this policy remain unchanged.

**EXHIBIT E**



# Insurance Claims Litigation Management:
# Guidelines for Defense Counsel

**Application of the Guidelines**

This document sets out XL Catlin's ("XL Catlin" or "the Company") litigation management guidelines for Defense Counsel ("Counsel") when retained by XL Catlin or a claim professional from the Company to provide a defense to our insureds and/or an XL Catlin company.

The primary purpose of these guidelines is to provide a clear and consistent framework of expectations for all aspects of management of the litigation including communications, settlement, and billing. These guidelines should not be taken as any form of instruction to limit the role of Counsel or reduce the quality of the representation being provided.

XL Catlin recognizes that special circumstances may arise that could require some flexibility in the application of these guidelines. Should this occur, Counsel should discuss any questions of its engagement with the designated XL Catlin claim professional.

**Note:** Nothing in these guidelines should override Counsel's professional obligations.

Unless otherwise indicated, all communication regarding a claim should be directed to the claim professional or designated contact person at XL Catlin.

**Philosophy**

It is XL Catlin's philosophy to seek the best possible resolution of a matter in the most expeditious and cost effective way, ensuring that XL Catlin's and its clients' needs are best served. Upon receipt of a newly assigned matter from the Company, Counsel should take a proactive approach with an effort to resolve matters whenever possible, unless otherwise instructed by the claim professional.

**Conflicts of interest – Initial Check**

Counsel should perform a conflict check prior to accepting an assignment. All actual and potential conflicts should be reported to XL Catlin.

Conflicts of interest in Counsel appointment should be avoided and any actual/potential conflicts should be reported to the claim professional (or the Company).

Furthermore, XL Catlin should be informed (to the extent regulations and duties of confidentiality permit) if a legal firm or any lawyer associated with that firm has a personal position or interest in the handling or outcome of the claim.

**Conflicts of Interest – Ongoing**

If, at any point during the life of the matter, any possibility of a conflict of interest situation arises, however slight, XL Catlin should be informed immediately (to the extent regulations and duties of confidentiality permit) and work ceased until the conflict is resolved.

**Acknowledgement of Instruction**

Counsel will receive a retention letter or email from the Company providing instruction with every potential assignment. The instruction will provide a meaningful description of the loss, loss parties and claim context. The instruction will also

1



provide a corresponding scope of services being suggested for the engagement.

In response, Counsel should acknowledge the instruction. An acknowledgement should be sent in writing to the claim professional and should typically include the following key elements.

- Scope of proposed services for the full engagement;
- Identification of the timekeeper who is ultimately responsible for the assignment and contact information;
- All other involved timekeepers and approved hourly rates;
- Confirmation of no conflicts (actual or potential);
- Acknowledgement of adherence to XL Catlin's current Litigation Management Guidelines;
- Determination on whether a Legal Hold must be issued by XL Catlin in connection with the assigned matter;
- Any local legal requirements that apply.

---

# Litigation Management Plan ("LMP") & Budget

---

**LMP Timing**

XL Catlin claim professionals and assigned Counsel are required to manage claims and any associated litigation proactively.  In order to do this, XL Catlin relies on assigned Counsel to provide meaningful communication on status, case management plans and the costs associated with litigation in a timely manner.  XL Catlin's guidelines for Litigation Management Plan (LMP) reporting and associated budgeting requirements are as follows:

- An initial Litigation Management Plan should be provided within 60 days maximum (and preferably within 30 days) of the initial instruction;
- An updated Litigation Management Plan should be provided 90 days from the initial instruction and every 90 days thereafter, focused on material changes and updates to the plan and budget;
- Invoices should be submitted to coincide with the submission of updated Litigation Management Plans.

**Note:** Late submission of Litigation Management Plans may impact timely payment of invoices.

Any significant developments should be reported immediately to the XL Catlin claim professional (in addition to the 90 day reporting cycle) including, but not limited to court rulings on significant motions, additions or withdrawal of any parties, significant pleadings such as filing of additional complaints including cross parties and settlement developments by any party, including any communication to Counsel by a party in connection with possible resolution of the matter.

---

**LMP Content**

A Litigation Management Plan and any subsequent periodic updates submitted by assigned Counsel should consistently include the following  key elements:
- Background Facts
- Policy Limits Assessment
- Claimant(s) Information
- Litigation Details

2



- Loss Party Detail – Insured/Codefendant, Claimant/Plaintiff, Witnesses
- Issues/Risks/Concerns
- Analysis of Liability
- Analysis of Damages/Injuries/Property Damage
- Liens/Lienholder Details
- Applicable Case/Substantive Law
- Overall case settlement evaluation/valuation
- Strategy for Resolution
- Offers/Demands
- Current Status
- Legal & non-legal billings to date (updated each quarter)
- Budget spent/projected for the remainder of the case (updated each quarter)
- Recommendations

*A sample Litigation Management Plan is included in the appendix for guidance.*

**Initial Budget & Budget Variance**

The Litigation Management Plan should be supported by an initial budget submitted by assigned Counsel through XL Catlin's e-Billing platform. The XL Catlin claim professional will review this budget and approve or reject the budget through e-Billing. If rejected, assigned Counsel should promptly work to adjust and resolve any issues to arrive at an agreed initial budget.

Following approval of the initial Litigation Management Plan and budget, each subsequent Litigation Management Plan should be accompanied by a Budget Summary (variance) Report. This should be completed by the legal firm every 90 days and emailed to the claim professional.

The purpose of the Budget Summary (variance) Report is to capture work in progress, provide the most accurate and up to date analysis of the total cost of the litigation and enables the XL Catlin claim professional to compare this information to the initially approved and remaining budget (e.g., budget spent and projected for the remainder of the case).

*A sample Budget Summary (variance) Report is included in the appendix for guidance.*

# Trial Reporting

**Pre-Trial Reporting**

At minimum of 60 days prior to any scheduled trial date, a report should be issued setting out a current status, anticipated outcome, key variable factors, and costs. If Counsel's prior opinion on liability has changed, this should be evident from the report which should always include:

- The pertinent list the facts of the case; and
- A summary of the contested legal issues.

The report should also include and describe (in detail, but concisely) some or all of the following key elements:

**Damages Assessment**

3



- Medical and/or Lost Time/Income (if work related), other (non-economic/general/all others)
- Property damage, Injuries/Property Damages

**Liability Assessment**
- Key elements of plaintiff's case (theories of liability)
- Key elements of the defense of the insured. Other defenses
- Likelihood (%) of court/jury to assign fault to plaintiff, insured, co-defendant(s)

**Case Evaluation/Recommendations**
- In cases of clear liability, $ valuation of injuries and damages
- Maximum $ amount to consider paying before allowing a jury to decide
- Motions in Limine and rationale
- Counsel's recommendation

**Negotiation Details**
- Status of negotiations
- Last offer, demands and corresponding dates, current $ authorization
- Policy limits, trial date, court/venue and docket
- Names of defense, plaintiff attorney(s) and firm(s)

**Estimated Trial Budget**
- Estimated tasks (e.g., preparation, general review & analyses, trial attendance, etc.) hours to complete, roles involved and total $ in expected fees

| | |
|---|---|
| **Trial Reporting** | **Daily Trial Reports:** During the time an XL Catlin insured's claim is in trial, Counsel should share a daily report of pertinent activities and review of witness testimony. |
| | **Post-Verdict/Appellate Assessment Report:** After a trial has been concluded and a verdict rendered, Counsel should send a report outlining the verdict and any potential appellate issues to the XL Catlin claim professional. |
| **Post-Trial** | Post-trial, Counsel should discuss the outcome with the claim professional. If requested, Counsel should prepare a post–trial report in an agreed format (containing final updates to the key elements suggested above for Pre-Trial reporting) and including an analysis of any appeal issues for consideration. |

# Settlement & Resolution

| | |
|---|---|
| **Settlement Authority & Negotiations** | Settlement authority can only come from XL Catlin and settlement negotiations should always be directed by the XL Catlin claim professional. Accordingly, it is mandatory that XL Catlin is kept fully apprised of all negotiations or opportunities to engage in resolution activities. |
| | XL Catlin should be informed immediately in writing of any settlement offer or overtures regardless of whether settlement authority is requested. Likewise, any settlements involving other parties (e.g. co-defendants) should be immediately reported to the claim professional. |
| **Alternative Dispute** | Alternative resolution strategies should be considered regularly. Counsel should continually evaluate the litigation and whether resolution by alternative dispute |



| | |
|---|---|
| **Resolution ('ADR')** | resolution (ADR) is appropriate. Prior to any mediation, Counsel should provide a report or mediation statement. This should be included in the updated Litigation Management Plan.  Any voluntary mediation/settlement conference should be scheduled in conjunction with the claim professional. |
| **Attendance at Settlement Conferences** | Counsel should confer with the claim professional at least thirty (30) days in advance of settlement conference/mediation to determine whether their attendance is desired and/or necessary.  If it is determined that the claim professional will not attend in person, arrangements for telephone contact with the claim professional during the conference should be established with sufficient advance notice to ensure they or an alternative claim professional with the appropriate authority will be available. |

# Litigation Process

| | |
|---|---|
| **Copies of Important Documents** | Copies of substantive pleadings, memoranda or legal research should be sent to XL Catlin. |
| **Applications/ Motions** | Each substantial application/ and every dispositive motion should be justified in the litigation plan and agreed with XL Catlin before being filed. |
| **Discovery Proceedings/ Witness Interviews/ Depositions** | Discovery proceedings beyond the exchange of the usual Interrogatories and Demands and Notices should be undertaken only with the written consent of the XL Catlin claim professional after an explanation by Counsel for the necessity of same.<br><br>Counsel should also obtain the consent of the claim professional prior to the notice of any deposition. Counsel should send the claim professional a summary of each deposition along with their opinion on the appearance and credibility of the witness and an assessment on how the testimony relates to the outcome of the case within 14 days of the deposition. |
| **Witness Preparation/ Statements** | XL Catlin should be given the option of being present whenever Counsel interviews (by telephone or otherwise) any witness or prepares any XL Catlin employee. |
| **Retention of Mediators, Experts, Vendors and Local Counsel** | XL Catlin approval is required for the use of all experts, mediators, vendors and local Counsel. Final selection is subject to the agreement of XL Catlin.<br><br>The following should also be provided prior to retention:<br><br>• Curriculum Vitae or Firm Brochure;<br>• Estimate of cost, including any hourly rate as applicable;<br>• Mediators: Facts to support selection of a particular mediator;<br>• Mediators: Confirmation whether or not a mediator has represented the opposing side or been selected as mediator for the opposing side in the past. |



Where there are multiple defendants and/or third party defendants, every effort should be made to share the costs of experts that can be utilized for a combined purpose.

| **Complaints** | Any complaints received by Counsel should be notified immediately to XL Catlin in writing, together with a copy of the complaint (if made in writing). If made by telephone, a comprehensive note of the relevant telephone conversation should be provided. Counsel should obtain prior approval from XL Catlin to contact any regulatory or governmental body or respond to an inquiry or complaint. |

**Mock Trials**   Counsel should obtain the consent of the claim professional prior to arranging any mock trial or similar proceedings.  Counsel should outline the benefit of such a proceeding and its perceived value on the outcome of the litigation relative to the cost in connection with any request for approval of same.

**Appeal**   Counsel should always obtain pre-approval from XL Catlin to file an appeal.


# Miscellaneous


**Publicity/ Media**   No comment should be made to the media or in any external forum relating to any matter without clearance from XL Catlin concerning XL Catlin or its Insured, or adverse parties currently in litigation or subject to a confidentiality agreement.

**Retention of Records**   Counsel should retain complete hard/ electronic records of all relevant information for a minimum of:

- Six years after final resolution; or
- As required under applicable law.

The manner of retention should permit the XL Catlin claim professional to inspect and make copies of such documents upon reasonable notice.

**Responding to XL Catlin**   Correspondence should be reviewed and responded to as appropriate or instructed, and in all cases within one week of receipt of same, unless instructed otherwise.

All telephone messages should be returned within 24 hours.

**Privacy & Data Security**   Acceptance of any legal assignment by Counsel is conditioned and subject to agreement of Counsel to properly and adequately protect such nonpublic information from disclosure, with such agreement surviving termination of the representation or relationship with XL Catlin.

Specifically, Counsel should take steps to protect XL Catlin Information from unauthorized access, acquisition, disclosure, loss, destruction or damage, including ensuring that hard copy and electronic materials are transmitted and stored in an appropriate fashion including the use of encryption or other similar technologies

6



when appropriate.

Counsel should limit access to XL Catlin Information to only those individuals who have a business need to access this Information. Counsel should inform XL Catlin promptly if there is any unauthorized access, acquisition, disclosure, loss, destruction or damage of XL Catlin Information.

**Insurance**

Counsel's Law Firm should have, and maintain coverage, with an insurance company holding a current A.M. Best Rating of A- or better for Technology Errors & Omissions or Miscellaneous Errors & Omissions Insurance or Professional Liability, including cyber liability, in the amount of $2,000,000.

# Billing/e-Billing

**General**

All approved legal panel firms (and non-panel firms engaged with e-Billing capabilities) should submit legal invoices electronically to XL Catlin for services rendered. These should be submitted through approved XL Catlin e-Billing systems in order for invoices to be reviewed and paid timely.

In certain limited circumstances and exceptional situations outside the United States, Canada and United Kingdom or where e-Billing may not be fully available for use, legal firms should make arrangements in advance with the XL Catlin claim professional before billing commences.

**Timing**

Invoices should be submitted at the same time as the 90 day follow up Litigation Management Plan. The 90 day follow up Litigation Management Plan should include the Budget Summary Report and be emailed to the claim professional.

<u>Note</u>:
- The corresponding totals of fees and expenses in an invoice should not exceed the approved amounts of the respective budget period;
- The line item service dates should fall within the start and end period of the specific budget period – depending on the service dates it may be necessary to split an invoice into the appropriate budget period;
- All remaining services should be invoiced no later than 30 days from the final disposition.

XL Catlin e-Billing processes and procedures should be adhered to for applicable countries/products and compliance will be monitored vigorously.

**Content**

Invoices should be itemized to show, for each task performed:

- The date the work was performed
- A full description of the specific task performed
- The name and title of the individual performing the task
- The time spent on the task in 1/10 hour increments (or as agreed)
- Charges incurred for the task – split by time and disbursements
- Disbursements should be individually itemized

The following should also be shown in total for each individual billed:



- Name and title
- Hourly rates
- Total number of hours billed
- Total disbursements

Total charges incurred during a billing period should be accounted separately from past amounts carried forward on a bill.

Unless the disbursement is of an unusually high amount, the legal firm should outlay the disbursement cost itself and seek reimbursement through its regular billing cycles.

| | |
|---|---|
| **Description of Charges & Block Billing** | Vaguely described or unspecified charges will not be reimbursed. With regard to research time, the research undertaken should be described with sufficient detail to identify the nature and purpose of the research.<br><br>Blocked billing entries are not acceptable unless all of the functions, activities and/or tasks entered together:<br>1. Fall within the same UTBMS Phase/Task Code; and<br>2. Reasonably relate to each other; and<br>3. Are entered together under the UTBMS Activity Code most related to the blocked activities.<br><br>Otherwise, each function, activity or task performed should be billed separately with an appropriate time entry. Any blocked billing entries will not be reimbursable.<br>A specific narrative description should be provided, even where the various UTBMS Code Sets are being used and included in the invoice. The Company will, at its sole discretion, afford the opportunity for the legal firm to correct the blocked billing entries. |
| **Hourly Rates** | Hourly charges of all fee earners (aka, Timekeepers) involved need to have been expressly agreed prior to instruction. |
| **Late Payment of Invoices** | If an invoice remains unpaid by the Company for 60 days, a reminder should be sent to the claim professional and then if unresolved, XL Catlin should be consulted about the unpaid bill. |
| **Quality Audit** | XL Catlin reserves the right to audit invoices and overall matter handling quality on an ad-hoc basis, and to instruct an external bill-review company to complete elements of this task. Full co-operation and access to files is expected in this circumstance.<br><br>Should XL Catlin determine that it is appropriate to seek this option, it will do so in full compliance of the law in the applicable jurisdiction and country. |

# Expense Control



| | |
|---|---|
| **Pre-approval of Personnel and Hourly Rates** | Both use of personnel and hourly rates should be agreed upfront with XL Catlin.<br><br>Invoices will not be accepted if personnel or their hourly rates have not been approved. Any fee increases should be approved prior to implementation. |
| **Appropriate Use of Personnel** | In all circumstances, tasks should be performed by person(s) at the appropriate level to ensure quality and cost effectiveness. To achieve the best efficiency and value, the role and responsibilities of the firm's staff members should be clearly defined and appropriate to each individual's qualifications, level of experience and billing rate.<br><br>The following activities are specific examples where the task is more efficiently handled by a paralegal. These tasks will be reimbursed at a paralegal rate unless an extraordinary circumstance or complexity exists that requires Counsel's involvement.<br><br>**Note:** If a firm does not employ paralegals and bill for the following services at an attorney level, the charges will be reduced to an appropriate representative paralegal rate. |

- preparing and reviewing deposition notices
- preparing summary of records including chronologies
- preparing document authorizations
- preparing subpoenas and work related to procurement of deposition notices, records and documents
- preparing page/line deposition summaries
- conducting database searches
- organizing documents received in discovery
- organizing documents to be submitted in response to discovery request
- preparing Entry of Appearance
- preparing Substitution of Attorney
- preparing form interrogatories
- preparing form requests  to produce
- preparing stipulations to extend time to answer
- preparing form jury trial demand

<u>Depositions</u>: If substantive deposition summaries are prepared (not page/line or indexing) they should be prepared by the attorney attending the deposition and focus on the impact the deposition had on the case.

| | |
|---|---|
| **Daily Hours Worked** | Any billing in excess of 8 hours per day per person needs to be pre-approved by XL Catlin. |
| **Meetings, Interviews, Inspections, Hearings** | Only one attorney should be present at meetings, interviews, inspections and hearings unless the attendance of additional personnel is beneficial and necessary, in which case express pre-approval should be obtained from XL Catlin. |
| **Extraordinary Legal Projects** | Prior approval should be obtained for any legal research projects involving over ten hours of time. A report summarizing the research should also be sent to XL Catlin. |
| **Education** | The education of inexperienced personnel is not a reimbursable expense. No training or education materials will be reimbursed. |



| | |
|---|---|
| **Conferences** | Conferences between or among personnel at the same firms are sometimes appropriate, but potentially expensive. Conferences will only be reimbursed if they advance the litigation in an efficient and cost effective manner. |

**Disallowed Billings**

XL Catlin will not pay for general diary or status reviews. These are defined as a review which is not precipitated by an event, such as a telephone call or receipt of correspondence, or which does not result in the creation of any tangible work product. File reviews conducted solely for the purpose of providing a status report are not billable unless the status report is either mandated by these guidelines or specifically requested by the claim professional.

XL Catlin will not pay for time spent for providing supervision. The following situations represent examples of supervision that should not be billed:

- Giving work assignments; or
- Reviewing, revising, or proofreading work product of another attorney or paralegal.

XL Catlin does not pay for research on local rules or items considered basic or routine as the company retains legal firms because of their knowledge and experience regarding local practice

**Non-Reimbursable Costs**

Conferences between or among personnel at the same firms are sometimes appropriate, but potentially expensive. Conferences will only be reimbursed if they advance the litigation in an efficient and cost effective manner. In addition, XL Catlin will not reimburse costs submitted for:

- Training of junior associates, paralegals, legal assistants, or clerks
- Routine Discovery - for routine discovery demands (unless "good cause" can be demonstrated requiring Counsel's extra work due to the uniqueness or novelty of the facts and issues presented)
- Any file review done when the file is transferred to a new attorney
- Research in excess of 10 hours, unless previously authorized
- Lexis, Westlaw or other electronic or computer assisted research license or usage fees without prior approval
- Time associated with compliance with e-Billing and/or budgeting
- Continuing education for any personnel
- Administrative services including secretarial and clerical functions. These tasks include, but are not limited to:
  - Opening mail
  - Acknowledgement letters
  - New file set up
  - Maintenance of office and attorney calendars
  - Transcribing, copying, posting, faxing, emailing, and inserting documents into and retrieving documents from the file
  - Preparing form letters
  - Communicating with copy services, interpreters, court reporters, medical offices or other law offices for the purpose of scheduling
  - Scheduling depositions, medical exams or other appointments
  - Calendaring
  - Conflict checks
  - Organizing and reorganizing files
  - Bate stamping/numbering and date stamping
  - Indexing file materials
  - Tabbing file materials



- o Create and organize folders, binders and notebooks
- o Update lists, logs and charts
- o Organize file for storage
- o In-house messenger service
- o In-house photocopying expenses in excess of $.10 per page. (the number of pages should be included on the invoice)
- o Overnight or express delivery service unless specific time constraints are required; if these items are billed, an explanation should be provided
- o Mileage in excess of the current tax authority rate for mileage reimbursement
- o Insurer and Counsel agree to be compensated fifty percent (50%) of the firm's billing for all travel time, other than necessary work completed during this time which will paid at 100%
- o Preparation of bills/billing and/or negotiating disputes over bills/billing charges
- o Facsimile transmission charges other than the appropriate long-distance or local telephone charges for the transmission
- o Normal postage
- o Telephone bills

| | |
|---|---|
| **Vendors Hired by Counsel** | Invoices from any vendors hired by Counsel and paid for by the firm should be attached to the firms invoices submitted to XL Catlin. No mark-ups are permitted and receipts should be made available upon request.<br><br>**Note:** There may be exceptions where vendors are paid directly by XL Catlin. These should be agreed on a case-by-case basis. |
| **Document Revisions** | Reasonable and non-excessive charges for substantially revising documents are reimbursable. However, revisions made because of proof reading a document will not be reimbursed. |
| **Document Management** | If the case involves document management which the legal firm is not equipped to handle and would require an addition to current facilities, XL Catlin should be advised in the acknowledgement letter or as soon as the burden is apparent.<br><br>Pre-approval is required for any additional expenses relating to document management. |
| **Court Fees** | Court fees will be reimbursed at cost with no mark up. |
| **External Printing** | External printing costs will be reimbursed at cost with no mark up. |
| **Meals & Hospitality** | Meal costs will not be reimbursed unless travel is required and pre-approved. |

# <u>Travel</u>



| | |
|---|---|
| **General Guidelines** | Out-of-area, overnight or day travel should be at the lowest available fare booked 14 days or more in advance, unless notice is not received within this time frame. It is expected that Counsel will seek the best rates for air travel, hotel, car rental and meals. |
| | Necessary travel for one person will be reimbursed. If any trip requires the presence of more than one person, pre-approval should be obtained from XL Catlin. Coach/ economy class fares for travel will be reimbursed.  The lowest available fare for the journey should be obtained. Any exceptions require pre-approval from XL Catlin. |
| | Alternatives to travel, such as video conferencing or the retention of local Counsel should be considered. XL Catlin should have prior approval of the selection of local Counsel. |
| | Entertainment, dry cleaning or other non-essential charges will not be reimbursed. Receipts should be submitted for all travel expenses. |
| **Charge for Travel Time** | Time spent travelling on XL Catlin's matters will be reimbursed at 50%, other than necessary work completed during this time which will paid at 100%, unless expressly agreed otherwise. |
| | If work is undertaken during the business trip either on another matter or for another client the time should be pro-rated accordingly. |
| **Receipts for Expenditure** | All disbursements relating to travel should be itemized and proof of receipts for all disbursements over USD $50 (or local equivalent) should be attached to the firm's invoices submitted. |
| **Overnight Stays** | If a matter requires an overnight stay, this should be in moderately priced accommodation. |
| | Personal expenses incurred while on a business trip will not be reimbursed. Reasonably priced meals will be reimbursed. |
| **Own Vehicle Use** | Reimbursement for use of own vehicles will be at the prevailing rate as published by the appropriate authority in the country / state in question, or at a reasonable rate if no prevailing rate applies. |
| **Car Rental** | Only rental of medium sized vehicles will be reimbursed. The lowest available rate for the journey should be obtained. |



# Appendix

**Sample Litigation Management Plan & Status Reporting:**

| LEGAL FIRM LETTERHEAD |
| --- |

| **XL Catlin Claims** |
| --- |
| **Initial/Interim Status Report #** |
| **XL Catlin File #** |
| **Dated: mm/dd/yyyy** |
| **Page 1 of 3** |

**ATTORNEY-CLIENT/PRIVILEGED/WORK-PRODUCT DOCUMENT**

**To:**   [XL Catlin File Supervisor]                    **Date:**

**From:** [Liaison Attorney]

    [Name of Firm]

**XL Catlin Initial/Interim Summary Status Report**

**Insured:** _____

**Date of Loss:** _____

**First Notice of Loss:** _____

**XL Catlin File #:** _____

**Subject Line:** _____

**Background Facts:**

**Policy Limits:**

**Claimants:**

   ➢ Name(s)

   ➢ Age

   ➢ Dependents / Names / Age

   ➢ Annual Earnings

13



XL CATLIN

---

**XL Catlin Claims
Initial/Interim Status Report #
XL Catlin File #
Dated: mm/dd/yyyy
Page 2 of 3**

---

<u>**Litigation:**</u>

➢ <u>Court(s)</u>

➢ <u>Date Suit Filed</u>

➢ <u>Judge(s)</u>

➢ <u>Co-Defendants / Name / Attorney Name & Firm / Insurer(s)</u>

➢ <u>Local Counsel(s) / Partner Name & Firm / Contact Information</u>

➢ <u>Plaintiff Attorney(s) / Firm Name / Client Name</u>

➢ <u>Punitive Damages / directly Assessed / Vicariously Assessed / Insurability</u>

➢ <u>Mediation Date(s) / Name of Mediator(s)</u>

➢ <u>Trial Date(s)</u>

<u>**Issues/Risks/Concerns:**</u>

➢ What are main issues to be litigated against XL Catlin insured(s)?
➢ What are the known risks or concerns?

<u>**Analysis of Liability:**</u>

<u>**Analysis of Damages / Injuries / Property Damage:**</u>

➢ <u>Death Cases</u> – Analysis is based on:

- Applicable Wrongful Death Statute
- Jurisdiction / Verdict Value
- Age
- Marital Status
- Income
- Dependents



> **XL Catlin Claims**
> **Initial/Interim Status Report #**
> **XL Catlin File #**
> **Dated: mm/dd/yyyy**
> **Page 3 of 3**

➢ <u>Injury Cases</u> – Analysis is based on :

- Severity
- Type of Injury
- Medical Specials to date
- # of surgeries performed
- # of surgeries prescribed / long-term prognosis

**Liens Filed / Lienholder:**

**Applicable Case Law / Substantive Law:**

➢ Short review of applicable jurisdiction law

➢ Comparative / Contributory Negligence rules of the jurisdiction

**Overall Case Settlement Evaluation / Value of Claim:**

**Strategy for Resolution:**

**Offers / Demands:**

**Current Status (update with each quarterly / monthly report):**

**Legal & non-legal billings to date (updated each quarter)**

**Budget spent/projected for the remainder of the case (updated each quarter)**

**Recommendations:**

_____          _____
Name of Attorney                                              Date

15



**Sample Budget Summary (Variance) Report**

# XL Catlin Budget Summary

| | |
|---|---|
| XL Catlin Claim Number: | |
| Name of Matter: | |
| (Name of Claimant) vs (Insured) | |
| Law Firm Reference: | |

**XL Catlin Budget Summary :**

XL Catlin requests your recommended budget to reflect the most likely fees and expenses required to defend this claim to trial. Our guidelines ask you to prepare a budget for approval and this document is intended to provide us with the most up to date summary of incurred and proposed fees and expenses.

This document is not a replacement of the budget process which must be prepared in accordance with our guidelines but rather it is a summary of the information needed to enable both you and us to more accurately assess the total cost of handling the claim and the accuracy of your budget recommendations. We ask you to submit a completed version of this document in to the native excel format with your 90 day reports AND any time that you recommend that the budget be amended.

**Current Budget Recommended by Law Firm inc. Tax**   Date Completed:

| Billing Category | Budget ($) |
|---|---|
| Legal (fee) | |
| Hard Costs ** | |
| Experts*** | |
| **Total:** | $ - |

**Revised Budget Recommended by Law Firm inc. Tax**   Date Completed:

| Billing Category | Budget ($) |
|---|---|
| Legal (fee) | |
| Hard Costs ** | |
| Experts*** | |
| **Total:** | $ - |

**Initial Budget Recommended by Law Firm inc. Tax**   Date Completed:

| Billing Category | Budget ($) |
|---|---|
| Legal (fee) | |
| Hard Costs ** | |
| Experts*** | |
| **Total:** | $ - |

**Submitted Invoices to Date (Include any Submitted Invoices awaiting Payment)**
(Excluding Expert Invoices **Paid by XL Catlin** - but including any Experts' fees incorporated in your invoices submitted - see table below)

| Date Range (from) | Date Range (to) | Invoice # | Legal | Hard Costs | Total |
|---|---|---|---|---|---|
| | | | | | $ - |
| | | | | | $ - |
| | | | | | $ - |
| | | | | | $ - |
| | | | | **Grand Total:** | $ - |

**Submitted Expert Invoices to Date (Include any Submitted Invoices awaiting Payment)**
(Include ALL Expert Invoices received by you but **paid directly by XL Catlin**)

| Date Range (from) | Date Range (to) | Vendor Name | Service | Reference # | Total |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | **Grand Total:** | $ - |

| | |
|---|---|
| **Work in Progress from Date of Last Invoice ($):** | |
| **Balance of Budget Less Billed Invoice Total:** | $ - |
| **Balance of budget, less billed invoices AND work in progress:** | $ - |

**Key Notes**

Press 'TAB' in cells J16 and J27 to create additional rows for invoices

Completion of Work in Progress from Date of Last Invoice', cell J37 is critical

All costs in USD

Revised and initial budget are NOT to be overwritten

**Hard Costs *includes* Disbursements, Expenses etc. (Note: experts are separate line item)

***Experts *includes* any experts fees submitted direct to XL Catlin, for payment by XL Catlin

ersion 17 - 24/02/2016

16

**EXHIBIT F**



Yeremey Krivoshey <ykrivoshey@bursor.com>

## McMillion v. RCA - confidential settlement communication
26 messages

**Andrew Steinheimer** <asteinheimer@ellislawgrp.com>　　　　Mon, Dec 12, 2016 at 1:08 PM
To: "Yeremey Krivoshey (ykrivoshey@bursor.com)" <ykrivoshey@bursor.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Yeremey,

I have discussed potential settlement with Rash Curtis and at this time, we don't really see a realistic way to settle the case on a class basis.  Identifying and providing notice to any putative class is simply not feasible (and a large part of why we do not believe this case will be certified) and I do not believe the Court will approve a notice by publication. However, Rash Curtis is willing to settle on an individual basis with the named plaintiffs on the condition that your office confirms that you do not represent any other putative class members and have no current intent to file a subsequent lawsuit on behalf of some other potential class member.  Rash Curtis has authorized me to offer $30,000 to settle the claims globally.  How that is divided among the plaintiffs or your firm is not material to RCA.  In return for the payment RCA requests a release of all known and unknown claims including a Civil Code 1542 waiver.  The case would be dismissed with prejudice as to the named plaintiffs and without prejudice as to any putative class.

Please let me know.


-Andrew Steinheimer


*Partner*

**Ellis Law Group, LLP**

740 University Ave., Suite 100

Sacramento, CA 95825

(916) 283-8820

(916) 283-8821 fax

asteinheimer@ellislawgrp.com




**Yeremey Krivoshey** <ykrivoshey@bursor.com>　　　　Mon, Dec 12, 2016 at 2:03 PM
To: Andrew Steinheimer <asteinheimer@ellislawgrp.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Thanks Andrew. I'll take this to my clients and get back to you.
[Quoted text hidden]
--
Yeremey Krivoshey
Bursor & Fisher, P.A.
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Tel: (925) 300-4455
Fax: (925) 407-2700

E-Mail: ykrivoshey@bursor.com

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>      Tue, Dec 13, 2016 at 9:39 AM
To: Andrew Steinheimer <asteinheimer@ellislawgrp.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Andrew:

For the class aspect, I understand that the class as plead would call for a very expensive notice campaign. Before we scrap a class-wide deal altogether, I would propose considering whether we can define the class as those people who received calls from Rash Curtis for whom Rash Curtis obtained their cellphone number through skip tracing. The data you have provided makes clear that Rash Curtis does in fact obtain cellphone numbers for at least some of its accounts using skip tracing. I imagine this class would be significantly more narrow, and likely quite a bit more manageable.

If a class-wide deal is simply off the table, we are willing to lower our offer for an individual settlement to $85,000 for a dismissal with prejudice as to the named plaintiffs and without prejudice as to any putative class.

Please let me know if you want to discuss. Thanks.
[Quoted text hidden]

---

**Andrew Steinheimer** <asteinheimer@ellislawgrp.com>      Tue, Dec 13, 2016 at 10:23 AM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

RCA's policy is not to call numbers obtained through skip-tracing with a dialer unless the number is not a cell phone. There may be numbers that fall through the cracks on that, but I don't see a way of figuring it out with records alone. I'll discuss that and the counter of $85,000 with Rash Curtis and get back to you soon.

[Quoted text hidden]

---

**Andrew Steinheimer** <asteinheimer@ellislawgrp.com>      Wed, Dec 14, 2016 at 1:27 PM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Yeremy,

Rash Curtis ups it offer to $37,500 to settle with three named plaintiffs. Let me know if we can get close.


-Andrew Steinheimer


*Partner*

**Ellis Law Group, LLP**

740 University Ave., Suite 100

Sacramento, CA 95825

(916) 283-8820

(916) 283-8821 fax

asteinheimer@ellislawgrp.com

**From:** Yeremey Krivoshey [mailto:ykrivoshey@bursor.com]
**Sent:** Tuesday, December 13, 2016 9:40 AM
**To:** Andrew Steinheimer
**Cc:** Jennifer Mueller; Amanda Griffith
**Subject:** Re: McMillion v. RCA - confidential settlement communication


Andrew:

[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]
[Quoted text hidden]

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                    Wed, Dec 14, 2016 at 1:46 PM
To: Andrew Steinheimer <asteinheimer@ellislawgrp.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

At this rate, we'd have to meet in the middle of our offers before I recommended that my clients take the offer. We can cut through the back and forth and get there now if your client is amenable.
[Quoted text hidden]

---

**Andrew Steinheimer** <asteinheimer@ellislawgrp.com>                    Wed, Dec 14, 2016 at 1:49 PM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

I'll talk to them.  I think it will be difficult to get them to $50k (and I know that's not the middle) but I will see what we can do.

[Quoted text hidden]

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                    Mon, Dec 19, 2016 at 10:18 AM
To: Andrew Steinheimer <asteinheimer@ellislawgrp.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Andrew, did you have a chance to talk to your client about this? I'm getting push back on my side for $50k, but I think we're close. I think $65k would get this done.
[Quoted text hidden]

---

**Andrew Steinheimer** <asteinheimer@ellislawgrp.com>                    Mon, Dec 19, 2016 at 10:20 AM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Yeremey,

I am not sure which middle you were suggesting, but I have discussed further with RCA and I have convinced them to get to the bottom line and offer $50,000 to settle the case.   However, they will need to make payment towards the settlement and we proposed 10,000 January 15 and $10,000 on the 15th of each month until the $50,000 is paid. Please let me know, if we can resolve on these terms.


-Andrew Steinheimer

*Partner*

**Ellis Law Group, LLP**

740 University Ave., Suite 100

Sacramento, CA 95825

(916) 283-8820

(916) 283-8821 fax

asteinheimer@ellislawgrp.com

**From:** Yeremey Krivoshey [mailto:ykrivoshey@bursor.com]
**Sent:** Wednesday, December 14, 2016 1:47 PM

[Quoted text hidden]

[Quoted text hidden]

---

**Andrew Steinheimer** <asteinheimer@ellislawgrp.com>                    Mon, Dec 19, 2016 at 10:21 AM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>

I was just e-mailing you.  I have the $50k,  I don't think I can get more.  Certainly not $65,000.

[Quoted text hidden]

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                    Mon, Dec 19, 2016 at 10:38 AM
To: Andrew Steinheimer <asteinheimer@ellislawgrp.com>

Andrew, we don't normally agree to payment plans for settlements of this size. I'd agree to a payment plan here if it's $60k
though, with the last payment being June 15.
[Quoted text hidden]

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                    Tue, Dec 20, 2016 at 3:36 PM
To: Andrew Steinheimer <asteinheimer@ellislawgrp.com>

FYI, I'm going to be out of the office all of next week. I'd like to get this resolved this week if possible so this doesn't spill
over into the next year.
[Quoted text hidden]

---

**Andrew Steinheimer** <asteinheimer@ellislawgrp.com>                    Tue, Dec 20, 2016 at 3:39 PM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>

Thanks for following-up.  I am working on getting over $50,000 but don't have any more yet.  My client is in and out
this week so I am not sure if I will have any response this week.

[Quoted text hidden]

---

**Andrew Steinheimer** <asteinheimer@ellislawgrp.com>                    Tue, Jan 3, 2017 at 10:30 AM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Yeremey,

Rash Curtis is willing to settle this matter for $55,000.  They can pay the $55,000 in payments ending June 15.  In return for release of all claims, dismissal of named plaintiff's claims with prejudice and dismissal of putative class claims without prejudice, with confirmation from your firm that you do not currently have another putative class member as a client that you intend to re-file.

Please let me  know if we have a deal.  Thanks.


-Andrew Steinheimer


*Partner*

**Ellis Law Group, LLP**

740 University Ave., Suite 100

Sacramento, CA 95825

(916) 283-8820

(916) 283-8821 fax

asteinheimer@ellislawgrp.com


---

**From:** Andrew Steinheimer
**Sent:** Tuesday, December 20, 2016 3:40 PM
**To:** 'Yeremey Krivoshey'
**Subject:** RE: McMillion v. RCA - confidential settlement communication


Thanks for following-up.  I am working on getting over $50,000 but don't have any more yet.  My client is in and out this week so I am not sure if I will have any response this week.


**From:** Yeremey Krivoshey [mailto:ykrivoshey@bursor.com]
**Sent:** Tuesday, December 20, 2016 3:37 PM
**To:** Andrew Steinheimer

[Quoted text hidden]

[Quoted text hidden]

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                    Tue, Jan 3, 2017 at 12:45 PM

To: Andrew Steinheimer <asteinheimer@ellislawgrp.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Andrew, the deal remains $60k with monthly payments. Please confer with your client and let me know if we have a deal.
Thanks.

[Quoted text hidden]

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                                      Fri, Jan 6, 2017 at 2:49 PM
To: Andrew Steinheimer <asteinheimer@ellislawgrp.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Andrew,

Any update on this?

[Quoted text hidden]

---

**Andrew Steinheimer** <asteinheimer@ellislawgrp.com>                              Fri, Jan 13, 2017 at 9:07 AM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Ok, we have a deal on the 60k with payments I'll prepare an agreement.

[Quoted text hidden]

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                                      Fri, Jan 13, 2017 at 5:46 PM
To: Andrew Steinheimer <asteinheimer@ellislawgrp.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Thanks.

[Quoted text hidden]

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                                      Tue, Jan 24, 2017 at 9:31 AM
To: Andrew Steinheimer <asteinheimer@ellislawgrp.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Andrew, you have an update on the settlement? We need to get this done asap considering that the payments are
already getting phased in monthly installments.

[Quoted text hidden]

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                                      Wed, Jan 25, 2017 at 2:37 PM
To: Andrew Steinheimer <asteinheimer@ellislawgrp.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Just got a call from Plaintiff McMillion saying that she's still getting robodialed daily by Rash Curtis to this day! Not sure
how messed up your client's dialer is, but this needs to stop. It's also strengthened her claims significantly. Further, based
on our review of the documents, it now appears clear each of the Plaintiffs' phone numbers were obtained through skip
tracing. Are we still doing this deal or should I start noticing depos for class cert?

[Quoted text hidden]

---

**Andrew Steinheimer** <asteinheimer@ellislawgrp.com>                             Wed, Jan 25, 2017 at 2:38 PM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

Please let me know what number is being called.  We have a deal and you will have the signed agreement soon.

[Quoted text hidden]

**Yeremey Krivoshey** <ykrivoshey@bursor.com>　　　　　　　Wed, Jan 25, 2017 at 2:40 PM
To: Andrew Steinheimer <asteinheimer@ellislawgrp.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

　415 632 0589. She said the most recent calls came from 707 454 2010.
　[Quoted text hidden]

---

**Andrew Steinheimer** <asteinheimer@ellislawgrp.com>　　　　Wed, Jan 25, 2017 at 4:47 PM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

　Yeremey,

　Can you give me a time/date of the recent calls? I want to make sure they stop. But it appears that the medical
　provider is continuing to send new accounts to Rash because McMillion is not paying her co-pays.

　[Quoted text hidden]

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>　　　　　　　Wed, Jan 25, 2017 at 5:09 PM
To: Andrew Steinheimer <asteinheimer@ellislawgrp.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

　I can't give you an exact time. I think she said she got one as recently as yesterday though.
　[Quoted text hidden]

---

**Andrew Steinheimer** <asteinheimer@ellislawgrp.com>　　　　Wed, Jan 25, 2017 at 5:09 PM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>

　Ok, I'll look into it.

　[Quoted text hidden]

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>　　　　　　　Tue, Jan 31, 2017 at 5:36 PM
To: Amanda Griffith <agriffith@ellislawgrp.com>
Cc: Jennifer Mueller <jmueller@ellislawgrp.com>

　FRE 408 Confidential Settlement Communication

　Amanda,

　We've been in touch with Steven Kizer, Rash Curtis' former Compliance Director, who I am sure you know well. He is a
　treasure trove of information, and obviously knows the ins and outs of Rash Curtis' practice better than any of us, you
　included. I have zero doubt that a class can be certified with his help.

　The settlement draft that was circulated earlier by your firm is unacceptable. Our new settlement offer is $375,000, or, in
　the alternative, we need to sit down and get a class deal done with a mediator.

　We have a class certification deadline quickly approaching, so we need to get a move on this quickly. We'll likely seek an
　extension to allow us to take discovery in light of all the newly discovered information and to get information that is now
　apparent has been improperly withheld.
　[Quoted text hidden]

**EXHIBIT G**



Yeremey Krivoshey <ykrivoshey@bursor.com>

## Mcmillion settlement
8 messages

**Mark Ellis** <mellis@ellislawgrp.com>                                    Tue, Jan 31, 2017 at 6:19 PM
To: "ykrivoshey@bursor.com" <ykrivoshey@bursor.com>
Cc: Mark Ellis <mellis@ellislawgrp.com>, Amanda Griffith <agriffith@ellislawgrp.com>, Paula Crary
<pcrary@ellislawgrp.com>, Rosanne Estrella <restrella@ellislawgrp.com>, Crystal Strong <cstrong@ellislawgrp.com>, Roxy
Chipak <rchipak@ellislawgrp.com>, Cheri Bowden <cbowden@ellislawgrp.com>

Counsel, my name is Mark and I am the managing partner of Ellis Law Group. It is clear that you and Andrew entered into
an enforceable settlement confirmed in writing on January 13, 2017. Andrew has left the firm and I have taken over the
finalization of the settlement. The fact that you are talking to a disgruntled former employee that is attempting to extort its
former employer is not impressive to me. Your suggestion that my client should pay you $375,000 given this done deal is
outrageous and is hereby rejected. I need your signed agreement back ASAP and we will get you the first payment as
promised when it is executed. Mark

Sent from my iPhone

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                              Tue, Jan 31, 2017 at 6:21 PM
To: "L. Timothy Fisher" <ltfisher@bursor.com>, Annick Persinger <apersinger@bursor.com>

That was quick.

[Quoted text hidden]
--
Yeremey Krivoshey
Bursor & Fisher, P.A.
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Tel: (925) 300-4455
Fax: (925) 407-2700
E-Mail: ykrivoshey@bursor.com

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                              Tue, Jan 31, 2017 at 6:29 PM
To: Mark Ellis <mellis@ellislawgrp.com>
Cc: Amanda Griffith <agriffith@ellislawgrp.com>, Paula Crary <pcrary@ellislawgrp.com>, Rosanne Estrella
<restrella@ellislawgrp.com>, Crystal Strong <cstrong@ellislawgrp.com>, Roxy Chipak <rchipak@ellislawgrp.com>, Cheri
Bowden <cbowden@ellislawgrp.com>
Bcc: "L. Timothy Fisher" <ltfisher@bursor.com>

Mark,

We never agreed on the material terms, and, further, Plaintiffs never even had a chance to provide revisions to the draft
agreement Andrew circulated. Obviously, no agreement has been signed and no agreement is enforceable.

We both know that Mr. Kizer's information could bankrupt the company. I urge you to take our offer seriously.

Otherwise, I look forward to working on this case with you as this case proceeds.

On Tue, Jan 31, 2017 at 6:19 PM, Mark Ellis <mellis@ellislawgrp.com> wrote:
Counsel, my name is Mark and I am the managing partner of Ellis Law Group. It is clear that you and Andrew entered
into an enforceable settlement confirmed in writing on January 13, 2017. Andrew has left the firm and I have taken over
the finalization of the settlement. The fact that you are talking to a disgruntled former employee that is attempting to
extort its former employer is not impressive to me. Your suggestion that my client should pay you $375,000 given this
done deal is outrageous and is hereby rejected. I need your signed agreement back ASAP and we will get you the first
payment as promised when it is executed. Mark

Sent from my iPhone

[Quoted text hidden]

---

**Mark Ellis** <mellis@ellislawgrp.com>                                             Tue, Jan 31, 2017 at 6:33 PM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>
Cc: Amanda Griffith <agriffith@ellislawgrp.com>, Paula Crary <pcrary@ellislawgrp.com>, Rosanne Estrella
<restrella@ellislawgrp.com>, Crystal Strong <cstrong@ellislawgrp.com>, Roxy Chipak <rchipak@ellislawgrp.com>, Cheri
Bowden <cbowden@ellislawgrp.com>

So sorry but I disagree. I will be happy to work with you but agreed settlements are not set aside this lightly and there was
no basis any of the terms are not acceptable. Mark.

Sent from my iPhone
[Quoted text hidden]

---

**Mark Ellis** <mellis@ellislawgrp.com>                                             Tue, Jan 31, 2017 at 6:39 PM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>
Cc: Amanda Griffith <agriffith@ellislawgrp.com>, Paula Crary <pcrary@ellislawgrp.com>, Rosanne Estrella
<restrella@ellislawgrp.com>, Crystal Strong <cstrong@ellislawgrp.com>, Roxy Chipak <rchipak@ellislawgrp.com>, Cheri
Bowden <cbowden@ellislawgrp.com>, Mark Ellis <mellis@ellislawgrp.com>, Andrew Steinheimer
<asteinheimer@ellislawgrp.com>

And just to be clear this demand is clearly extortive per se (bankrupt the company- really?) I ask you to reconsider.
Sincerely. Mark

Sent from my iPhone

On Jan 31, 2017, at 6:29 PM, Yeremey Krivoshey <ykrivoshey@bursor.com> wrote:

[Quoted text hidden]

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                                       Tue, Jan 31, 2017 at 6:47 PM
To: Mark Ellis <mellis@ellislawgrp.com>
Cc: Amanda Griffith <agriffith@ellislawgrp.com>, Paula Crary <pcrary@ellislawgrp.com>, Rosanne Estrella
<restrella@ellislawgrp.com>, Crystal Strong <cstrong@ellislawgrp.com>, Roxy Chipak <rchipak@ellislawgrp.com>, Cheri
Bowden <cbowden@ellislawgrp.com>, Andrew Steinheimer <asteinheimer@ellislawgrp.com>

Not meant to be a final offer. We're happy to consider a counter once you've had a chance to discuss with your client.

Not extortive in the least. Discovery now shows that there were hundreds of calls made to my clients, that skip tracing
was used to obtain their cell phone numbers, and that calls persisted after requests to stop.  We're looking at $1,500 per
call easy. Plus, attorneys fees for the debt collection claims.

[Quoted text hidden]

---

**Annick Persinger** <apersinger@bursor.com>                                        Tue, Jan 31, 2017 at 7:32 PM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>

Yup. The question is, or what?

Sent from my iPhone
[Quoted text hidden]

---

**Mark Ellis** <mellis@ellislawgrp.com>                                             Tue, Jan 31, 2017 at 8:15 PM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>
Cc: Amanda Griffith <agriffith@ellislawgrp.com>, Paula Crary <pcrary@ellislawgrp.com>, Rosanne Estrella
<restrella@ellislawgrp.com>, Crystal Strong <cstrong@ellislawgrp.com>, Roxy Chipak <rchipak@ellislawgrp.com>, Cheri

Bowden <cbowden@ellislawgrp.com>, Andrew Steinheimer <asteinheimer@ellislawgrp.com>, Mark Ellis <mellis@ellislawgrp.com>

You had all discovery before the case settled. You chose to settle. What can I say?

Sent from my iPhone
[Quoted text hidden]

**EXHIBIT H**



**Yeremey Krivoshey <ykrivoshey@bursor.com>**

---

## Kizer Transcript
1 message

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>      Mon, May 1, 2017 at 10:20 AM
To: Mark Ellis <mellis@ellislawgrp.com>, Anthony Paul John Valenti <AValenti@ellislawgrp.com>

Attached.

--
Yeremey Krivoshey
Bursor & Fisher, P.A.
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Tel: (925) 300-4455
Fax: (925) 407-2700
E-Mail: ykrivoshey@bursor.com

---

📄 **Kizer Transcript.PDF**
2239K

**EXHIBIT I**



Yeremey Krivoshey <ykrivoshey@bursor.com>

## McMillion v. Rash Curtis & Associates, Case No. 4:16-cv-03396-YGR

**Mark Ellis** <mellis@ellislawgrp.com>      Sat, Jul 15, 2017 at 6:49 PM
To: "L. Timothy Fisher" <ltfisher@bursor.com>
Cc: Yeremey Krivoshey <ykrivoshey@bursor.com>, Anthony Paul John Valenti <AValenti@ellislawgrp.com>, Crystal Strong <cstrong@ellislawgrp.com>, Rosanne Estrella <restrella@ellislawgrp.com>, Paula Crary <pcrary@ellislawgrp.com>, Cheri Bowden <cbowden@ellislawgrp.com>, Jennifer Mueller <jmueller@ellislawgrp.com>, Mark Ellis <mellis@ellislawgrp.com>

Thank you. I figured. We are expediting the deposition transcripts to bring the motion.

We will also separately be filing motions for summary judgment as to each plaintiff.

And the prior settlement of $60,000 which you claimed was not a settlement will never be re-offered.

Thanks Tim.

Mark

Sent from my iPhone
[Quoted text hidden]

**EXHIBIT J**

# REDACTED[1]

---

[1] Pursuant to 5/11/2020 Order, ECF No. 32

**EXHIBIT K**



Yeremey Krivoshey <ykrivoshey@bursor.com>

## McMillion, et al. v. Rash Curtis & Associates

17 messages

---

**Anthony Paul John Valenti** <AValenti@ellislawgrp.com>                    Wed, Aug 30, 2017 at 11:11 AM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>, "L. Timothy Fisher" <ltfisher@bursor.com>
Cc: Mark Ellis <mellis@ellislawgrp.com>, Paula Crary <pcrary@ellislawgrp.com>, Crystal Strong <cstrong@ellislawgrp.com>,
Rosanne Estrella <restrella@ellislawgrp.com>, Jennifer Mueller <jmueller@ellislawgrp.com>, Cheri Bowden
<cbowden@ellislawgrp.com>

Yeremey,

Pursuant to Civil Local Rule 30-1, please accept this email as an attempt to meet and confer regarding the scheduling of
the deposition of Ms. Adekoya's supervisor, Teresa Magtibay. Please provide me with three dates in mid-September
when you or one of your colleagues are available to attend Ms. Magtibay's deposition.

**Anthony P. J. Valenti**

**Attorney at Law | Associate**

**Ellis Law Group, LLP**

1425 River Park Drive, Suite 400

Sacramento, CA 95815

Tel: (916) 283-8820

Fax: (916) 283-8821

avalenti@ellislawgrp.com

WARNING: The information contained in this e-mail is intended for the use of the individual or entity to which it is
addressed, and may be privileged, confidential and exempt from disclosure under applicable law. If the reader of this
message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are
hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have
received this e-mail in error, please notify us immediately at the telephone number listed above, or by return e-mail to
avalenti@ellislawgrp.com and delete this communication in a manner that permanently removes it from any computer
drive in your possession. This document was not intended or written to be used and it cannot be used for the purpose of
avoiding tax penalties that may be imposed on the taxpayer.

---

**Anthony Paul John Valenti** <AValenti@ellislawgrp.com>                    Thu, Aug 31, 2017 at 8:30 AM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>, "L. Timothy Fisher" <ltfisher@bursor.com>
Cc: Mark Ellis <mellis@ellislawgrp.com>, Paula Crary <pcrary@ellislawgrp.com>, Crystal Strong <cstrong@ellislawgrp.com>,
Rosanne Estrella <restrella@ellislawgrp.com>, Jennifer Mueller <jmueller@ellislawgrp.com>, Cheri Bowden
<cbowden@ellislawgrp.com>

Yeremey,

Following up on my email from yesterday, I also need your availability in mid-September for the depositions of Daniel Reynoso as well as your experts, Randall Snyder and Colin Weir. Please get back to me with three or four available dates in mid-September so we can start working on the rest of the logistics.

*Anthony P. J. Valenti*

**Attorney at Law | Associate**

**Ellis Law Group, LLP**

1425 River Park Drive, Suite 400

Sacramento, CA 95815

Tel: (916) 283-8820

Fax: (916) 283-8821

avalenti@ellislawgrp.com

WARNING: The information contained in this e-mail is intended for the use of the individual or entity to which it is addressed, and may be privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this e-mail in error, please notify us immediately at the telephone number listed above, or by return e-mail to avalenti@ellislawgrp.com and delete this communication in a manner that permanently removes it from any computer drive in your possession. This document was not intended or written to be used and it cannot be used for the purpose of avoiding tax penalties that may be imposed on the taxpayer.

[Quoted text hidden]

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>      Thu, Aug 31, 2017 at 10:01 AM
To: Anthony Paul John Valenti <AValenti@ellislawgrp.com>
Cc: "L. Timothy Fisher" <ltfisher@bursor.com>, Mark Ellis <mellis@ellislawgrp.com>, Paula Crary <pcrary@ellislawgrp.com>, Crystal Strong <cstrong@ellislawgrp.com>, Rosanne Estrella <restrella@ellislawgrp.com>, Jennifer Mueller <jmueller@ellislawgrp.com>, Cheri Bowden <cbowden@ellislawgrp.com>

Anthony,

We'll seek a protective order if you notice Ms. Adekoya's supervisor's deposition. Your intent to notice her deposition furthers the harassment your client has already inflicted.

We'll seek a protective order as to Daniel Reynoso. There's no reason to depose third party witnesses who have not involved themselves with this litigation and have nothing to do with this case.

We think it's premature to depose our two experts as discovery is ongoing, Defendant has been improperly withholding relevant documents for many months, and they will supplement their expert reports at the close of discovery once a full production is made. We'll agree for these deposition to go forward in September only on the condition that you agree not to take their depositions again after supplemental expert reports are made.

[Quoted text hidden]
--
Yeremey Krivoshey
Bursor & Fisher, P.A.
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Tel: (925) 300-4455
Fax: (925) 407-2700
E-Mail: ykrivoshey@bursor.com

**Anthony Paul John Valenti** <AValenti@ellislawgrp.com>                    Thu, Aug 31, 2017 at 11:31 AM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>
Cc: "L. Timothy Fisher" <ltfisher@bursor.com>, Mark Ellis <mellis@ellislawgrp.com>, Paula Crary <pcrary@ellislawgrp.com>,
Crystal Strong <cstrong@ellislawgrp.com>, Rosanne Estrella <restrella@ellislawgrp.com>, Jennifer Mueller
<jmueller@ellislawgrp.com>, Cheri Bowden <cbowden@ellislawgrp.com>

Mr. Krivoshey,

My obligation under Civil Local Rule 30-1 is to meet and confer regarding your availability for the depositions
themselves.  Please provide me with the requested dates so we can move forward with noticing the depositions.  If I
don't receive dates from you by the close of business tomorrow, September 1, 2017, I *will* notice the depositions for a
unilaterally selected date on the basis that you failed to meet and confer regarding your availability, and raise that
issue as necessary.

Either way, your office is free to seek whatever protective orders it wants.  Ms. Magtibay clearly has personal
knowledge and information relevant to Ms. Adekoya's claims of emotional distress stemming from the alleged
conversation they had following the fax sent by Rash Curtis to verify Ms. Adekoya's employment (which it was legally
entitled to do).  Contrary to your assertions, Ms. Magtibay's deposition is not being taken for any other purpose,
including but not limited to harassment.

As to Mr. Reynoso, it is anticipated that he will have personal knowledge and information relevant to Mr. Perez's
claims.  The fact that he is a "third-party witness who [has] not involved [himself] with this litigation and [has] nothing
to do with this case" is irrelevant.  We expect Mr. Reynoso will be able to explain how Mr. Perez's cell phone number
ended up on his Sutter General Hospital patient information facesheet.  Both Ms. Magtibay and Mr. Reynoso may be
deposed by Rash Curtis pursuant to Rule 30(a)(1) of the Federal Rules of Civil Procedure, which states: "A party may,
by oral questions, depose *any person*, including a party, without leave of court..."

As to your experts, Rule 26(b)(4)(A) of the Federal Rules of Civil Procedure states: "A party may depose any person
who has been identified as an expert whose opinions may be presented at trial.  If Rule 26(a)(2)(B) requires a report
from the expert, the deposition may be conducted only after the report is provided."  Plaintiffs have disclosed both
Mr. Snyder and Mr. Weir as their trial experts and have provided their respective reports.  Accordingly, Rash Curtis is
permitted to notice their depositions at this time.  We will not agree that their depositions will not be taken again in
the event they elect to supplement their reports at a later date.

Yeremey, it was your clients who brought this action against mine.  It was your clients who ditched the previous
settlement agreement. ███████████████████████████████████████  They cannot now
seek to limit Rash Curtis from obtaining relevant information and testimony that falls well within the scope of
discovery on the bases you have asserted below.

It was also your clients who voluntarily provided their respective cell phone numbers to each of the entities on whose
behalf Rash Curtis was calling.  They each gave their prior express consent to be called, and neither of your proposed
class reps meet the class definitions because neither of their cell phone numbers were skip-traced.  Rather, they were
provided by Rash Curtis' creditor-clients in whose shoes Rash Curtis stood when it placed the allegedly-violative calls.

Consequently, Rash Curtis has a complete affirmative defense to your clients' TCPA claims. *Van Patten v. Vertical Fitness Group, LLC,* 847 F.3d 1037, 1044 (9th Cir. 2017).

Similarly, there is no evidence that Rash Curtis intended to harass your clients in violation of the FDCPA or Rosenthal Act. *See Arteaga v. Asset Acceptance, LLC,* 733 F.Supp.3d 1218, 1229 (E.D. Cal. 2010); *Jiminez v. Accounts Receivable Management, Inc.,* 2010 WL 5829206, at *6 (C.D. Cal. 2010); *Tucker v. The CBE Group, Inc.,* 710 F.Supp.2d 1301, 1305-1306 (M.D. Fla. 2010). Moreover, Mr. Perez doesn't even meet the definition of a "consumer" under the FDCPA or a "debtor" under the Rosenthal Act. 15 U.S.C. § 1692a(3); Cal. Civ. Code § 1788.2(h). Thus, he lacks standing to even assert FDCPA or Rosenthal Act claims. *Lachi v. GE Capital Bank,* 993 F.Supp.2d 1228, 1232-1233 (S.D. Cal. 2014); *Christy v. EOS CCA,* 905 F.Supp.2d 648, 653 (E.D. Pa. 2012); *Sibersky v. Borah, Goldstein, Alschuler & Schwartz, P.C.,* 2000 WL 1448635 at *5 (S.D. N.Y. 2000).

My office has tried to resolve this matter for some time, but your ignorance of the basic facts underlying this case can no longer be excused. It is now clear that none of your clients' claims are actionable, and continuing to litigate such meritless claims, which have no factual or legal tenability, exposes both you and your clients to liability for malicious prosecution. *Zamos v. Stroud,* 32 Cal.4[th] 958, 970 (2004).

By now, you should be aware that Rash Curtis has, pursuant to Judge Rogers' Standing Order for Civil Cases, filed a letter with Judge Rogers requesting a pre-filing conference for next Wednesday, September 6, 2017, at 2:00 p.m. Your clients can either choose to dismiss this frivolous case now, or Rash Curtis *will* move forward with the depositions of Ms. Magtibay, Mr. Reynoso, Mr. Snyder, and Mr. Weir, as well as its motion for summary judgment. Once that motion is granted, and it will be, Rash Curtis will be deemed to have received a "favorable termination" of this matter.

Very Truly Yours,

*Anthony P. J. Valenti*

**Attorney at Law | Associate**

**Ellis Law Group, LLP**

1425 River Park Drive, Suite 400

Sacramento, CA 95815

Tel: (916) 283-8820

Fax: (916) 283-8821

avalenti@ellislawgrp.com

WARNING: The information contained in this e-mail is intended for the use of the individual or entity to which it is addressed, and may be privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this e-mail in error, please notify us immediately at the telephone number listed above, or by

return e-mail to avalenti@ellislawgrp.com and delete this communication in a manner that permanently removes it from any computer drive in your possession. This document was not intended or written to be used and it cannot be used for the purpose of avoiding tax penalties that may be imposed on the taxpayer.

[Quoted text hidden]

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                              Thu, Aug 31, 2017 at 11:51 AM
To: Anthony Paul John Valenti <AValenti@ellislawgrp.com>
Cc: "L. Timothy Fisher" <ltfisher@bursor.com>, Mark Ellis <mellis@ellislawgrp.com>, Paula Crary <pcrary@ellislawgrp.com>, Crystal Strong <cstrong@ellislawgrp.com>, Rosanne Estrella <restrella@ellislawgrp.com>, Jennifer Mueller <jmueller@ellislawgrp.com>, Cheri Bowden <cbowden@ellislawgrp.com>

I will be out of the country until September 12 starting tomorrow. Without waiving our right to seek protective orders regarding the depositions, we request that the depositions occur in late September or early October.

We need to check with our experts about availability and will get back to you soon. Please note that Colin Weir is in Massachusetts and Randall Snyder is in Nevada, and their depositions will need to take place in those respective locations.

Save the hot air regarding "extortion" and "malicious prosecution." We're not going to engage that kind of rhetoric.

As you know, your client never even made an offer at mediation. If your client is actually interested in resolution, you know where to find us.

[Quoted text hidden]

---

**L. Timothy Fisher** <ltfisher@bursor.com>                                Thu, Aug 31, 2017 at 11:53 AM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>

Good email.

Tim

--
L. Timothy Fisher
Bursor & Fisher, P.A.
1990 North California Blvd., Suite 940
Walnut Creek, California 94596
Tel: (925) 300-4455
Fax: (925) 407-2700
E-Mail: ltfisher@bursor.com

PRIVILEGED COMMUNICATION
This email may contain confidential material or other matter protected by the attorney-client privilege. Unless you are the addressee (or are authorized to receive this email for the addressee), you may not copy, use or distribute it. If you receive this email in error, please contact the sender immediately and permanently delete the email from any and all storage devices under your control.
[Quoted text hidden]

---

**Anthony Paul John Valenti** <AValenti@ellislawgrp.com>                   Thu, Aug 31, 2017 at 1:05 PM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>
Cc: "L. Timothy Fisher" <ltfisher@bursor.com>, Mark Ellis <mellis@ellislawgrp.com>, Paula Crary <pcrary@ellislawgrp.com>, Crystal Strong <cstrong@ellislawgrp.com>, Rosanne Estrella <restrella@ellislawgrp.com>, Jennifer Mueller <jmueller@ellislawgrp.com>, Cheri Bowden <cbowden@ellislawgrp.com>

Do you actually have any proposed dates in late September? If so, please let me know so we can check our availability. If I don't hear from you or Tim by close of business tomorrow, I will have no choice but to notice the depositions without your input.

As to your experts' depositions, your clients chose to file this action in the Northern District, and your clients chose to retain experts that reside in other states. Their depositions will be noticed for a location within the Northern District of California, consistent with the general rules that: (1) the noticing party may designate the deposition location; and (2) the plaintiff or its agents are required to appear for the taking of depositions in the district in which the suit is brought. *See Fausto v. Credigy Services Corp.,* 251 F.R.D. 427, 429 (N.D. Cal. 2008); *Aerocrine AB v. Apieron Inc.,* 267 F.R.D. 105, 108 (D. Del. 2010) (*citing Bayer AG v. Sony Elecs. Inc.,* No. 95-8-JJF, slip op. at 5 (D. Del. 1998); *South Seas Catamaran, Inc. v. The Motor Vessel "Leeway,"* 120 F.R.D. 17, 21 (D. N.J. 1998); *see also Estate of Gerasimenko v. Cape Wind Trading Co.,* 272 F.R.D. 385, 387 (S.D. N.Y. 2011); *In re Outsidewall Tire Litigation,* 267 F.R.D. 466, 471 (E.D. Va. 2010).

As for settlement, the last I heard before your ridiculous, six-figure demand, you weren't willing to settle Ms. Adekoya's or Mr. Perez's claims on an individual basis. If your clients are actually willing to resolve this matter, in whole, as to their individual claims only, and not on a class-wide basis, please let me know. Otherwise, we look forward to being awarded summary judgment on each of those claims.

Finally, with respect to any subsequent claim for malicious prosecution, as someone once told me, "you're on notice."

Have a nice vacation,

[Quoted text hidden]

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                                          Thu, Aug 31, 2017 at 1:17 PM
To: Anthony Paul John Valenti <AValenti@ellislawgrp.com>
Cc: "L. Timothy Fisher" <ltfisher@bursor.com>, Mark Ellis <mellis@ellislawgrp.com>, Paula Crary <pcrary@ellislawgrp.com>, Crystal Strong <cstrong@ellislawgrp.com>, Rosanne Estrella <restrella@ellislawgrp.com>, Jennifer Mueller <jmueller@ellislawgrp.com>, Cheri Bowden <cbowden@ellislawgrp.com>

Anthony, we'll get you dates tomorrow. We can't guarantee we'll have the dates for our experts by then as they're quite busy typically.

Re settlement: ████████████  your client didn't counter and walked out. We're still open to listening to a counter if you have one.
[Quoted text hidden]

---

**Anthony Paul John Valenti** <AValenti@ellislawgrp.com>                              Thu, Aug 31, 2017 at 1:43 PM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>
Cc: "L. Timothy Fisher" <ltfisher@bursor.com>, Mark Ellis <mellis@ellislawgrp.com>, Paula Crary <pcrary@ellislawgrp.com>, Crystal Strong <cstrong@ellislawgrp.com>, Rosanne Estrella <restrella@ellislawgrp.com>, Jennifer Mueller <jmueller@ellislawgrp.com>, Cheri Bowden <cbowden@ellislawgrp.com>

████████████████████████

[Quoted text hidden]

---

**Yeremey Krivoshey** <ykrivoshey@bursor.com>                                          Thu, Aug 31, 2017 at 1:43 PM
To: Anthony Paul John Valenti <AValenti@ellislawgrp.com>
Cc: "L. Timothy Fisher" <ltfisher@bursor.com>, Mark Ellis <mellis@ellislawgrp.com>, Paula Crary <pcrary@ellislawgrp.com>, Crystal Strong <cstrong@ellislawgrp.com>, Rosanne Estrella <restrella@ellislawgrp.com>, Jennifer Mueller <jmueller@ellislawgrp.com>, Cheri Bowden <cbowden@ellislawgrp.com>

████████

[Quoted text hidden]

---

**L. Timothy Fisher** <ltfisher@bursor.com>             Fri, Sep 1, 2017 at 1:09 PM
To: Yeremey Krivoshey <ykrivoshey@bursor.com>
Cc: Anthony Paul John Valenti <AValenti@ellislawgrp.com>, Mark Ellis <mellis@ellislawgrp.com>, Paula Crary
<pcrary@ellislawgrp.com>, Crystal Strong <cstrong@ellislawgrp.com>, Rosanne Estrella <restrella@ellislawgrp.com>,
Jennifer Mueller <jmueller@ellislawgrp.com>, Cheri Bowden <cbowden@ellislawgrp.com>, Joel Smith <jsmith@bursor.com>

     Anthony:
     Mr. Weir is available for a deposition on 9/26 or 9/27 in Boston.

     Mr. Snyder is available for a deposition on 9/28 or 9/29 in Las Vegas.

     Let us know if those dates work for you.

     Tim
     --
     L. Timothy Fisher
     Bursor & Fisher, P.A.
     1990 North California Blvd., Suite 940
     Walnut Creek, California 94596
     Telephone: (925) 300-4455
     Facsimile: (925) 407-2700
     E-Mail: ltfisher@bursor.com

     PRIVILEGED COMMUNICATION
     This email may contain confidential material or other matter protected by the attorney-client privilege.  Unless you are the
     addressee (or are authorized to receive this email for the addressee), you may not copy, use or distribute it.  If you
     receive this email in error, please contact the sender immediately and permanently delete the email from any and all
     storage devices under your control.
     [Quoted text hidden]

---

**Mark Ellis** <mellis@ellislawgrp.com>             Fri, Sep 1, 2017 at 1:14 PM
To: "L. Timothy Fisher" <ltfisher@bursor.com>
Cc: Yeremey Krivoshey <ykrivoshey@bursor.com>, Anthony Paul John Valenti <AValenti@ellislawgrp.com>, Paula Crary
<pcrary@ellislawgrp.com>, Crystal Strong <cstrong@ellislawgrp.com>, Rosanne Estrella <restrella@ellislawgrp.com>,
Jennifer Mueller <jmueller@ellislawgrp.com>, Cheri Bowden <cbowden@ellislawgrp.com>, Joel Smith <jsmith@bursor.com>

     Are they available on those dates in San Francisco. We do not need to travel there. They need to come to the Northern
     District. Let us know. Mark

     Sent from my iPhone
     [Quoted text hidden]

---

**Anthony Paul John Valenti** <AValenti@ellislawgrp.com>             Fri, Sep 1, 2017 at 1:15 PM
To: "L. Timothy Fisher" <ltfisher@bursor.com>, Yeremey Krivoshey <ykrivoshey@bursor.com>
Cc: Mark Ellis <mellis@ellislawgrp.com>, Paula Crary <pcrary@ellislawgrp.com>, Crystal Strong <cstrong@ellislawgrp.com>,
Rosanne Estrella <restrella@ellislawgrp.com>, Jennifer Mueller <jmueller@ellislawgrp.com>, Cheri Bowden
<cbowden@ellislawgrp.com>, Joel Smith <jsmith@bursor.com>

     Tim,


     I'm not going to play this game.  We both know your clients have to produce their experts for deposition in the
     district in which they filed this case.  We didn't pick this forum; you did.  We didn't retain experts from out-of-state;
     you did.

By close of business today, provide me with your experts' availability for depositions *in the Northern District*, or I will notice them unilaterally and you can move for protective orders - which will be summarily denied.



*Anthony P. J. Valenti*

**Attorney at Law | Associate**

**Ellis Law Group, LLP**

1425 River Park Drive, Suite 400

Sacramento, CA 95815

Tel: (916) 283-8820

Fax: (916) 283-8821

avalenti@ellislawgrp.com



WARNING:  The information contained in this e-mail is intended for the use of the individual or entity to which it is addressed, and may be privileged, confidential and exempt from disclosure under applicable law.  If the reader of this message is not the intended recipient, or the employee or agent responsible for delivery to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this e-mail in error, please notify us immediately at the telephone number listed above, or by return e-mail to avalenti@ellislawgrp.com and delete this communication in a manner that permanently removes it from any computer drive in your possession.  This document was not intended or written to be used and it cannot be used for the purpose of avoiding tax penalties that may be imposed on the taxpayer.


[Quoted text hidden]

---

**L. Timothy Fisher** <ltfisher@bursor.com>                                              Fri, Sep 1, 2017 at 1:24 PM
To: Anthony Paul John Valenti <AValenti@ellislawgrp.com>
Cc: Yeremey Krivoshey <ykrivoshey@bursor.com>, Mark Ellis <mellis@ellislawgrp.com>, Paula Crary <pcrary@ellislawgrp.com>, Crystal Strong <cstrong@ellislawgrp.com>, Rosanne Estrella <restrella@ellislawgrp.com>, Jennifer Mueller <jmueller@ellislawgrp.com>, Cheri Bowden <cbowden@ellislawgrp.com>, Joel Smith <jsmith@bursor.com>

Anthony and Mark:
I will check on their availability to travel to San Francisco.

Of course, your client will be responsible for their travel expenses.  *See Rock River Communications, Inc. v. Universal Music Group*, 276 F.R.D. 633, 637 (C.D. Cal. 2011) ("Time an expert spent traveling to and from the deposition generally is regarded as an expenses that should be shifted to the deposing party."); *see also Federal Civil Procedure Before Trial, Calif. & 9th Cir. Eds.*, Section 11:464.1, Rutter Group (2017) ("If the expert travels to a location designated by the deposing party (instead of the deposing party coming to the expert), the expert's travel and lodging expenses should be paid by the deposing party.").

Tim
--
L. Timothy Fisher
Bursor & Fisher, P.A.
1990 North California Blvd., Suite 940
Walnut Creek, California 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com

PRIVILEGED COMMUNICATION
This email may contain confidential material or other matter protected by the attorney-client privilege.  Unless you are the addressee (or are authorized to receive this email for the addressee), you may not copy, use or distribute it.  If you receive this email in error, please contact the sender immediately and permanently delete the email from any and all storage devices under your control.

[Quoted text hidden]

---

**L. Timothy Fisher** <ltfisher@bursor.com>                                                          Fri, Sep 1, 2017 at 2:52 PM
To: Anthony Paul John Valenti <AValenti@ellislawgrp.com>
Cc: Yeremey Krivoshey <ykrivoshey@bursor.com>, Mark Ellis <mellis@ellislawgrp.com>, Paula Crary <pcrary@ellislawgrp.com>, Crystal Strong <cstrong@ellislawgrp.com>, Rosanne Estrella <restrella@ellislawgrp.com>, Jennifer Mueller <jmueller@ellislawgrp.com>, Cheri Bowden <cbowden@ellislawgrp.com>, Joel Smith <jsmith@bursor.com>

Anthony and Mark:
I have checked with both Mr. Weir and Mr. Snyder and they can make those same dates (9/26 or 9/27 for Mr. Weir and 9/28 or 9/29 for Mr. Snyder) work in San Francisco.  Please confirm that those dates work for you.

Tim
--
L. Timothy Fisher
Bursor & Fisher, P.A.
1990 North California Blvd., Suite 940
Walnut Creek, California 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com

PRIVILEGED COMMUNICATION
This email may contain confidential material or other matter protected by the attorney-client privilege.  Unless you are the addressee (or are authorized to receive this email for the addressee), you may not copy, use or distribute it.  If you receive this email in error, please contact the sender immediately and permanently delete the email from any and all storage devices under your control.

[Quoted text hidden]

---

**Anthony Paul John Valenti** <AValenti@ellislawgrp.com>                                  Fri, Sep 1, 2017 at 2:53 PM
To: "L. Timothy Fisher" <ltfisher@bursor.com>
Cc: Yeremey Krivoshey <ykrivoshey@bursor.com>, Mark Ellis <mellis@ellislawgrp.com>, Paula Crary <pcrary@ellislawgrp.com>, Crystal Strong <cstrong@ellislawgrp.com>, Rosanne Estrella <restrella@ellislawgrp.com>, Cheri Bowden <cbowden@ellislawgrp.com>, Joel Smith <jsmith@bursor.com>

I will check.  In the meantime, can you get me your availability for the depositions of Daniel Reynoso and Teresa Magtibay?

[Quoted text hidden]

---

**L. Timothy Fisher** <ltfisher@bursor.com>                                                          Fri, Sep 1, 2017 at 2:56 PM
To: Anthony Paul John Valenti <AValenti@ellislawgrp.com>
Cc: Yeremey Krivoshey <ykrivoshey@bursor.com>, Mark Ellis <mellis@ellislawgrp.com>, Paula Crary <pcrary@ellislawgrp.com>, Crystal Strong <cstrong@ellislawgrp.com>, Rosanne Estrella <restrella@ellislawgrp.com>, Cheri Bowden <cbowden@ellislawgrp.com>, Joel Smith <jsmith@bursor.com>

Subject to Yeremey's early statements regarding these depositions, we are available the week of 10/2-10/6.

Tim
--
L. Timothy Fisher
Bursor & Fisher, P.A.
1990 North California Blvd., Suite 940
Walnut Creek, California 94596

Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com

PRIVILEGED COMMUNICATION
This email may contain confidential material or other matter protected by the attorney-client privilege.  Unless you are the
addressee (or are authorized to receive this email for the addressee), you may not copy, use or distribute it.  If you
receive this email in error, please contact the sender immediately and permanently delete the email from any and all
storage devices under your control.

[Quoted text hidden]

**EXHIBIT L**

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **SANDRA MCMILLION, ET AL.,** | CASE NO. 16-cv-03396-YGR |
| Plaintiffs, | |
| vs. | **ORDER GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**[1] |
| **RASH CURTIS & ASSOCIATES,** | Re: Dkt. Nos. 47 |
| Defendant. | |

Plaintiffs Sandra McMillion, Jessica Adekoya, and Ignacio Perez bring this putative class action against defendant Rash Curtis & Associates alleging that defendants called plaintiffs without consent, in violation of several laws. Specifically, plaintiffs claim that defendant violated the following: (i) Telephone Consumer Protection Act, 47 U.S.C. sections 227, *et seq.* (the "TCPA"); (ii) Fair Debt Collection Practices Act, 15 U.S.C. sections 1692, *et seq.* (the "FDCPA"); and (iii) the California Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code sections 1788, *et seq.*, (the "Rosenthal Act").

Plaintiffs[2] now seek to certify the following four classes as both injunctive relief classes pursuant to Rule 23(b)(2) and damages classes pursuant to Rule 23(b)(3):

**With Adekoya and Perez as Class Representatives:**

**(a) Skip-Trace Class 1:** All persons who received a call on their cellular telephones within four years of the filing of the complaint until the date that class notice is disseminated from Rash Curtis' DAKCS VIC dialer and/or Global Connect dialer whose cellular telephone was obtained by Rash Curtis through skip tracing.

---

[1] The parties have waived oral arguments, and the Court finds that plaintiffs' motion can be resolved without hearing. Thus, the Court **VACATES** the hearing on this motion, currently set for September 26, 2017.

[2] Only plaintiffs Adekoya and Perez seek to be representatives of the classes described herein. Plaintiff McMillion does not seek certification of her claims, and intends to pursue them on an individual basis. Additionally, plaintiffs have moved for class certification with respect to their TCPA claims only, and intend to pursue their FDCPA and Rosenthal Act claims on individual bases. (Dkt. No. 66 at 2.)

**(b) Skip-Trace Class 2:** All persons who received a prerecorded message or robocall on their cellular telephones [or] landline phones within four years of the filing of the complaint until the date that class notice is disseminated from Rash Curtis whose telephone number was obtained by Rash Curtis through skip tracing.

**With Perez Only as Class Representative:**

**(a) Non-Debtor Class 1:** All persons who received a call on their cellular telephones within four years of the filing of the complaint until the date that class notice is disseminated from Rash Curtis' DAKCS VIC dialer and/or Global Connect dialer whose telephone number was obtained by Rash Curtis through skip tracing and for whom Rash Curtis never had a debt-collection account in their name.

**(b) Non-Debtor Class 2:** All persons who received a prerecorded message or robocall on their cellular telephones [or] landline phones within four years of the filing of the complaint until the date that class notice is disseminated from Rash Curtis whose telephone number was obtained by Rash Curtis through skip tracing and for whom Rash Curtis has never had a debt-collection account in their name.[3]

Excluded from the classes are "persons who provided their cellular telephone in an application for credit to a creditor that has opened an account with [d]efendant in such debtor's name prior to [d]efendant first placing a call using an automatic telephone dialing system and/or prerecorded voice," in addition to certain entities related to defendant, defendant's agents and employees, and any judge or magistrate judge to whom this action is assigned, their staff, and immediate families. (Dkt. No. 46-5 at 10.)

Having carefully considered the pleadings, the papers and exhibits submitted, and for the reasons set forth more fully below, the Court **GRANTS IN PART** plaintiffs' motion, as set forth herein.[4]

---

[3] Relevant to the classes plaintiffs seek to certify, the TCPA prohibits: (i) "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system [(an "ATDS")] or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service" and (ii) "any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party," other than certain enumerated exceptions. 47 U.S.C. §§ 227(b)(1)(A)(iii) & 227(b)(1)(B).

[4] After briefing was completed on plaintiffs' motion for class certification, defendant requested permission to file a supplemental brief with additional exhibits, which they claimed demonstrated that plaintiffs Adekoya and Perez had provided prior express consent. The Court granted that request, and also allowed plaintiffs the opportunity to respond. The Court also considers these filings herein.

United States District Court
Northern District of California

2

United States District Court
Northern District of California

I.  **BACKGROUND**

Plaintiffs bring the instant action against defendant in connection with defendant's allegedly unlawful debt collection practices. Defendant is a "large, nationwide debt collection agency" and plaintiffs allege that defendant "uses repeated robocalls, pre-recorded voice messages, and auto-dialed calls to threaten and harass consumers in an attempt to collect" debts, in violation of the TCPA, the FDCPA, and the Rosenthal Act. (Dkt. No. 1 ("Compl.") at ¶ 1.)

Plaintiffs allege that defendant repeatedly called them on their cellular telephones using an autodialer and/or an artificial or prerecorded voice. (*Id*. at ¶¶ 2, 4, 6.) Plaintiffs further allege that they did not provide defendant with prior express written consent, and they specifically asked defendant to stop calling. (*Id*.) Defendant allegedly called McMillion thirty-three times, Adekoya forty-five times, and Perez four times. (*Id*. at ¶¶ 3, 5, 7.) The complaint further alleges that several consumer complaints have been filed against defendant regarding similarly unsolicited robocalls and autodialed calls. (*Id*. at ¶ 38.)

To make these calls, plaintiffs offer evidence indicating that defendant employs two autodialer systems, namely, the DAKCS/VIC Software System and the Global Connect system. (*See* Deposition of Steven Kizer ("Kizer Dep."), Dkt. No. 46-6, at 55:6–56:12.) The VIC dialer can allegedly dial about eighty phone numbers per minute, and the Global Connect dialer can dial approximately 60,000 phone numbers in a twelve-hour period. (*Id*. at 99:12–100:12.) Plaintiffs allege thus regarding defendant's business practices related to these calls:

Defendant generally receives debt-accounts from creditors. (*Id*. at 45:19–47:17.) While some of these accounts include debtors' phone numbers—such individuals are excluded from the class definitions as set forth above—defendant receives many accounts without any telephone numbers at all. (*Id*. at 47:23–48:1.) For these accounts, defendant uses a process referred to as "skip tracing" to obtain phone numbers associated with the names on the accounts. (*Id*. at 83:3–84:20; 91:9–92:6.) "Skip tracing" is a "method or process for locating individuals for the purpose of contacting them," using "data analysis of personal information obtained from various and multiple public and private databases." (Declaration of Randall A. Snyder ("Snyder Decl."), Dkt. No. 46-7, at ¶¶ 58–60.) According to plaintiffs, accounts where phone numbers were obtained

3

1   through skip tracing are marked with a unique status code and are, therefore, readily identifiable.

2   (Kizer Dep. Tr. 86:7–9; 90:13–90:24.)  At times, this process would produce a phone number not

3   connected to any individual for whom defendant had a debt account from a creditor.  Yet,

4   defendant would often call these numbers despite not having any accounts related to those

5   individuals.

6         On such bases, plaintiffs seek to certify four classes as set forth above, challenging

7   defendant's use of autodialers, robocallers, and pre-recorded voice messages to contact individuals

8   in an attempt to collect on their debt.

9   **II.**    **LEGAL FRAMEWORK**

10        Under Federal Rule of Civil Procedure 23(a), the Court may certify a class only where "(1)

11  the class is so numerous that joinder of all members is impracticable; (2) there are questions of law

12  or fact common to the class; (3) the claims or defenses of the representative parties are typical of

13  the claims or defenses of the class; and (4) the representative parties will fairly and adequately

14  protect the interests of the class."  Fed. R. Civ. P. 23(a).  Courts refer to these four requirements as

15  "numerosity, commonality, typicality[,] and adequacy of representation."  *Mazza v. Am. Honda*

16  *Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012).

17        Once the threshold requirements of Rule 23(a) are met, plaintiffs must then show "through

18  evidentiary proof" that a class is appropriate for certification under one of the provisions in Rule

19  23(b).  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013).  Here, plaintiffs seek

20  certification under Rule 23(b)(2) and Rule 23(b)(3).

21        Rule 23(b)(2) requires plaintiffs to establish that the "party opposing the class has acted or

22  refused to act on grounds that apply generally to the class, so that final injunctive relief or

23  corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P.

24  23(b)(2).  "Class certification under Rule 23(b)(2) is appropriate only where the primary relief is

25  declaratory or injunctive."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 986 (9th Cir. 2011)

26  (citation omitted).

27        Rule 23(b)(3) requires plaintiffs to establish "that the questions of law or fact common to

28  class members predominate over any questions affecting only individual members, and that a class

United States District Court
Northern District of California

action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The predominance inquiry focuses on "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).

"[A] court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.'" *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 465 (2013) (quoting *Wal-Mart*, 564 U.S. at 351); *see also Mazza*, 666 F.3d at 588. The Court considers the merits to the extent they overlap with the Rule 23 requirements. *Ellis*, 657 F.3d at 983. The Court must resolve factual disputes as "necessary to determine whether there was a common pattern and practice that could affect the class *as a whole*." *Id.* (emphasis in original). "When resolving such factual disputes in the context of a motion for class certification, district courts must consider 'the persuasiveness of the evidence presented.'" *Ellis*, 657 F.3d at 982. "A party seeking class certification must affirmatively demonstrate [its] compliance with the Rule." *Wal-Mart*, 564 U.S. at 350. Ultimately, the Court exercises its discretion to determine whether a class should be certified. *Califano v. Yamasaki*, 442 U.S. 682, 703 (1979).

### III. DISCUSSION

Plaintiffs seek to certify the proposed classed under both Rule 23(b)(2) and 23(b)(3). For the sake of clarity, the Court first addresses certification as damages classes under Rule 23(b)(3), and then addresses plaintiffs' arguments for certification as injunctive relief classes under Rule 23(b)(2).

#### A. Rule 23(b)(3) Damages Class

Defendant challenges all elements for certification of a Rule 23(b)(3) class, except for numerosity.[5] The Court will first address commonality under Rule 23(a) together with

---

[5] Plaintiffs' evidence purports to demonstrate that defendant's dialers can "place about 120 connected calls per debt-collector per day during working hours and place roughly 15,000 and 30,000 calls total per day." (Dkt. No. 46-5 at 19.) A six-day sample of calls made by Global Connect, for instance, indicates more than 265,000 calls were made. (*Id.*) Plaintiffs contend that

predominance under Rule 23(b)(3). *See, e.g.*, *Collins v. ITT Educ. Servs., Inc.*, No. 12-CV-1395, 2013 WL 6925827, at *3 (S.D. Cal. July 30, 2013) (addressing commonality and predominance together) (citing *Amchem Prods.*, 521 U.S. at 609 ("Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class 'predominate over' other questions.")). The Court will then address the remaining factors under Rules 23(a) and 23(b)(3)—Typicality, Adequacy, and Superiority—in turn.

### 1. **Commonality and Predominance**

Rule 23(a)(2) requires that the party seeking certification show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy this requirement, a common question "must be of such a nature that it is capable of classwide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. The existence of common questions itself will not satisfy the requirement. Instead, "[w]hat matters to class certification . . . is . . . the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* at 350 (citation omitted) (emphasis in original). The predominance inquiry under Rule 23(b)(3) is "far more demanding." *See Amchem Prods.*, 521 U.S. at 623–24.

Defendant argues that the following issues require individualized inquiries and, therefore, defeat class certification, namely whether: (i) each call recipient provided prior express consent; (ii) defendant called a particular cell phone number belonging to a class member; (iii) any putative class member was actually charged for calls they received; and (iv) each class member will be entitled to different damage calculations.[6] None of defendant's arguments persuade.

---

at least thousands of these calls were to members of the putative classes—*i.e.*, persons whose numbers were acquired through skip tracing. On this basis, plaintiffs argue that the numerosity requirement is satisfied. The Court agrees.

[6] Defendant also vaguely argues without any citations or explanation that questions related to whether it has any good faith or common law defenses would predominate. Without further explanation, such hypothetical "defenses" are merely speculative and cannot defeat class certification.

United States District Court
Northern District of California

United States District Court
Northern District of California

First, defendant contends that individualized issues regarding consent will predominate, yet offers no evidence demonstrating that that will be an issue with respect to the proposed classes. *See Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1042 (9th Cir. 2012) (rejecting argument that individualized issues of consent would predominate where defendant "did not show a single instance where express consent was given before the call was placed"); *Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1307 (D. Nev. 2014) ("The Ninth Circuit has held that in the absence of any evidence of consent by the defendant, consent is a common issue with a common answer." (citing *Meyer*, 707 F.3d at 1036, 1042)). Particularly here, where the classes are limited to those whose phone numbers defendant obtained through skip tracing rather than from a third-party debt owner or the individuals themselves, "there is no need for an individualized inquiry" regarding consent. *Meyer v. Portfolio Recovery Assocs., LLC*, No. 11-CV-1008-AJB, 2011 WL 11712610, at *3 (S.D. Cal. Sept. 14, 2011), *aff'd, Meyer*, 707 F.3d 1036. Defendant engaged in the same practice with respect to all class members, and whether that practice was performed without prior express consent is common to the classes.[7]

Second, defendant's arguments regarding plaintiffs' ability to prove that defendant called the cell phones of any other putative class member are equally unsupported. Rather, the evidence before the Court demonstrates that plaintiffs are capable of determining whether defendant called the cell phone or landline phone numbers of other putative class members. (Kizer Dep. Tr. 72:18–73:9 (testifying that defendant's software can identify whether a telephone number is a cell phone or landline); *see also* Snyder Decl. at ¶¶ 13, 61–68 (explaining process for determining whether telephone number belongs to a cell phone or landline), ¶¶ 86–92 (demonstrating feasibility of identifying owner of phone numbers called by defendant).)

Third, defendant's argument that issues relating to whether class members were charged for any calls contradicts established case law finding that receiving charges for the unlawful calls

---

[7] Defendant has proffered evidence suggesting that Adekoya and Perez had provided prior express consent, and that it did not acquire their phone numbers through skip tracing. If true, however, that does not constitute evidence that anyone in the proposed classes—*i.e.*, those whose phone numbers were obtained through skip tracing—provided prior express consent. The Court considers defendant's evidence relative to Adekoya and Perez in the context of typicality.

is not an element of a TCPA claim. *See Nghiem v. Dick's Sporting Goods, Inc.*, 222 F. Supp. 3d 805, 811 (C.D. Cal. 2016) ("It does not matter whether a plaintiff lacks additional tangible harms like wasted time, actual annoyance, and financial losses. Congress has identified that unsolicited telephonic contact constitutes an intangible, concrete harm . . . ."); *Meyer v. Bebe Stores, Inc.*, No. 14-CV-267-YGR, 2015 WL 431148, at *2 (N.D. Cal. Feb. 2, 2015) ("[C]ourts have found an injury in fact for a purported TCPA violation even where the plaintiff did not receive an additional charge for the messages received." (citing cases)); *Smith v. Microsoft Corp.*, No. 11-CV-1958-JLS, 2012 WL 2975712, at *6 (S.D. Cal. July 20, 2012) ("Accordingly, based on the plain language of the TCPA and supported by the legislative history as set forth above, the Court finds that by alleging he received a text message in violation of the TCPA, [plaintiff] has established a particularized injury in satisfaction of Article III premised on the invasion of his privacy, even absent any economic harm.").

Fourth, and finally, the Ninth Circuit has held that "potential existence of individualized damage assessments . . . does not detract from the action's suitability for class certification." *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1089 (9th Cir. 2010). Especially given the present circumstances, assuming liability is determined, the damages calculation will depend only upon the number of times an individual class member received a call and whether defendant acted knowingly and willfully, which would result in treble damages under the TCPA. Defendant argues that the latter inquiry requires an individualized determination as to whether each call was made knowingly and willfully. However, as this Court has previously found in similar contexts, the question of defendant's willfulness and knowledge is a common question. *See Meyer v. Bebe Stores, Inc.*, No. 14-CV-267-YGR, 2016 WL 8933624, at *7 (N.D. Cal. Aug. 22, 2016) ("[A] determination of whether [a defendant's] conduct was willful would appear to depend on [the defendant's] intent, not any unique or particular characteristics related to potential class members."); *see also Kavu, Inc. v. Omnipak Corp.*, 246 F.R.D. 642, 648 (W.D. Wash. 2007) (finding that the issue of whether defendant's "conduct was willful will be common"); *Zyburo v. NCSPlus, Inc.*, 44 F. Supp. 3d 500, 504 (S.D.N.Y. 2015) (finding that willfulness determination

1    will "depend on defendant's general practices and procedures," which "is entirely suitable for

2    class determination").

3         Accordingly, the Court finds that plaintiffs have satisfied the commonality requirement

4    under Rule 23(a)(2) and the predominance requirement under Rule 23(b)(3).

5              **2.    Typicality**

6         To satisfy typicality, plaintiffs must establish that the "claims or defenses of the

7    representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).

8    "The purpose of the typicality requirement is to assure that the interest of the named representative

9    aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168,

10   1175 (9th Cir. 2010) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).

11   "The test of typicality is whether other members have the same or similar injury, whether the

12   action is based on conduct which is not unique to the named plaintiffs, and whether other class

13   members have been injured by the same course of conduct." *Id.* (citation omitted).

14        In defendant's supplemental briefing, defendant proffers evidence it claims shows (i) that

15   both Adekoya and Perez provided prior express consent, as demonstrated in their depositions; and

16   (ii) that defendant did not acquire their phone numbers via skip tracing.[8]  The Court addresses

17   each.[9]

18

19

---

20        [8]  Defendant also argues that plaintiffs have not demonstrated that they incurred any
     charges as a result of the allegedly unlawful calls. For the same reasons discussed above, the
21   Court rejects that argument in this context. Additionally, defendant argues that evidence of prior
     express consent with regard to plaintiff McMillion disqualifies her from serving as a class
22   representative. (Dkt. No. 50 at 15.) Plaintiff McMillion, however, has not been put forward as a
     potential class representative, and, thus, defendant's arguments in this regard are moot.
23

24        [9]  Plaintiffs argue that the Court should strike the new documents submitted by defendant
     in connection with its supplemental briefing because such were not disclosed to plaintiffs in
25   discovery. However, discovery in this matter is still on-going and remains open until October 25,
     2017, under the current pretrial order. Additionally, as a practical matter, even if the Court were
26   to accept plaintiffs' position that the Court reject these documents for the purposes of the instant
     motion for class certification, defendants may simply bring a motion for decertification on the
27   basis of the very same documents. While the Court does not condone defendant's blatant delaying
     and sandbagging tactics, for the purposes of judicial efficiency, the Court will consider the
28   additional evidence at this time. Defendant is warned, however, that the use of such tactics in the
     future may result in evidentiary or monetary sanctions.

United States District Court
Northern District of California

1    First, defendant argues that Adekoya's and Perez's depositions demonstrate that both

2    provided prior express consent.  Plaintiffs concede that Adekoya's admissions in her deposition

3    and defendant's records show that she falls into the class definition's exclusion of persons who

4    provided their cellular telephone number in an application for credit to a creditor that has opened

5    an account with defendant.  Thus, the Court finds that Adekoya is an atypical representative and,

6    therefore, cannot serve as a class representative.  Defendant, however, does not persuade with

7    regard to Perez.  Perez's deposition does, indeed, indicate that Perez gave his phone number to

8    Sutter General Hospital, which is the entity on whose behalf defendant called Perez.  However,

9    according to a declaration submitted by defendant, Perez's provision of his phone number was not

10   in connection with any particular debt owed by Perez.  Rather, Sutter General Hospital referred a

11   debt account associated with another individual.  (Dkt. No. 71-2, Keith Decl. ¶ 4; *see also* Exhibit

12   6 thereto.)  Sutter General Hospital then allegedly forwarded to defendant that individual's patient

13   information sheet at some point, which included a cell phone number that belonged to Perez.  That

14   sequence of events does not constitute prior express consent.  *See Meyer*, 707 F.3d at 1042 (stating

15   that "prior express consent is consent to call a particular telephone number *in connection with a*

16   *particular debt* that is given before the call in question is placed") (emphasis supplied).

17   Second, defendant argues that the referral from Sutter General Hospital, which included a

18   document containing Perez's phone number, demonstrates that it did not obtain Perez's phone

19   number through skip tracing.  Defendant's lawyer avers that this document was transmitted to it

20   by Sutter General Hospital on May 7, 2015, when Sutter General Hospital opened that debtor

21   account.  Thus, Perez would not fall into the classes here, which are specifically defined as those

22   individuals whose numbers defendant obtained through skip tracing.  (Keith Decl., Exhibit 6.)

23   Plaintiffs argue that the evidence in the record suggests otherwise.  For instance, Kizer testified

24   that defendant does not generally obtain documents from creditors providing proof of debt or the

25   debtor's original phone number, and specifically testified that Sutter General Hospital is one such

26   creditor that does not routinely do so.  (Kizer Dep. Tr. 45:25–46:5; 47:7–17.)  Additionally,

27   plaintiffs' expert Snyder, who reviewed the account records produced by defendant, observed that

28   Perez's consumer account record did not include any telephone contact information and included

1 an "ECA Advanced Trace" notation, indicating that Perez's number was obtained via skip tracing.

2 (Snyder Decl. ¶¶ 87–89.) If defendant truly had definitive evidence as of May 7, 2015 that it did

3 not use skip tracing to obtain Perez's phone number, it defies all logic that defendant would only

4 raise this evidence now, almost two months after filing its opposition.

5       Thus, the Court finds that plaintiffs' showing at this stage is sufficient to demonstrate that

6 Perez satisfies the typicality requirement of Rule 23(a).[10] Plaintiffs have demonstrated that

7 Perez's claims are typical of the claims of the classes, which he seeks to represent, namely that

8 defendants called Perez after obtaining his phone number through skip tracing, allegedly without

9 his consent. That is the general theory of liability for all of the proposed classes. Additionally,

10 with respect to Perez, the analysis conducted by plaintiffs' expert demonstrates that he, like the

11 members of the Non-Debtor classes, never had a debt collection account with Rash Curtis. (*See*

12 Snyder Decl. ¶¶ 88–89.) Accordingly, the Court finds that Perez has satisfied Rule 23(a)(3)'s

13 typicality requirement, and proceeds with the analysis as to Perez only.

14       **3.**    **Adequacy**

15       Rule 23(a)'s adequacy requirement considers "(1) [whether] the representative plaintiffs

16 and their counsel have any conflicts of interest with other class members, and (2) [if] the

17 representative plaintiffs and their counsel [will] prosecute the action vigorously on behalf of the

18 class." *Staton v. Boeing*, 327 F.3d 938, 957 (9th Cir. 2003). Defendant argues only that Rule

19 23(a)(3)'s typicality inquiry may overlap with Rule 23(a)(4)'s adequacy requirement because both

20 look to the potential for conflicts in the class.[11] Thus, for the same reasons the Court rejected

21 defendant's arguments in the context of typicality, the Court rejects them here.

22

23     [10] Defendant also argues that plaintiffs lack evidence demonstrating their ownership of the cell phone numbers. Defendant ignores the uncontroverted evidence submitted by plaintiffs'

24 expert, as set forth above. In the face of this evidence, defendant submits only the affidavit of its attorney, Anthony Valenti, in which Valenti avers that he has "not received any documents or

25 other evidence which demonstrates that [p]laintiffs Jessica Adekoya or Ignacio Perez actually owned the alleged cell phone numbers called by [d]efendant." (Dkt. No. 50-1 at 2.) Defendant's

26 "evidence," does not suffice.

27     [11] Defendant raises additional arguments in its supplemental briefing pertaining to Perez's alleged lack of detailed knowledge regarding his claims and the relief he is seeking. The Court

28 rejects those arguments, and finds that Perez's understanding and participation in this action are sufficient to satisfy the adequacy requirement of Rule 23(a).

United States District Court
Northern District of California

Case 4:19-cv-07288-YGR Document 331 Filed 05/18/207 Page 122 of 158

1       Plaintiffs have made a sufficient showing for purposes of Rule 23(a) that Perez and his

2    counsel are adequate representatives. Specifically: The record before the Court indicates that

3    plaintiff Perez has been an active participant in the litigation, frequently requesting case updates

4    from his attorneys. (Declaration of Krivoshey ("Krivoshey Decl."), Dkt. No. 46-6, at ¶ 5.)

5    Additionally, plaintiffs' counsel, Bursor & Fisher, P.A., have experience litigating class action

6    claims in both federal and state courts, and appear to have been prosecuting this action vigorously.

7    Defendant raises no arguments to the contrary.

8       Accordingly, the Court finds that plaintiffs have satisfied the adequacy requirement under

9    Rule 23(a)(4).

### 4. Superiority

11       Lastly, the Court may certify a class under Rule 23(b)(3) only upon a finding that a class

12    action is superior to individual suits. To make this determination, the Court considers the

13    following four non-exhaustive factors: (1) the interests of members of the class in individually

14    controlling the prosecution or defense of separate actions; (2) the extent and nature of any

15    litigation concerning the controversy already commenced by or against the members of the class;

16    (3) the desirability of concentrating the litigation of the claims in the particular forum; and (4) the

17    difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P.

18    23(b)(3)(A)–(D). "Where classwide litigation of common issues will reduce litigation costs and

19    promote greater efficiency, a class action may be superior to other methods of litigation."

20    *Valentino v. Carter-Wallace, Inc.*, 97 F.3d. 1227, 1235 (9th Cir. 1996).

21       Defendant raises two arguments in this regard: First, the predominance of individualized

22    issues precludes a finding of superiority. And, second, certification of a class action here could

23    result in excessive statutory damages, thus defeating superiority, particularly because Congress

24    allowed for sufficiently high statutory damages for individual actions under the TCPA.

25    Defendants do not present any other arguments relating to the other superiority factors.[12]

27       [12] Defendant also contends that, in addition to the explicit requirements of Rule 23, courts have found an implied threshold requirement that the classes are identifiable and ascertainable, and that plaintiffs have failed to so demonstrate here. That argument directly contradicts controlling authority issued by the Ninth Circuit earlier this year, and defendant's failure to

United States District Court
Northern District of California

Case 4:16-cv-02389-YGR  Document 331  Filed 05/18/07  Page 123 of 158

1  Defendant does not persuade.  For the same reasons set forth above in the context of

2  predominance, the Court rejects defendant's first argument.  With respect to defendant's second

3  argument, courts routinely certify classes where certification of the classes creates large liability

4  risks for defendants.  In fact, the Ninth Circuit has held that such a consideration—*i.e.* whether

5  "class treatment would render the magnitude of the defendant's liability enormous"—"is not an

6  appropriate reason to deny class certification under Rule 23(b)(3)."  *Bateman v. Am. Multi-*

7  *Cinema, Inc.*, 623 F.3d 708, 721 (9th Cir. 2010).  It would certainly be perverse to deny

8  certification on the basis that defendant harmed too many people and, thus, has too much exposure

9  to liability.  *See id.* ("If the size of defendant's potential liability alone was a sufficient reason to

10  deny class certification, however, the very purpose of Rule 23(b)(3)—'to allow integration of

11  numerous small individual claims into a single powerful unit'—would be substantially

12  undermined." (citation omitted)).  To the contrary, several courts have certified similar TCPA

13  class actions, finding that the statutory damages provided by the TCPA are "not sufficient to

14  compensate the average consumer for the time and effort that would be involved in bringing a

18  address the same is borderline sanctionable.  *See Burke v. Pitney Bowes, Inc. Long-Term*
19  *Disability Plan*, No. 04-CV-4483, 2005 WL 1876103, at *4 (N.D. Cal. Aug. 8, 2005) ("[T]he fact
that plaintiff's counsel failed to cite such adverse controlling authority raises serious questions
20  concerning his compliance with his ethical obligations as a member of the bar.").  On January 3,
2017, the Ninth Circuit held that "Rule 23 does not impose a freestanding administrative
21  feasibility prerequisite to class certification," rejecting the line of authority upon which defendant
relies for the proposition that a threshold, ascertainability requirement exists.  *Briseno v. ConAgra*
22  *Foods, Inc.*, 844 F.3d 1121, 1126 (9th Cir. 2017).  This Court has previously addressed *Briseno*,
explaining that "class proponents are not required to demonstrate that there is an administratively
23  feasible way to determine who is in the class in order for the class to be certified."  *Bebe Stores*,
2017 WL 558017, at *3.  Rather, the Ninth Circuit instructs that concerns related to
24  "ascertainability" should be addressed within the context of the Court's superiority analysis under
Rule 23(b)(3).  *Briseno*, 844 F.3d at 1126.  For the reasons set forth herein, the Court finds that
25  plaintiffs have satisfied that standard.
      Furthermore, and in any event, plaintiffs have sufficiently demonstrated that the classes are
26  feasibly ascertainable, and defendant offers no evidence to the contrary, except for attorney
argument and unpersuasive declarations that fail to address plaintiffs' expert's opinions in this
27  regard.  (*See* Snyder Decl. ¶¶ 70–74, 82–83 (explaining that defendant's database can identify
which numbers were obtained through skip tracing and which numbers belong to individuals for
28  whom defendant did not have a debt collection account, and that the list could then be cross-
checked against the list of all calls made by defendant's dialers).)

United States District Court
Northern District of California

United States District Court
Northern District of California

1  small claims action against a national corporation." *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D.

2  559, 571–72 (W.D. Wash. 2012) (citing cases); *see also Bebe Stores*, 2016 WL 8933624, at *11.[13]

3        Thus, the Court finds that plaintiffs have satisfied the superiority requirement here.[14]

4  Accordingly, plaintiffs have satisfied all the requirements for certification of Rule 23(b)(3) classes

5  as to all four of their proposed classes in this action.

6        **B.**    **Rule 23(b)(2) Injunctive Relief Class**

7        Rule 23(b)(2) allows a Court to certify a class when the requirements of Rule 23(a) are

8  satisfied and the defendant "has acted or refused to act on grounds that apply generally to the

9  class, so that final injunctive or corresponding declaratory relief is appropriate respecting that class

10  as a whole." Fed. R. Civ. P. 23(b)(2). District courts may certify both a 23(b)(2) class for the

11

---

12      [13] Defendant also argues that such high and "excessive" damages would violate their
13  rights to due process because the monetary amount is unrelated to the actual harm suffered by
plaintiffs. However, two of the cases upon which plaintiffs rely relate to the imposition of
14  excessive punitive damages, and are inapposite to the statutory damages at issue here. *See State
Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419, 425 (2003); *BMW of N. Am., Inc. v.
Gore*, 517 U.S. 559, 580 (1996). The final case upon which defendant relies involves the
15  mandatory imposition of a $100 penalty on a landlord for each day that they failed to correct
certain deficiencies. *Hale v. Morgan*, 22 Cal.3d 388, 399 (1978) (noting that "importantly, the
16  duration of the penalties is potentially unlimited, even though the landlord has done nothing after
the initial wrongful termination of utility service except fail to restore it"). The circumstances of
17  that case run far afield of the circumstances involved in this litigation, wherein defendant allegedly
performed a wrongful and illegal act every time that it called a putative class member.
18  Additionally, *Hale* involved a challenge to the statutory damage scheme established by the
California legislature. No such challenge has been presented here.

19      [14] Defendant additionally contends that the class definitions here are impermissible "fail-
20  safe" classes because they specifically exclude people who provided their numbers to creditors,
who, in turn, opened an account with defendant. By way of background, a fail-safe class
21  definition is one which would require the court to "reach a legal determination" in order to
"determine who should be a member of the[] classes." *Brazil v. Dell Inc.*, 585 F. Supp. 2d 1158,
22  1167 (N.D. Cal. 2008). For instance, a fail-safe class definition in this context would define the
class as "all persons who were called by defendant and did not give prior express consent." *See,
23  e.g., Panacci v. A1 Solar Power, Inc.*, No. 15-CV-532-JCS, 2015 WL 3750112, at *9 (N.D. Cal.
June 15, 2015) (finding no fail-safe class because the "definitions do not require the court to
24  legally conclude whether a person gave 'prior consent' in order to determine whether that person
is in the class").
25      As an initial matter, the Ninth Circuit has not explicitly held that fail-safe classes are *per se*
impermissible. *See In re AutoZone, Inc., Wage & Hour Employment Pracs. Litig.*, 289 F.R.D.
26  526, 546 (N.D. Cal. 2012) (citing *Vizcaino v. U.S. Distr. Ct. for W.D. Wash.*, 173 F.3d 713, 722
(9th Cir. 1999)). In any event, the class definitions here are not fail-safe classes. The exclusion of
27  which defendant complains only eliminates categorically any person who may have consented by
virtue of their provision of their phone number to a creditor. The Court need not make any legal
28  conclusions establishing defendant's liability to determine whether a person belongs in one of the
classes defined herein.

14

1    portion of the case concerning injunctive and declaratory relief and a 23(b)(3) class for the portion

2    of the case requesting monetary damages. *See* Newberg on Class Actions § 4:38 (5th ed. 2017);

3    *see, e.g.*, *Barrett v. Wesley Fin. Grp., LLC*, No. No. 13-CV-554-LAB, 2015 WL 12910740, at *6–

4    7 (S.D. Cal. Mar. 30, 2015) (certifying both classes in the context of the TCPA); *Kavu*, 246 F.R.D.

5    at 649 (same). However, "[c]lass certification under Rule 23(b)(2) is appropriate only where the

6    primary relief sought is declaratory or injunctive." *Ellis*, 657 F.3d at 986 (citation omitted).

7    "Although the Ninth Circuit previously held that, in Rule 23(b)(2) cases, monetary damage

8    requests were generally allowable if they were incidental to the litigation, the Supreme Court has

9    called this standard into doubt." *Barrett*, 2015 WL 12910740, at *6 (citing *Wal-Mart*, 131 S. Ct.

10   at 2560).

11       Here, the large amount of potential liability undermines the proposition that declaratory or

12   injunctive relief is primary to plaintiffs' action. However, in cases "where a plaintiff seeks both

13   declaratory and monetary relief, [courts] may certify a damages-seeking class under Rule 23(b)(3),

14   and an injunction-seeking class under Rule 23(b)(2)." *Barrett*, 2015 WL 12910740, at *7 (citing

15   *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013)). The Court finds that

16   certifying the classes here as both damages-seeking classes under Rule 23(b)(3) and injunctive

17   relief only classes under Rule 23(b)(2) is appropriate and promotes judicial efficiency. In the

18   event that plaintiffs are able to demonstrate liability under the TCPA, but ultimately fail to

19   establish classwide damages, the Court may still enter an injunction against defendant.

20       Accordingly, the Court finds that plaintiffs have satisfied the requirements for certification

21   under Rule 23(b)(2).

22   **IV.    CONCLUSION**

23       For the foregoing reasons, plaintiffs' motion for class certification under both Rule

24   23(b)(2) and Rule 23(b)(3) is **GRANTED IN PART**. The Court, therefore, **CERTIFIES** the following

25   classes with Perez as the class representative, both for injunctive relief only pursuant to Rule

26   23(b)(2) and damages pursuant to Rule 23(b)(3):

27       **(a)  Skip-Trace Class 1:** All persons who received a call on their cellular
         telephones within four years of the filing of the complaint until the date that class
28       notice is disseminated from Rash Curtis' DAKCS VIC dialer and/or Global

United States District Court
Northern District of California

Connect dialer whose cellular telephone was obtained by Rash Curtis through skip tracing.

**(b) Skip-Trace Class 2:** All persons who received a prerecorded message or robocall on their cellular telephones [or] landline phones within four years of the filing of the complaint until the date that class notice is disseminated from Rash Curtis whose telephone number was obtained by Rash Curtis through skip tracing.

**(c) Non-Debtor Class 1:** All persons who received a call on their cellular telephones within four years of the filing of the complaint until the date that class notice is disseminated from Rash Curtis' DAKCS VIC dialer and/or Global Connect dialer whose telephone number was obtained by Rash Curtis through skip tracing and for whom Rash Curtis never had a debt-collection account in their name.

**(d) Non-Debtor Class 2:** All persons who received a prerecorded message or robocall on their cellular telephones [or] landline phones within four years of the filing of the complaint until the date that class notice is disseminated from Rash Curtis whose telephone number was obtained by Rash Curtis through skip tracing and for whom Rash Curtis has never had a debt-collection account in their name.

The Court further **APPOINTS** plaintiffs' counsel, Bursor & Fisher, P.A., as class counsel.

The Court **SETS** a case management conference for **Monday, October 2, 2017.** No later than **September 25, 2017**, the parties must file updated joint case management statements, in accordance with the Civil Local Rules and this Court's Standing Order, including any remaining requests for extensions to the discovery and dispositive motion schedule.[15]

This Order terminates Docket Numbers 47 and 70.

**IT IS SO ORDERED.**

Dated: September 6, 2017

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

---

[15] The Court **DENIES WITHOUT PREJUDICE** plaintiffs' administrative motion at Docket Number 70.

16

**EXHIBIT M**



Yeremey Krivoshey <ykrivoshey@bursor.com>

---

## McMillion et al v. Rash and Curtis

---

**L. Timothy Fisher** <ltfisher@bursor.com>                        Wed, Sep 6, 2017 at 12:46 PM
To: "Doug deVries, Mediator" <doug@dkdmediation.com>
Cc: "ykrivoshey@bursor.com" <ykrivoshey@bursor.com>

Dear Doug:

Judge Gonzalez Rogers issued the attached order today granting our motion for class certification in the Rash Curtis case. Can we find a time to speak next week to discuss possible next steps?

Tim
--
L. Timothy Fisher
Bursor & Fisher, P.A.
1990 North California Blvd., Suite 940
Walnut Creek, California 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com

PRIVILEGED COMMUNICATION
This email may contain confidential material or other matter protected by the attorney-client privilege. Unless you are the addressee (or are authorized to receive this email for the addressee), you may not copy, use or distribute it. If you receive this email in error, please contact the sender immediately and permanently delete the email from any and all storage devices under your control.

[Quoted text hidden]

---

 **2017.09.06 Order Granting Class Cert.pdf**
98K

**EXHIBIT N**



L. Timothy Fisher <ltfisher@bursor.com>

## Re: Rash Curtis - Class Cert Order and Discovery Orders
1 message

**Doug deVries, Mediator** <doug@dkdmediation.com>      Mon, Feb 5, 2018 at 8:43 PM
To: "L. Timothy Fisher" <ltfisher@bursor.com>
Cc: Yeremey Krivoshey <ykrivoshey@bursor.com>

Hi Tim,

Long day today. Yes, I will review the Order and reach out to Mark Ellis. Will then get back to you when I have something to report.

Best regards, Doug.

Doug deVries, Mediator

deVries Dispute Resolution
(c) 916-768-1116
(e) doug@dkdmediation.com
www.dkdmediation.com
Statewide - No Added Travel Charges

To schedule mediations contact:
Pam Pickering
(t) 800-488-8805
(e) pamp@judicatewest.com

On Feb 5, 2018, at 12:08 PM, L. Timothy Fisher <ltfisher@bursor.com> wrote:

> Dear Doug:
> I hope this email finds you well. I wanted to follow up with you about the Rash Curtis class action that we
> mediated with you last year. We received Judge Gonzalez Rogers' order on the parties' motions for
> summary judgment on Friday. Once again, it was a resounding victory for the plaintiffs. A copy of the order
> is attached. Can you follow up with defendant's counsel Mark Ellis and see if he has any interest in
> mediating?
>
> Tim
> --
> L. Timothy Fisher
> Bursor & Fisher, P.A.
> 1990 North California Blvd., Suite 940
> Walnut Creek, California 94596
> Telephone: (925) 300-4455
> Facsimile: (925) 407-2700
> E-Mail: ltfisher@bursor.com
>
> PRIVILEGED COMMUNICATION
> This email may contain confidential material or other matter protected by the attorney-client privilege.
> Unless you are the addressee (or are authorized to receive this email for the addressee), you may not copy,
> use or distribute it. If you receive this email in error, please contact the sender immediately and
> permanently delete the email from any and all storage devices under your control.
>
> On Mon, Sep 18, 2017 at 10:26 AM, Doug deVries, Mediator <doug@dkdmediation.com> wrote:
>
>> Tim,

Having consulted with Mark Ellis, I am advised that while options may remain open in future no further settlement negotiations will occur at this time. Best regards, Doug.

## DOUG deVRIES

**Mediator**



<image001.jpg>

## www.JudicateWest.com

**Help us Go Green by registering your paperwork**

**Preferences at www.judicatewest.com/green**

**Phone: 800.488.8805 | ddevries@judicatewest.com**

PLEASE NOTE: Th s message, nc ud ng any attachments, may nc ude pr v eged, conf dent a and/or ns de nformat on. Any d str but on or use of th s commun cat on by anyone other than the ntended rec p ent(s) s str ct y proh b ted and may be un awfu . If you are not the ntended rec p ent, p ease not fy the sender by rep y ng to th s message and then de ete t from your system. Thank you.

**From:** L. Timothy Fisher [mailto:ltfisher@bursor.com]
**Sent:** Friday, September 15, 2017 3:02 PM
**To:** Doug deVries, Mediator
**Subject:** Re: Rash Curtis - Class Cert Order and Discovery Orders

Thanks, Doug.  Much appreciated.  Have a good weekend.

Tim

--

L. Timothy Fisher

Bursor & Fisher, P.A.

1990 North California Blvd., Suite 940

Walnut Creek, California 94596

Telephone: (925) 300-4455

Facsimile: (925) 407-2700

E-Mail: ltfisher@bursor.com


PRIVILEGED COMMUNICATION
This email may contain confidential material or other matter protected by the attorney-client privilege.
Unless you are the addressee (or are authorized to receive this email for the addressee), you may not
copy, use or distribute it. If you receive this email in error, please contact the sender immediately and
permanently delete the email from any and all storage devices under your control.


On Fri, Sep 15, 2017 at 3:01 PM, Doug deVries, Mediator <doug@dkdmediation.com> wrote:

Confidential Mediation Communication


Tim, I reviewed the orders, have spoken with Mark Ellis and followed up with an email to him to see
whether or not there is any interest on their part in re-engaging in settlement discussions at this time. I
will advise you as soon as I have a response. Regards, Doug.


Doug deVries, Mediator

deVries Dispute Resolution

(c) 916-768-1116

(e) doug@dkdmediation.com

www.dkdmediation.com

Statewide - No Added Travel Charges


To schedule mediations contact:

Pam Pickering

(t) 800-488-8805

(e) pamp@judicatewest.com


On Sep 12, 2017, at 3:07 PM, L. Timothy Fisher <ltfisher@bursor.com> wrote:

Dear Doug:

See attached. Thank you for your help.


Tim

--

L. Timothy Fisher

Bursor & Fisher, P.A.

1990 North California Blvd., Suite 940

Walnut Creek, California 94596

Telephone: (925) 300-4455

Facsimile: (925) 407-2700

E-Mail: ltfisher@bursor.com


PRIVILEGED COMMUNICATION
This email may contain confidential material or other matter protected by the attorney-client
privilege.  Unless you are the addressee (or are authorized to receive this email for the
addressee), you may not copy, use or distribute it.  If you receive this email in error, please
contact the sender immediately and permanently delete the email from any and all storage
devices under your control.

<2017.09.06 Order Granting Class Cert.pdf>

<2017.09.07 Order Denying Motion for Relief from Nondispositive Order.pdf>


<2018.02.02 Order Re Motions for Summary Judgment.pdf>

**EXHIBIT O**

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANDRA MCMILLION, ET AL., | CASE NO. 16-cv-03396-YGR |
| Plaintiffs, | |
| | **ORDER RE: CROSS MOTIONS FOR SUMMARY JUDGMENT; DENYING MOTION FOR STAY** |
| vs. | |
| RASH CURTIS & ASSOCIATES, | Re: Dkt. Nos. 139, 140, 153, 156 |
| Defendant. | |

Plaintiffs Sandra McMillion, Jessica Adekoya, and Ignacio Perez bring this putative class action against defendant Rash Curtis & Associates ("Rash Curtis") alleging that defendant called plaintiffs without consent, in violation of several laws. This case arises from Rash Curtis' alleged violations of the (i) Telephone Consumer Protection Act, 47 U.S.C. sections 227, *et seq.* (the "TCPA"); (ii) Fair Debt Collection Practices Act, 15 U.S.C. sections 1692, *et seq.* (the "FDCPA"); and (iii) the California Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code sections 1788, *et seq.*, (the "Rosenthal Act"). On September 6, 2017, this Court certified the four classes with Perez as the class representative, both for injunctive relief pursuant to Rule 23(b)(2) and damages pursuant to Rule 23(b)(3).[1] (Dkt. No. 81, Order Granting Plaintiffs' Motion for Class Certification.)

---

[1] Plaintiffs moved for class certification with respect to their TCPA claims only, and intend to pursue their FDCPA and Rosenthal Act claims on individual bases. (Dkt. No. 66 at 2.)

United States District Court
Northern District of California

1   Now before the Court are the parties' cross motions for partial summary judgment. (Dkt.

2   Nos. 139, 140.)  With respect to claims affecting the class, plaintiffs move for partial summary

3   judgment on the issue of whether defendant's Global Connect, TCN, and DAKCS/VIC dialers (the

4   "Dialers") constitute Automatic Telephone Dialing Systems ("ATDSs") within the meaning of the

5   TCPA.[2]  Both parties move on whether plaintiffs provided prior express consent.

6   With respect to the individual claims, defendant seeks summary judgment as to (i) Perez

7   claiming that he lacks standing to assert a claim under the Section 1692e(11) of the FDCPA

8   because he is not a "consumer" within the meaning of the FDCPA; (ii) plaintiffs' FDCPA claims

9   under Section 1692d because plaintiffs cannot show that Rash Curtis engaged in harassing

10  conduct, failed to disclose its identity, or acted with the intent to annoy; (iii) plaintiffs' Rosenthal

11  Act claims because plaintiffs cannot show that Rash Curtis called plaintiffs to "annoy" or with

12  such frequency as to be unreasonable and to constitute harassment under the circumstances; and

13  (iv) all plaintiffs on the ground they lack Article III standing for their TCPA and FDCPA claims.

14  Having carefully considered the pleadings, the papers and exhibits submitted, and for the

15  reasons set forth more fully below, the Court **ORDERS** as follows:[3]

16  1.  With regard to defendant's Dialers, plaintiffs' motion for partial summary
        judgment is **GRANTED** and the Court holds that defendant's Dialers constitute
17      ATDSs within the meaning of the TCPA.

18  2.  On the issue of McMillion's prior express consent, defendant's motion for partial
        summary judgment is **GRANTED** with regard to calls received on or prior to
19      February 2, 2016.  By contrast, plaintiffs' motion is **GRANTED** as to calls after
        February 2, 2016.
20
21  3.  With regard to Adekoya's prior express consent, defendant's motion for partial
        summary judgment is **GRANTED** with regard to calls received on or prior to April
22      18, 2016. By contrast, plaintiffs' motion is **GRANTED** as to calls received after
        April 18, 2016.

24  [2] Defendant has filed a request for judicial notice of the Ninth Circuit's (i) order deferring
    submission and (ii) transcript of oral argument held on December 6, 2016, in *Marks v. Crunch San*
25  *Diego, LLC*, Case No. 14-56834 (9th Cir. 2016); and (iii) two briefs filed by petitioners in *ACA*
    *International v. Federal Communications Commission, et al*, Case No. 15-1211 (D.C. Cir. 2016).
26  (Dkt. No. 153.)  In light of the lack of opposition to either, the Court **GRANTS** both requests for
    judicial notice, but does not accept the truth of any matters asserted in the documents.  The Court
27  gives such documents their proper evidentiary weight.

28  [3] To the extent that a motion is granted, the corollary cross motion is denied.

2

4.    Plaintiffs' motion for partial summary judgment on the issue of prior express consent with regard to Perez is **GRANTED.**

5.    Defendant's motion for partial summary judgment on plaintiffs' FDCPA claims is **GRANTED**.

6.    Defendant's motion for partial summary judgment on plaintiffs' Rosenthal Act claims is **GRANTED** as to plaintiff Perez and **DENIED** as to plaintiffs Adekoya and McMillion.

7.    Defendant's motion to dismiss plaintiffs' TCPA and FDCPA claims for lack of Article III standing is **DENIED**.

## II.    BACKGROUND

Plaintiffs bring the instant class action[4] against defendant in connection with defendant's allegedly unlawful debt collection practices. Defendant is a "large, nationwide debt collection agency" and plaintiffs allege that defendant "uses repeated robocalls, pre-recorded voice

---

[4] The classes are defined as follows:

**(a) Skip-Trace Class 1:** All persons who received a call on their cellular telephones within four years of the filing of the complaint until the date that class notice is disseminated from Rash Curtis' DAKCS VIC dialer and/or Global Connect dialer whose cellular telephone was obtained by Rash Curtis through skip tracing.

**(b) Skip-Trace Class 2:** All persons who received a prerecorded message or robocall on their cellular telephones [or] landline phones within four years of the filing of the complaint until the date that class notice is disseminated from Rash Curtis whose telephone number was obtained by Rash Curtis through skip tracing.

**(c) Non-Debtor Class 1:** All persons who received a call on their cellular telephones within four years of the filing of the complaint until the date that class notice is disseminated from Rash Curtis' DAKCS VIC dialer and/or Global Connect dialer whose telephone number was obtained by Rash Curtis through skip tracing and for whom Rash Curtis never had a debt-collection account in their name.

**(d) Non-Debtor Class 2:** All persons who received a prerecorded message or robocall on their cellular telephones [or] landline phones within four years of the filing of the complaint until the date that class notice is disseminated from Rash Curtis whose telephone number was obtained by Rash Curtis through skip tracing and for whom Rash Curtis has never had a debt-collection account in their name.

Excluded from the classes are "persons who provided their cellular telephone in an application for credit to a creditor that has opened an account with [d]efendant in such debtor's name prior to [d]efendant first placing a call using an automatic telephone dialing system and/or prerecorded voice," in addition to certain entities related to defendant, defendant's agents and employees, and any judge or magistrate judge to whom this action is assigned, their staff, and immediate families. (Dkt. No. 46-5 at 10.)

1    messages, and auto-dialed calls to threaten and harass consumers in an attempt to collect" debts, in

2    violation of the TCPA, the FDCPA, and the Rosenthal Act. (Dkt. No. 1, Complaint ¶ 1.)

3         Plaintiffs allege that defendant repeatedly called them on their cellular telephones using an

4    autodialer and/or an artificial or prerecorded voice. (*Id*. ¶¶ 2, 4, 6.) Plaintiffs further allege that

5    they did not provide defendant with prior express consent, and they specifically asked defendant to

6    stop calling. (*Id*.) Defendant allegedly called McMillion thirty-three times, Adekoya forty-five

7    times, and Perez four times. (*Id*. ¶¶ 3, 5, 7.) The complaint further alleges that several consumer

8    complaints have been filed against defendant regarding similarly unsolicited robocalls and

9    autodialed calls. (*Id*. ¶ 38.)

10        To make these calls, plaintiffs offer evidence indicating that defendant employs three

11   Dialers, namely, the (i) DAKCS/VIC Software System ("DAKCS/VIC"), (ii) Global Connect

12   system ("Global Connect"), and (iii) TCN. (Dkt. No. 46-6, Deposition of Steven Kizer ("Kizer

13   Dep.") at 55:6–56:12.) The DAKCS/VIC dialer can allegedly dial eighty phone numbers per

14   minute, and the Global Connect dialer can dial approximately 60,000 phone numbers in a twelve-

15   hour period. (*Id*. at 99:12–100:12.) Plaintiffs allege thus regarding defendant's business practices

16   related to defendant's debt collection calls:

17        Defendant generally receives debt-accounts from creditors. (*Id*. at 45:19–47:17.) While

18   some of these accounts include debtors' phone numbers—such individuals are excluded from the

19   class definitions as set forth above—defendant receives many accounts without any telephone

20   numbers at all. (*Id*. at 47:23–48:1.) For these accounts, defendant uses a process referred to as

21   "skip tracing" to obtain phone numbers associated with the names on the accounts. (*Id*. at 83:3–

22   84:20; 91:9–92:6.) "Skip tracing" is a "method or process for locating individuals for the purpose

23   of contacting them," using "data analysis of personal information obtained from various and

24   multiple public and private databases." (Declaration of Randall A. Snyder ("Snyder Decl."), Dkt.

25   No. 46-7, at ¶¶ 58–60.) According to plaintiffs, accounts where phone numbers were obtained

26   through skip tracing are marked with a unique status code and are, therefore, readily identifiable.

27   (Kizer Dep. Tr. 86:7–9; 90:13–90:24.) At times, this process would produce a phone number not

28   connected to any individual for whom defendant had a debt account from a creditor. Yet,

United States District Court
Northern District of California

1    defendant would often call these numbers despite not having any accounts related to those

2    individuals.

3    **III.**    **LEGAL STANDARD**

4        A party seeking summary judgment bears the initial burden of demonstrating the absence

5    of a genuine issue of material fact as to the basis for the motion. *Celotex Corp. v. Catrett*, 477

6    U.S. 317, 323 (1986). Material facts are those that might affect the outcome of the case.

7    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is

8    "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving

9    party. *Id.*

10        Where the moving party has the burden of proof at trial, it "must affirmatively demonstrate

11    that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty*

12    *Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). If the moving party meets its initial burden, the

13    opposing party must then set out specific facts showing a genuine issue for trial in order to defeat

14    the motion. *Anderson*, 477 U.S. at 250; *Soremekun*, 509 F.3d at 984; *see* Fed. R. Civ. P. 56(c), (e).

15    The opposing party's evidence must be more than "merely colorable" and must be "significantly

16    probative." *Anderson*, 477 U.S. at 249–50. Further, the opposing party may not rest upon mere

17    allegations or denials of the adverse party's evidence, but instead must produce admissible

18    evidence showing a genuine dispute of material fact exists. *See Nissan Fire & Marine Ins. Co.,*

19    *Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). "Disputes over irrelevant or

20    unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac.*

21    *Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

22        Nevertheless, when deciding a summary judgment motion, a court must view the evidence

23    in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor.

24    *Anderson*, 477 U.S. at 255; *Hunt v. City of Los Angeles*, 638 F.3d 703, 709 (9th Cir. 2011). A

25    district court may only base a ruling on a motion for summary judgment upon facts that would be

26    admissible in evidence at trial. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 385 (9th Cir. 2010);

27    Fed. R. Civ. P. 56(c).

28

United States District Court
Northern District of California

## IV. DISCUSSION

The Court will first address whether defendant's Dialers constitute ADTSs within the meaning of the TCPA. Next, the Court will analyze whether triable issues exist with regard to each plaintiff's express prior consent. The Court will then turn to defendant's challenge to plaintiffs' individual FDCPA and Rosenthal Act claims. Finally, the Court will address defendant's Article III standing arguments.

### A. Automatic Telephone Dialing Systems

The TCPA defines ATDSs as "equipment which has the capacity – (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). Predictive Dialers, "unlike prior versions of automated dialing technology [that] created and dialed 10-digit phone numbers arbitrarily . . . [employ] a stored database of numbers which could then be dialed at a rate to ensure that when a consumer answered the phone, a sales person would be available to take the call." *Hernandez v. Collection Bureau of Am., Ltd.*, 2014 WL 4922379, at *2 (C.D. Cal. 2014) (quoting 43 F.C.C. 2003, 1953 WL 83579, at 14092 ("2003 Federal Communication Commission ('FCC') Order")). The FCC and several district courts have "recognized that[,] technological advances aside, 'the basic function of such equipment . . . has not changed – the capacity to dial numbers without human intervention.'" *Id.*; *see Warnick v. Dish Network LLC*, 2014 WL 12537066, at *12 (D. Col. 2014); *Griffith v. Consumer Portfolio Serv., Inc.*, 838 F. Supp. 2d 723, 727 (N.D. Ill. 2011) (finding that even though the dialer at issue "cannot generate and dial random or sequential numbers, it is still an 'automatic telephone dialing system," because the dialer "automatically dials numbers stored in [a database of numbers] routes answered calls to available collectors"). "Therefore, because predictive dialers had the capacity to dial numbers without human intervention, the Commission concluded that they fell within the statutory definition of automatic telephone dialing system and the intent of Congress." *Id.*; *see also Warnick*, 2014 WL 12537066, at *12; *Griffith,* 838 F. Supp. 2d at 727. In 2008, the FCC issued a declaratory ruling affirming the 2003 FCC Order. *See id.* (citing *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, CG Dkt. No. 92-90, 23 FCC Rcd. 559 (2008) ("2008 FCC Ruling")). Interpreting

Case 4:16-cv-03396-YGR   Document 367   Filed 05/18/2018   Page 1 of 158

1   the 2008 FCC Ruling, the Ninth Circuit held in *Meyer* that "predictive dialers fall squarely within

2   the FCC's definition of 'automatic telephone dialing system.'"  *Meyer v. Portfolio Recovery*

3   *Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012).

4          The record reflects that defendants used three dialers during the class period, namely (i)

5   DAKCS/VIC, (ii) Global Connect, and (iii) TCN.  Plaintiffs offer the testimony of Rash Curtis

6   executives who state DAKCS/VIC and TCN are predictive dialers.  (Dkt. No. 139-2, Declaration

7   of Yeremy Krivoshey ("Krivoshey Decl."), Ex. 1, Deposition of Daniel Correa ("Correa Dep.") at

8   23:10-13 (DAKCS/VIC dialer), 30:9-21 (TCN dialer); Ex. 2, Deposition of Nick Keith ("Keith

9   Dep.") at 26:22-27:11 (DAKCS/VIC dialer).)  With regard to Global Connect, plaintiffs proffer

10  that Global Connect offers "predictive" functionality and enables defendant to make ten

11  simultaneous calls per agent to reach "thousands of contacts within minutes."  (Dkt. No. 46-4,

12  Declaration of Randall A. Snyder ¶ 39, Ex. C; Krivoshey Decl., Ex. 9.)  Further, defendant's

13  advertising materials highlight that Rash Curtis uses "predictive dialers" to increase productivity.

14  (Krivoshey Decl. Ex. 9 at 8; Ex. 12 at 18.)  Accordingly, defendant's Dialers "fall squarely within

15  the FCC's definition of 'automatic telephone dialing system.'"  *Meyer*, 707 F.3d at 1043.

16          Defendant counters that this case should be stayed on the ground that the Ninth Circuit

17  deferred submission on the issue of whether a predictive dialer constitutes an ATDS in *Marks v.*

18  *Crunch San Diego, LLC*, Case No. 14-56834 (9th Cir. 2016), pending the D.C. Circuit's decision

19  in *ACA International v. Federal Communications Commission, et al.,* No. 15-1211 (argued on

20  October 19, 2016).  *ACA International* concerns a a related issue, namely whether the 2003 FCC

21  Order and 2008 FCC Ruling which indicate that predictive dialers constitute ATDSs are unlawful

22  on due process grounds and under the Administrative Procedure Act.  (Dkt. No. 159.)

23          Rash Curtis does not persuade.  First, defendant offers no explanation as to why it waited

24  until after plaintiffs incurred the costs of fact and expert discovery to seek a stay when the Ninth

25  Circuit's deferral in *Marks* occurred more than one year ago.  Second, the mere deferral of a case

26  does not displace the existing law on the issue of whether predictive dialers constitute ATDSs.

27  Third, even if the FCC's Orders are overturned, defendant could still face liability if plaintiffs

28

United States District Court
Northern District of California

1  show that defendant made calls using prerecorded messages or artificial voices which are not at

2  issue in *ACA International*.

3      Defendant further argues that *ACA International* implicates another issue in this case,

4  namely the meaning of "called party" under the TCPA. While the Ninth Circuit has not addressed

5  the definition of "called party" under section 227(b)(1)(A), district courts in this circuit have

6  generally rejected the "intended recipient" definition proffered by defendant here. *See Olney v.*

7  *Progressive Cas. Ins. Co.,* 2014 WL 294498, at \*3 (S.D. Cal. 2014); *Jordan v. Nationstar*

8  *Mortgage LLC*, 2014 WL 5359000, at \*12 (N.D. Cal. 2014) (describing a brief history of how the

9  federal courts have interpreted the term "called party" to conclude that continuing a stay would

10  unnecessarily delay the case). Likewise, the Courts of Appeal in the Seventh and Eleventh

11  Circuits have held that "called party" means current subscriber, not "intended recipient." *See*

12  *Soppet v. Enhanced Recovery Company., LLC,* 679 F.3d 637, 643 (7th Cir. 2012); *Osorio v. State*

13  *Farm Bank, F.S.B.,* 2014 WL 1258023, at \*7 (11th Cir. 2014). Nothing about the interpretation of

14  this statutory term appears to require any special expertise. The fact that numerous courts have

15  interpreted the term "called party" weighs against a stay.

16      Accordingly, Defendant's motion to stay the case is **DENIED**. Plaintiffs' motion for

17  summary judgment as to defendant's Dialers is **GRANTED** and the Court holds that Rash Curtis'

18  Dialers constitute ATDSs within the meaning of the TCPA.

19      **B.    Prior Express Consent**

20      The Ninth Circuit has held that "prior express consent is a complete defense to [a] TCPA

21  clam." *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017). Defendant

22  argues that plaintiffs' TCPA claims fail as a matter of law because each plaintiff provided express

23  prior consent. Plaintiffs disagree arguing that as a matter of law each plaintiff (i) did not provide

24  express prior consent, and/or (ii) revoked consent prior to receiving certain calls. The Court

25  addresses the parties' arguments with respect to each plaintiff.

26      1.    McMillion

27      Defendant offers evidence that plaintiff McMillion voluntarily provided her cell phone

28  number ending in 0589 to Marin General Hospital ("Marin General") on several occasions. (Keith

United States District Court
Northern District of California

8

United States District Court
Northern District of California

Decl. ¶ 3, Ex. 4; Dkt. No. 140, Declaration of Mark E. Ellis ("Ellis Decl.") ¶ 4, Ex. 5, Deposition of Sandra McMillion ("McMillion Dep.") at 44:615, 92:9-93:3, 93:16-22, 94:2-8, 94:16-18, 95:105.) The record reflects that Rash Curtis obtained McMillion's cell phone ending in 0589 from Marin General which was defendant's client. (Keith Decl. ¶ 18, Ex. 3.)

Plaintiffs concede that defendant "initially had prior express consent to call McMillion." (Dkt. No. 151 at 6.) Accordingly, the Court **GRANTS IN PART** defendant's motion for partial summary judgment and holds that Rash Curtis had prior express consent with regard to calls received on or prior to February 2, 2016.

However, plaintiffs assert that McMillion revoked consent and was subsequently called by defendant on at least two occasions, namely on February 16, 2016 and February 17, 2016.[5] Plaintiffs proffer Rash Curtis' account notes for February 2, 2016, which state that McMillion "ASKED FOR NO MORE CALLS AT ALL SHE HAS A ATTY SO I ASKED FOR HIS INFO SHE SAID DNC [do not call] ME AGAIN [] AND REMOVE ALL NUMBER." (Krivoshey Decl. Ex. 18 at RCA000227 (capitalization in original).) Further, plaintiffs offer Rash Curtis call logs which show that McMillion's cellphone was called by Global Connect on February 16, 2016 and again on February 17, 2016.[6] (*Id.* at RCA000227.)

---

[5] Defendant asserts that these two calls are not at issue because they were "never expressly listed" in plaintiffs' complaint. (Dkt. No. 152 at 6.) Defendant makes similar arguments with regard to calls made to Adekoya and Perez which were not specifically listed in the complaint. Defendant does not persuade, as the complaint states that defendant called McMillion, Adekoya, and Perez "at least" on the dates specifically listed in the complaint. The complaint does not indicate that the lists are exhaustive. These additional calls are simply new facts supporting plaintiffs' claims and do not constitute a new theory of liability or an attempted amendment. *See Rezaipour v. County of Los Angeles*, 2014 WL 12674923, at *5 (C.D. Cal. 2014) (considering "new facts" at summary judgment where "the new facts are also logically related to those related in the [complaint]"); *McHenry v. Ford Motor Co.*, 269 F. 2d 18, 25 (6th Cir. 1959) ("As a general rule plaintiffs should be liberally allowed to set up new facts which really are part of the original case.")

[6] Defendant argues in passing that that it had consent to make these calls because it received another account from Marin General on February 15, 2016, which was associated with McMillion. However, the record reflects that this account was related to a debt incurred on September 2, 2015, which was six months before McMillion allegedly revoked consent. Defendant makes no showing that McMillion's alleged revocation of consent was limited to a specific debt account.

United States District Court
Northern District of California

1    Defendant counters that McMillion incurred a new debt from Marin General on June 27,

2    2016, and never revoked consent to be called with regard to that debt. This debt was referred to

3    Rash Curtis on December 10, 2016. Plaintiffs argue that the filing of this lawsuit which seeks

4    damages and injunctive relief constitutes revocation of consent to be called by defendant in

5    connection with *all* debts. Defendant was served on June 27, 2016. The Court finds that the

6    service of plaintiffs' complaint effectively revoked consent to be called by Rash Curtis regarding

7    all debts which McMillion allegedly owed.

8    Accordingly, the Court **GRANTS IN PART** plaintiff's motion for partial summary judgment

9    with regard to calls received after February 2, 2016.

10                      2.      Adekoya

11    Adekoya provided her cell phone number ending in 5496 to Doctors Medical Center (the

12    "DMC") in San Pablo, California, in connection with treatment administered to her minor son on

13    January 5, 2015. (Keith Decl. ¶ 23, Ex. 8 at RCA 264; Ex. 9 at RCA 265.) According to

14    defendant, Adekoya became indebted to the DMC in connection which the treatment of her son

15    and the DMC referred the debt to Rash Curtis. (*Id.*)

16    Plaintiffs proffer Rash Curtis' audio call files which reflect that Adekoya revoked consent

17    on April 18, 2016. During that call, Adekoya stated that "I believe you sent something to my

18    mom already. I told you guys to stop called me, but you guys keep calling me . . . . I asked you

19    nicely to stop calling and that I didn't have anything that you needed at the moment but if I do []

20    come across it I'll definitely give you guys a call. But you guys are not supposed to be contacting

21    me."[7]  (Dkt. No. 151-4 at 6:18–6:44.) Defendant's representative replied that she didn't "see

22    where we've got down not to call you." (*Id.* at 6:46-6:52.) Adekoya responded that she had "been

23    saying that for a long time" and that another Rash Curtis representative "called my job. She's not

24    supposed to do that at all. That could get me terminated and then how am I supposed to pay any

25

26    [7] Defendant argues that Adekoya's alleged revocation applied only to her own debt and not
      to a separate debt incurred by Adekoya's mother. However, the record does not support a finding
27    that Adekoya's alleged revocation of consent was limited to her own debt as her request to "stop
      calling me" does not appear ambiguous or equivocal. In any event, as noted above Adekoya
28    specifically references contacts with regard to her mother.

United States District Court
Northern District of California

1   bill? That's not something that should be happening so definitely she went too far." (*Id.* at 6:52-
2   7:22.) Further, plaintiffs offer defendant's records which show that defendant called Adekoya's
3   cellphone on April 27, 2016, and again on April 28, 2016. (*Id.* ¶ 21.)

4       Defendant counters that to revoke consent a plaintiff must "clearly express his or her desire
5   not to receive further calls." *Van Patten*, 847 F.3d at 1048 (quoting *In re Rules & Regulations*
6   *Implementing the Telephone Consumer Protection Act of 1991*, 30 F.C.C. Rcd. 7961, 7997 ¶ 67
7   (July 10, 2015)). The Court has reviewed the audio file of the April 18, 2016, call and finds that
8   Adekoya "clearly express[ed] . . . her desire not to receive further calls." *Id.* Accordingly, the
9   Court **GRANTS IN PART** plaintiff's motion for partial summary judgment as to whether defendant
10  had prior express consent to call Adekoya with regard to calls received after April 18, 2016. By
11  contrast, in light of defendant's unrebutted showing that Rash Curtis had express consent to call
12  Adekoya prior to the call quoted above, the Court **GRANTS IN PART** defendant's motion for
13  summary judgment as to calls received on or prior to April 18, 2016.

14          3.      Perez

15      Perez alleges four calls in violation of the TCPA to his cell phone number ending in 5193.
16  (Complaint ¶ 7.) According to defendant, non-party Daniel Reynoso voluntarily provided a cell
17  phone ending in 5193 to Sutter General Hospital ("Sutter"). (Keith Decl. ¶ 26, Ex. 15.) Sutter
18  then provided that number to Rash Curtis.[8] (Keith Decl. ¶ 26, Ex. 15.) Defendant argues that this
19  constitutes prior express consent to call the cell phone ending in 5193 regardless of the account
20  holder.

21      Defendant does not persuade. First, defendant concedes that that Rash Curtis "was
22  attempting to reach a different individual when it called Mr. Perez's cell phone number," namely
23  Reynoso. (Dkt. No. 71 at 3; 71-2, Ex. 6.) During his deposition, Perez testified that he had never

24  _____

25      [8] Rash Curtis offers the testimony of Perez who states that on several occasions he
    voluntarily provided his cell phone number ending in 5193 to Sutter. (Ellis Decl. ¶ 6, Ex. 17,
26  Deposition of Ignacio Perez ("Perez Dep.") at 49:9-24, 50:12-51:7.) However, defendant does not
    dispute that Perez provided this number to Sutter in connection with treatment which did *not* result
27  in a debt and which was never referred to defendant for the purposes of debt collection. (Dkt. No.
    152-7 at No. 21.)
28

11

Case 4:16-cv-02396-YGR   Document 367   Filed 05/18/2018   Page 146 of 158

United States District Court
Northern District of California

1    heard of Reynoso.  (Perez Dep. at 46:19-25, 48:18-49:6.)  Second, the Court reaffirms its previous

2    rejection of defendant's argument:

3           Perez's provision of his phone number was not in connection with any particular
            debt owed by Perez.  Rather, Sutter [] referred a debt account associated with
4           another individual.  Sutter [] then allegedly forwarded to defendant that
            individual's patient information sheet at some point, which included a cell phone
5           number that belonged to Perez.  *That sequence of events does not constitute prior
            express consent.*
6

7    (Order Granting Plaintiffs' Motion for Class Certification at 10 (emphasis supplied).)  As in

8    *Meyer*, *supra*, "prior express consent is consent to call a particular telephone number *in connection*

9    *with a particular debt* that is given before the call in question is placed."  *See Meyer*, 707 F.3d at

10   1042 (emphasis supplied).  Here, it is undisputed that defendant did not call Perez "in connection

11   with a particular debt" owned by Perez.  Rather, the calls were in connection with a debt

12   apparently owed by non-party Reynoso.  Accordingly, the Court **GRANTS** plaintiffs' motion for

13   partial summary judgment and holds that defendant lacked prior express consent to call Perez.[9]

14

15          [9] Plaintiffs move to strike Exhibits 18 and 19 to the declaration of Bob Keith which was
     filed on January 8, 2018.  (Dkt. No 140, Declaration of Bob Keith ("Bob Keith Decl."), Exs. 18
16   and 19.)  According to Keith, Exhibit 18 "is a screenshot of an 'ECA Advanced Trace Report'"
     and "does not show a phone number ending in 5193" which is the number associated with plaintiff
17   Perez.  (*Id.* ¶ 12.)  Exhibit 19 is a screenshot of a defendant's "'Edit Tracking Report' for Daniel
     Reynoso's account." (*Id.* ¶ 13.)  Defendant argues that these reports show that Perez's number was
18   not skip-traced and therefore Perez cannot meet the class definition.
            Plaintiffs aver that these exhibits should be stricken pursuant to Fed. R. Civ. Pro. 37(c)(1)
19   because defendant failed to "provide [this] information as required by Rule 26(a)."  Specifically,
     plaintiffs proffer evidence that defendant represented on May 8, 2017, that no "ECA reports were
20   generated for . . . Perez."  (Dkt. No. 151, Ex. 38.)  Counsel further represented on May 8, 2017,
     that plaintiffs "already have everything which my client can produce in this regard." (*Id.*)
21          Defendant counters that these reports were generated for Reynoso, not for Perez.  Rash
     Curtis does not persuade.  The Court finds defendant's representation that plaintiffs "already [had]
22   everything that [Rash Curtis] can produce" in regard to ECA Advanced Trace and Edit Tracking
     Reports relevant to Perez's claims inconsistent with defendant's current position that Exhibits 18
23   and 19 "conclusively establish that Mr. Perez's 5194 number was not skip-traced." Accordingly,
     the Court **STRIKES** Exhibits 18 and 19 to the declaration of Bob Keith.
24          Plaintiffs also move to strike Exhibit 14 which an ECA Advanced Trade Report for
     plaintiff Adekoya pursuant to (i) Federal Rule of Evidence 1002, (ii) the best evidence rule, and
25   (iii) defendant's production of these exhibits three days after plaintiffs deposed defendant's
     30(b)(6) witness.  The Court previously warned defendant that "delaying and sandbagging tactics"
26   would not be tolerated and would result in monetary and/or evidentiary sanctions.  (Order
     Granting Plaintiffs' Motion for Class Certification at 9 n.9.)  Accordingly, Exhibit 14 is hereby
27
28

                                                    12

### C.     Fair Debt Collection Practices Act

Under Section 1692d of the FDCPA, a "debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." 15 U.S.C. § 1692d. Further, pursuant to Section 1692e, a "debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." *Id*. § 1692e. The FDCPA enumerates sixteen specific types of conduct which constitute violations of Section 1692e, including failure to disclose during the "initial communication with the consumer . . . that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in subsequent communications that the communication is from a debt collector." *Id*. § 1692e(11). The term "'consumer' means any natural person obligated or allegedly obligated to pay any debt." *Id*. § 1692a(3).

#### 1.     Section 1692d

The Court finds that plaintiffs' Section 1692d claims fail because plaintiff fail to show that defendant "acted with the requisite 'intent to annoy, abuse, or harass' in making the telephone calls at issue." *Saltzman v. I.C. System, Inc.*, 2009 WL 3190359 (E.D. Mich. 2009). "Although the term 'harass' is not defined in the FDCPA, the Act's legislative history sheds light on what abusive practices violate § 1692d: obscene or profane language, threats of violence, telephone calls at unreasonable hours, misrepresentation of a consumer's legal rights, disclosing a

---

**STRICKEN.**

Finally, plaintiffs seek to exclude the testimony of Mr. Keith and Mr. Paff which indicates that none of defendant's Dialers "contain an active random or sequential number generator which can dial numbers" on the ground that neither is qualified as an expert in the field and, in any event, they have not stated the basis for their opinions. (Keith Decl. ¶ 32; Declaration of Chris Paff, ("Paff Decl.") ¶ 2.) Plaintiffs do not persuade, as Mr. Keith serves as defendant's Collection Manager and Mr. Paff has served as Collection Manager and is currently President of Operations. Both testify that through their work at Rash Curtis they are familiar with the "collection policies and procedures used by Rash Curtis during the relevant time periods, including the collection communications made" to plaintiffs. (Keith Decl. ¶ 2; Paff Decl. ¶ 2.) The declarants' first-hand professional experience provides a sufficient basis for them to testify regarding the capabilities and functionality of defendant's Dialers. Plaintiffs' motion in this regard is **DENIED.**

13

United States District Court
Northern District of California

1  consumer's personal affairs to friends, neighbors, or an employer, obtaining information about a

2  consumer through false pretense, impersonating public officials and attorneys, and simulating

3  legal process." *Christy v. EOS CCA*, 905 F. Supp. 2d 648, 654 (E.D. Pa. 2012) (citing S.Rep. No.

4  95–382, at 2; 1977 U.S.C.C.A.N. 1695, 1696)).  Several district courts have granted summary

5  judgment in favor of a debt collector defendant on the ground that plaintiffs failed to show that

6  defendant "placed each of its telephone calls with [the] intent to . . . harass or annoy." *Tucker v.*

7  *The CBE Group Inc.*, 710 F. Supp. 2d 1301, 1305-1306 (M.D. Fla. 2010); *see also Chavious v.*

8  *The CAE Group*, 2012 WL 113509, at *2 (E.D.N.Y. 2012); *Jones v. Rash Curtis*, 2011 WL

9  2050185, at *2-3 (N.D. Cal. 2011); *Lynch v. Nelson, Watson & Assoc.*, LLC, 2011 WL 2472588

10 (D. Kan. 2011); *Carmen v. CBE Group,* 782 F. Supp. 2d 1223, 1232 (D. Kan. 2011); *Waite v.*

11 *Financial Recovery Services, Inc.*, 2010 WL 5209350, *3, 6 (M.D. Fla. 2010).

12       Here, plaintiffs' complaint alleges that defendant called them four (Perez), 33 (McMillion),

13 and 45 times (Adekoya), respectively, and that such calls were made with "the intent to annoy and

14 harass." (Complaint ¶¶ 3, 5, 7, 25, 30, 36.)  The Court finds that plaintiffs' allegations are

15 insufficient to create a triable factual issue at this juncture.  First, the majority of cases cited above

16 involved a *greater* number of calls than plaintiffs allege here. *See Carmen,* 782 F. Supp. 2d at

17 1232 (149 calls); *Lynch*, 2011 WL 247588 at *2 (86 calls); *Jones*, 2011 WL 2050185 at * 2-3 (179

18 calls); *Waite*, 2010 WL 5209350, at *3, 6 (132 calls).  Second, plaintiffs cite "no evidence in the

19 record from which a reasonable trier of fact could infer that [d]efendant acted with the requisite

20 *intent* to annoy or harass in making the telephone calls at issue."[10]  *Saltzman*, 2009 WL 3190359,

21 at *7 (emphasis supplied).  Although plaintiffs offer evidence that they requested Rash Curtis to

22 stop calling them, plaintiffs did "not send [Rash Curtis] a cease and desist letter,[11] dispute the

23 amount owed, or provide evidence that [Rash Curtis] has acted in a manner that would be

24

25       [10] The fact that McMillion was suffering from a serious illness does not establish
26  defendant's *intent* to harass or annoy.  Similarly, the mere fact that defendant allegedly called
   McMillion and Perez more than once on certain days is insufficient to establish the intent element.

27       [11] Even though a lawsuit was filed, virtually all of the conduct at issue occurred before
28  Rash Curtis was served.

United States District Court
Northern District of California

1 actionable as harassment, oppression or abuse." *Id*.  Further, plaintiffs present no evidence that

2 defendant "called [plaintiffs] immediately after [plaintiffs] hung up . . . [or] called at odd hours."

3 *Arteaga v. Asset Acceptance, LLC*, 733 F. Supp. 2d 1218, 1239 (E.D. Cal. 2010).

4      In light of the legislative history of the Section 1692d and district court decisions

5 interpreting the same, the Court **GRANTS** defendant's motion for partial summary judgment as to

6 plaintiffs' claims under 15 U.S.C. § 1692d.

7         2.    Section 1692e(11)

8      Defendant also argues that it is entitled to summary judgment with regard to Perez's

9 FDCPA claim under Section 1692e(11) because plaintiffs concede that Perez was not obligated to

10 pay any debt referred to defendant for collection and is thus not a "consumer" within the meaning

11 of the FDCPA.  (Perez Dep. at 29:4-30:16.)  As noted Section 1692e(11) applies to "consumers"

12 which the FDCPA defines as "any natural person obligated or allegedly obligated to pay any

13 debt." 15 U.S.C. § 1692a(3). The Court finds that Perez does not qualify as a "consumer" as

14 defined under the FDCPA because Perez was "not obligated on the [Rash Curtis] debt.  Further, he

15 is not the debtor's spouse, guardian, executor, or administrator."  *Christy*, 905 F. Supp. 2d. at 653

16 (internal quotations omitted).  Therefore, the Court **GRANTS** defendant's motion for partial

17 summary judgment on Perez's claim under 15 U.S.C. § 1692e(11).[12]

18     **D.**    **Rosenthal Act**

19      The Rosenthal Act prohibits debt collectors from "(d) Causing a telephone to ring

20 repeatedly or continuously to annoy the person called; or (e) Communicating, by telephone or in

21 person, with the debtor with such frequency as to be unreasonable and to constitute an harassment

22 to the debtor under the circumstances."  Cal. Civ. Code § 1788.11(d), (e).  Under Section 1788.11,

23 a "communication" requires "actual contact between the debt collector and the debtor." *Krapf v.*

24 *Nationwide Credit Inc.*, 2010 WL 2025323, at *4 (C.D. Cal. 2010).

25

26

27     [12]  At the hearing held on January 30, 2018, plaintiffs' counsel conceded that Perez could not proceeded on his claim under 15 U.S.C. § 1692e(11).  To the extent that plaintiffs seek

28 recovery under Section 1788.11(b) and 1692d(6), the Court declines to address those claims as they were never pled.

Case 4:16-cv-03396-YGR   Document 337   Filed 05/28/2018   Page 150 of 158

1    The Court finds that Perez fails to make a sufficient showing show that defendant's "actual

2    contact" was "with such frequency as to be unreasonable and to constitute [] harassment to the

3    debtor under the circumstances." *Id.*; Cal. Civ. Code § 1788.11(e).   As noted Perez alleges only

4    four calls.  Therefore, the Court **GRANTS** defendant's motion for partial summary judgment as to

5    the Section 1788.11(e) claims of plaintiff Perez.

6    By contrast, plaintiff McMillion has proffered evidence sufficient to establish a triable with

7    regard to her claim under Section 1788.11(e).  Specifically, McMillion testified that she spoke

8    with Rash Curtis as many as thirty times and that she obtained professional medical help to deal

9    with the stress which defendant's automated calls caused her.  (McMillion Dep. at 29:9-27:22,

10   72:7-74:19, 81:23- 82:20.)  Defendant counters that the testimony of McMillion is not credible

11   because it is inconsistent with Rash Curtis' call records.  Defendant does not persuade, as the

12   discrepancy between McMillion's testimony and defendant's call records reflects a disputed issue

13   of material fact.  Further, whether thirty instances of actual contact are "unreasonable and []

14   constitute an harassment to the debtor under the circumstances" presents a triable issue.

15   Similarly, Adekoya proffers sufficient evidence to establish a triable issue as to her claim

16   under Section 1788.11(e).  Specifically, the record reflects that defendant called Adekoya twice

17   per day on at least a dozen occasions, and three times on May 27, 2015.  (Dkt. No. 151, Fisher

18   Decl., Ex. 22.)  Further, plaintiffs proffer evidence that defendant called her at work on March 16,

19   2016, after Adekoya specifically asked defendant not to do so, and sent a fax to her work also after

20   Adekoya specifically asked defendant not to do so.  (*Id.*, Ex. 31 at 3:07, 7:05; Ex. 36 at 1:08,

21   1:30.)

22   Defendant's final point that plaintiffs' Rosenthal Act claims does not persuade because

23   plaintiffs' "medical debt" does not constitute a "consumer credit transaction" under the Rosenthal

24   Act also fails.  "Credit" is defined as the "time that a seller gives the buyer to make the payment

25   that is due." Black's Law Dictionary (10th ed. 2004.)  "Consumer credit" is defined as credit

26   "extended to an individual to facilitate the purchase of consumer goods and services."[13]  *Id.*  Here,

27

28   [13] "Consumer goods" are undefined in Black's Law Dictionary, but are defined in the Uniform Commercial Code as "goods that are used or bought for use primarily for personal,

1   plaintiffs obtained medical services from various healthcare providers without immediate

2   payment. Stated another way, the medical providers afforded plaintiffs "time . . . to make the

3   payment that is due" and therefore extended "credit." Finally, the medical services at issue were

4   used for personal and family purposes, namely maintaining the health of plaintiffs and their

5   families. Giving the plain meaning to the statutory terms, the transaction here falls within the

6   purview of "consumer credit transaction."

7   Accordingly, the Court **DENIES** defendant's motion for partial summary judgment as to the

8   Section 1788.11(e) claim of plaintiffs McMillion and Adekoya.

9       **E.    Article III Standing**

10          1.    Legal Standard

11   The constitutional standing doctrine "functions to ensure, among other things, that the

12   scarce resources of the federal courts are devoted to those disputes in which the parties have a

13   concrete stake." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 191

14   (2000). This "case or controversy" requirement is jurisdictional and cannot be waived. *City of*

15   *L.A. v. Cty. of Kern*, 581 F.3d 841, 845 (9th Cir. 2009). The party asserting federal jurisdiction

16   must carry the burden of establishing standing under Article III. *DaimlerChrysler Corp. v. Cuno*,

17   547 U.S. 332, 341 (2006).

18   The Supreme Court has held that the "'irreducible constitutional minimum' of standing

19   consists of three elements." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May

20   24, 2016) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992)). "The plaintiff must

21   have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the

22   defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan*,

23   504 U.S. at 560-561; *Friends of the Earth,* 528 U.S. at 180–181.) "To establish injury in fact, a

24   plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is

25   'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at

26   1548 (quoting *Lujan*, 504 U.S. at 560). "For an injury to be 'particularized,' it 'must affect the

27

28   _____

family, or household purposes." UCC § 9-102(23).

17

United States District Court
Northern District of California

United States District Court
Northern District of California

1  plaintiff in a personal and individual way.'" *Id.* (quoting *Lujan*, 504 U.S. at 560 n.1).

2  "Particularization is necessary to establish injury in fact, but it is not sufficient. An injury

3  in fact must also be 'concrete.'" *Id.* "A 'concrete' injury must be '*de facto*'; that is, it must

4  actually exist." *Id.* (Emphasis in original.) However, a "concrete" injury need not be "tangible."

5  *Id.* at 1549. For example, intangible harm may nevertheless be concrete where the intangible harm

6  "has a close relationship to a harm that has traditionally been regarded as providing a basis for a

7  lawsuit in English or American courts." *Id.* at 1549. Further, "Congress may 'elevat[e] to the

8  status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in

9  law.'" *Id.* (quoting *Lujan*, 504 U.S. at 578).

2.  Discussion

11  Defendants attack plaintiffs' Article III standing with regard to plaintiffs' claims under the

12  TCPA and FDCPA. The Court addresses each.

a.  TCPA Claims

14  According to Rash Curtis, plaintiffs lack standing with regard to their TCPA claims

15  because plaintiffs fail to allege "injury in fact" as a result of defendant's telephone calls. (Dkt. No.

16  140, Defendant's MSJ at 32.) Specifically, defendant argues that plaintiffs' alleged TCPA

17  violations are insufficient to establish an "invasion of a legally protected interest" which is

18  "actual" and not "conjectural or hypothetical."

19  Defendant relies primarily on *Romero v. Dep't Stores Nat'l Bank*, 199 F. Supp. 3d 1256,

20  1262 (S.D. Cal. 2016), which held that a TCPA violation was insufficient to satisfy the "concrete"

21  requirement of Article III. Defendant does not persuade, as *Romero* is distinguishable.[14] There,

22

23  [14] Further, the Court notes that *Romero* does not constitute binding precedent and has been
criticized by more than a dozen district courts. *See, e.g., Abante Rooter & Plumbing, Inc. v.*

24  *Pivotal Payments, Inc.*, 2017 WL 733123, at *7 (N.D. Cal. 2017) (finding that the reasoning of
*Romero* was not consistent with *Spokeo*); *DeClue v. United Consumer Fin. Servs. Co.*, 2017 WL

25  1400144, at *3 (S.D. Cal. 2017); *United States v. Dish Network LLC*, 256 F. Supp. 3d 810, 820
(C.D. Ill. 2017); *LaVigne v. First Cmty. Bancshares, Inc.*, 215 F. Supp. 3d 1138, 1147 (D.N.M.

26  2016) (the "draconian analysis" of *Romeo* "ignores the existence of intangible harms that have
been recognized in the legislative history and in the case law" and represents "an outlier in holding

27  that a violation of the TCPA is a bare *procedural* violation and that some additional harm must be

28  shown to establish standing") (emphasis in original); *Smith v. Blue Shield of California Life &*

18

the court found that it was "possible that the recipient's phone was not turned on or did not ring, that the recipient did not hear the phone ring, or the recipient for whatever reason was unaware that the call occurred." *Id.* Here, by contrast, the record reflects that plaintiffs answered defendant's calls.[15]

In any event, the Ninth Circuit specifically recognized in *Satterfield* that the "TCPA was enacted to 'protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home.'" *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009) (quoting S.Rep. No. 102–178, at 1, 2 (1991), *reprinted in* 1991 U.S.C.C.A.N. 1968) (internal citations omitted)). The *Satterfield* Court further stated that the "TCPA was enacted in response to an increasing number of consumer complaints arising from the increased number of telemarketing calls. The consumers complained that such calls are a 'nuisance and an invasion of privacy.'" *Id.* The Court thus finds plaintiffs' showing sufficient to satisfy the "concrete" injury requirement of Article III and **DENIES** defendant's motion to for summary judgment as to plaintiffs' TCPA claims based on lack of standing.[16]

---

*Health Ins. Co.*, 228 F. Supp. 3d 1056, 1062 (C.D. Cal. 2017), *judgment entered,* 2017 WL 149798 (C.D. Cal. 2017) (agreeing with "those federal courts that have criticized [] *Romero*"); *Mbazomo v. Etourandtravel, Inc.*, 2016 WL 7165693 (E.D. Cal 2016) (rejecting the reasoning of *Romero*); *Wilkes v. CareSource Mgmt. Grp., Co.*, 2016 WL 7179298, at *5 (N.D. Ind. 2016).

[15] In any event, as stated in this Court's order granting plaintiff's motion for class certification, it "does not matter whether a plaintiff lacks additional tangible harms like wasted time, actual annoyance, and financial losses. Congress has identified that unsolicited telephonic contact constitutes an intangible, concrete harm." (Order Granting Plaintiffs' Motion for Class Certification at 7–8 (quoting *Nghiem v. Dick's Sporting Goods, Inc.*, 222 F. Supp. 3d 805, 811 (C.D. Cal. 2016)); *see also Smith v. Microsoft Corp.*, 2012 WL 2975712, at *6 (S.D. Cal. 2012).

[16] Defendant also argues that plaintiffs lack standing because plaintiffs have not suffered a "financial injury" as they "were not charged for any call." (Defendant's MSJ at 33.) This argument fails in light of *Spokeo* which held that intangible injuries can satisfy Article III's standing requirements.
Further, Rash Curtis asserts that plaintiffs cannot show that their injuries were "fairly traceable to the challenged conduct of the defendant" because each plaintiff "voluntarily provided his or her cell phone numbers." (*Id.*) Defendant's challenge is more aptly addressed as an argument that Rash Curtis is entitled to an affirmative defense of prior express consent, not as an attack on plaintiffs' Article III standing. In any event, as noted herein, defendant fails to establish as a matter of law that it is entitled to this defense. *See* Section II.B, *supra*.

19

United States District Court
Northern District of California

United States District Court
Northern District of California

1                      b.     FDCPA Claims

2         Defendant argues that plaintiffs lack standing for their FDCPA claims because plaintiffs

3 fail to allege "actual concrete harm" as a result of defendant's telephone calls. (Defendant's MSJ

4 at 32.) Rash Curtis relies primarily on *May*, which held that a "violation of the FDCPA alone . . .

5 does not automatically amount to an injury in fact." *May v. Consumer Adjustment Co., Inc.*, 2017

6 WL 227964, at \*4 (E.D. Mo. 2017.) Defendant does not persuade. As an initial matter, *May* is

7 not binding on this Court. Second, "successful post-*Spokeo* standing challenges to FDCPA claims

8 are a small minority" and "[m]any other recent district court opinions have also recognized that"

9 an FDCPA "violation, standing alone, creates a sufficiently concrete injury." *Byrne v. Oregon*

10 *One, Inc.*, 2017 WL 3568412 (D. Or. 2017), at \*6 (citing *Feldheim v. Fin. Recovery Serv., Inc.*,

11 2017 WL 2821550, at \*6 (S.D.N.Y. 2017) ("[M]aking a false statement in connection with an

12 attempt to collect a debt is sufficient harm for standing purposes. In other words, a plaintiff who

13 receives such a misrepresentation has suffered injury in precisely the form [§] 1692e of the

14 FDCPA was intended to guard against.") (citation and internal quotation marks omitted)).[17]

15 Accordingly, defendant's motion for summary judgment on plaintiff's FDCPA claims based on

16 lack of standing is **DENIED**.

17    //

18    //

19    //

20

21         [17]*See also Gonzalez v. Credit Prot. Ass'n, LP*, 2017 WL 2798404, at \*2 (N.D. Ill. 2017)
("Although any actual concrete injury to either of the Plaintiffs appears to be minimal, even
22 bordering on invisible . . . the type of violations of the FDCPA alleged in this case are sufficient to
confer Article III standing."); *Dunham v. Robert Crane & Assoc., LLC*, 2017 WL 2664287, at \*5
23 (S.D. Ind. 2017) ("[C]ourts routinely find that FDCPA violations establish concrete injuries for
standing purposes."); *Balke v. Alliance One Receivables Mgmt., Inc.*, 2017 WL 2634653, at \*3
24 (E.D.N.Y. 2017) ("[T]he Court finds that the Plaintiff's alleged failure to plead facts showing an
injury beyond the statutory violations themselves does not divest her of Constitutional standing to
25 maintain this action."); *Matute v. A.A. Action Collection Co., Inc.*, 2017 WL 2573714, at \*5 (D.
N.J. 2017); *Pogorzelski v. Patenaude & Felix APC*, 2017 WL 2539782, at \*5 (E.D. Wis. 2017);
26 *Kaiser v. Cascade Capital LLC*, 2017 WL 2332856, at \*5 (D. Or. 2017); *Hill v. Accounts
Receivable Servs., LLC*, 2016 WL 6462119, at \*4 (D. Minn. 2016) (stating that section 1692e
27 establishes a right to truthful information regarding the collection of a debt," the violation of
which constituted "real harms and not merely procedural violations"); *Bernal v. NRA Grp., LLC*,
28 318 F.R.D. 64, 71–73 (N.D. Ill. 2016) (holding that alleged violations of §§ 1692e and 1692f
constitute concrete injuries sufficient for Article III standing).

## V.   CONCLUSION

For the reasons discussed above, the Court **ORDERS** as follows:

1.   Plaintiffs' motion for partial summary judgment is **GRANTED** with regard to Rash Curtis' Dialers and the Court holds that the Dialers constitute ATDSs within the meaning of the TCPA.

2.   On the issue of McMillion's prior express consent, defendant's motion for partial summary judgment is **GRANTED** with regard to calls received on or prior to February 2, 2016; plaintiffs' motion is **GRANTED** as to calls after February 2, 2016.

3.   With regard to Adekoya's prior express consent, defendant's motion for partial summary judgment is **GRANTED** with regard to calls received on or prior to April 18, 2016; plaintiffs' motion is **GRANTED** as to calls received after April 18, 2016.

4.   Plaintiffs' motion for partial summary judgment on the issue of prior express consent with regard to Perez is **GRANTED.**

5.   Defendant's motion for partial summary judgment on plaintiffs' FDCPA claims is **GRANTED**.

6.   Defendant's motion for partial summary judgment on plaintiffs' Rosenthal Act claims is **GRANTED** as to plaintiff Perez and **DENIED** as to plaintiffs Adekoya and McMillion.

7.   Defendant's motion to dismiss plaintiffs' TCPA and FDCPA claims for lack of Article III standing is **DENIED**.

This Order terminates Docket Numbers 139–140, 153, 156.

**IT IS SO ORDERED.**

Dated: February 2, 2018

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

**EXHIBIT 2**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**IGNACIO PEREZ**,

            Plaintiff,

     v.

**RASH CURTIS & ASSOCIATES**,

            Defendant.

Case No. 16-cv-03396-YGR

**ORDER GRANTING MOTION TO ADVANCE HEARING DATE AND MOTION TO APPROVE THE OCTOBER 11, 2019 ASSIGNMENT**

Re: Dkt. Nos. 386, 387

The Court telephonically conferred with the parties on October 21, 2019. (*See* Dkt. No. 391.) The parties confirmed during this conference that defendant would not file an opposition with the Court on either the Motion to Approve the October 11, 2019 Assignment, (Dkt. No. 386) or to the Motion to Advance the Hearing Date on the Motion to Approve the October 11, 2019 Assignment. (Dkt. No. 387.) Any opposition to the Motion to Approve the October 11, 2019 Assignment under an advanced hearing date would have been due by October 22, 2019. No such responses were received.

Therefore, upon consideration of the parties' responses at the October 21, 2019 telephone conference and that no such opposition or objection was received, the Court advances the hearing date on the Motion to Approve the October 11, 2019. In light of no stated or received opposition and for the reasons stated in the Motion to Approve the October 11, 2019 Assignment, the Court finds it appropriate to approve the October 11, 2019 assignment, and further concludes that no hearing on the Motion to Approve the October 11, 2019 Assignment is necessary. *See* Civil Local Rule 7-1(b) ("In the Judge's discretion . . . a motion may be determined without oral argument.").

\\

\\

*United States District Court*
*Northern District of California*

1   Accordingly, the Court **GRANTS** the Motion to Advance the Hearing Date and **GRANTS** the

2   Motion to Approve the October 11, 2019 Assignment pursuant to Fed. R. Civ. P. 23(d)(1)(C),

3   subject to two conditions:

4       (1) Plaintiff, through Class Counsel, shall promptly notify the Court of the recovery, if

5          any, obtained on behalf of Class Members as a result of the Assignment; and

6       (2) Any recovery obtained as a result of the Assignment shall be held in trust until this

7          Court approves a fair, reasonable, and adequate method for distributing the proceeds of

8          the recovery to Class Members.

9   This Order terminates the motions at Docket 386 and 387.

10  **IT IS SO ORDERED.**

11  Dated: October 25, 2019

13  YVONNE GONZALEZ ROGERS
    United States District Judge

United States District Court
Northern District of California